# EXHIBIT A

ELECTRONICALLY FILED
8/31/2016 9:03 PM
2016-L-008689
CALENDAR: N
PAGE 1 of 14
CIRCUIT COURT OF
COOK COUNTY, ILLINOIS
LAW DIVISION
CLERK DOROTHY BROWN

**IN THE CIRCUIT COURT COOK COUNTY, ILLINOIS**
**COUNTY DEPARTMENT - LAW DIVISION**

| | |
|---|---|
| **CHRIS GUMINO,** Individually and as an Agent of Swype-Now, and **ACS CAPITAL PARTNERS, INC. D/B/A SWYPE-NOW,** An Illinois Corporation, )<br><br>  **Plaintiffs,** )<br><br>  **v.** )<br><br>  **FIRST DATA CORPORATION,** a Delaware Corporation, and **IGNITE PAYMENTS, LLC,** a registered Independent Sales Organization of Wells Fargo Bank, )<br><br>  **Defendants.** ) | **Jury Demand**<br><br>**Case No.:** |

## COMPLAINT AT LAW

NOW COME the Plaintiffs ACS CAPITAL PARTNERS, INC. D/B/A SWYPE-NOW and CHRISTOPHER GUMINO, by and through their attorneys, Parikh Law Group, LLC, and for their Complaint against Defendants FIRST DATA CORPORATION and IGNITE PAYMENTS, LLC, they state as follows:

## PARTIES

1. ACS Capital Partners, Inc. is an Illinois corporation doing business in Illinois under the pseudonym Swype-Now.com ("Swype-Now").

2. ACS Capital Partners, Inc. is owned and operated by Christopher Gumino ("Gumino").

3. Ignite Payments ("Ignite") is an Independent Sales Organization ("ISO") and Member Service Provider.

4. Ignite Payments is an Independent Sales Organization of Wells Fargo Bank and is owned by First Data. Ignite Payments is a California limited liability company.

5.  First Data is a Delaware Corporation.

ELECTRONICALLY FILED
8/31/2016 9:03 PM
2016-L-008689
PAGE 2 of 14

## **CHOICE OF LAW**

6.  The parties in their contracting agreed to apply New York Law to their transactions and any disputes arising therefrom.

## **VENUE AND JURISDICTION**

7.  The parties in their contracting did not agree to a choice of venue.

8.  This Court has jurisdiction over all of the parties because the parties transacted business within the State of Illinois and executed all contracts in Illinois which, in turn, gave rise to the cause of this action.

9.  Venue is proper in Cook County because the transaction, or some part thereof, occurred in Cook County and because Defendants do business in Cook County.

## **FACTS COMMON TO ALL COUNTS**

10. On or about April 2, 2013, Plaintiff, Swype-Now entered into a Premier Agent Agreement (the "Contract") with Ignite in which Swype-Now solicited purchasers of services provided by Ignite. *See* Exhibit A.

11. First Data, through Ignite, would process credit card charges on behalf of businesses.

12. First Data, through Ignite, sells "terminals" which processes credit card transactions, also called swypers or ports, so that the credit card can be scanned and processed through their company's programs.

13. Gumino, owner and operator of Swype-Now, sells Ignite/First Data's products and services to merchants who rely upon these services to process payments.

14. As part of the Contract, the parties agreed to the following provisions:

2

ELECTRONICALLY FILED
8/31/2016 9:03 PM
2016-L-008689
PAGE 3 of 14

a. "On or about the 20th day of each calendar month Ignite Payments shall pay to Agent a Residual for Merchant Accounts boarded by Agent on or after the Effective Date that are Open Accounts in accordance with the terms set in Exhibit C."

b. "Residuals for Premier Open Accounts for a calendar month shall be an amount equal to the product of **Gross Processing Revenue – Premier** for Premier Open Accounts for the prior calendar month multiplied by the applicable percentage from the "Premier Residual Schedule.""

c. "Ignite Payments in its sole discretion may modify the Premier Schedule in so far as it affects Ignite Payments Residual obligations *prospectively*, with respect to any existing Open Accounts subject to the Premier Schedule or both, by giving Agent 90 days proper written notice; provided, however, that Agent may terminate this Agreement within 90 days of receiving such notice from Ignite Payments by giving Ignite Payments written notice of termination within such 90 day period." [*Emphasis added*]

d. "Ignite Payments shall bear the risk for Merchant Losses (other than those caused by the gross negligence or willful misconduct of Agent or Agent Personnel) and shall not deduct such Merchant Losses from any amounts due to Agent under this Agreement"

e. "During the Term, Ignite Payments hereby offers to purchase Agent's unencumbered rights to receive Residuals if Agent ceases to conduct the business of soliciting merchants for the purchase of Services from Ignite Payments and any and all competitors of Ignite Payments ("Retirement") subject to the terms and

ELECTRONICALLY FILED
8/31/2016 9:03 PM
2016-L-008689
PAGE 4 of 14

conditions set forth under Resources/Forms on MyAgentOffice.com, including the Acceptance of Ignite Payments Offer to Purchase Agent's Residuals Rights (Retirement) Form."

f.  "This Agreement, including the exhibits hereto, constitutes the sole and exclusive terms and conditions and agreement between the parties relating to the subject matter hereof, and supersedes all prior or cotemporaneous discussions, writings, negotiations, understandings and agreements with respect thereto."

g.  "Except as set forth in this Agreement, no amendment of any provision of this Agreement will be valid *unless the same will be in writing and signed by each of the parties.* No waiver by any party of any provision of this Agreement or any default, misrepresentation, or breach of warranty or covenant hereunder, whether intentional or not, will be valid unless the same will be in writing and signed by the party making such waiver, default, misrepresentation or breach of warranty, or covenant hereunder or affect in any way any rights arising by virtue of any prior or subsequent waiver, default, misrepresentation, or breach of warranty or covenant except pursuant to its express terms."

15. In addition to the Contract, an additional agreement titled "2011 Premier Agent Incentive Commissions and Residuals Summary" (the "Commissions Contract") was entered into and executed by the Parties hereto. *See* Exhibit B. As part of Commissions Contract, the Parties agreed to the following:

a.  "The initial Revenue Share percentage is 50% for a period of one year. After the initial one year period is over, the revenue share is determined based upon the Premier Schedule below … New Open Accounts >50 = Revenue Share 55%."

4

ELECTRONICALLY FILED
8/31/2016 9:03 PM
2016-L-008689
PAGE 5 of 14

b. "The up-front commission offers apply only to new Tier 1 businesses with multi-year contract. Internet business and mail-order/telephone-order merchants who use an Internet gateway to process payments are not eligible. Tier designation is determined by FDIS at its sole discretion and is subject to change. Accounts with pricing exceptions approved by corporate will be paid the up-front or high volume commission at the sole discretion of the FDIS profitability department… Length of Agreement Three Years Commission Per Eligible Account $150.00."

16. On or about December 2013, Gumino presented Ignite with the opportunity to open an account for a company called Beauty Counter, which, if signed by Gumino, would entail the opening of thousands of accounts.

17. Beauty Counter is a start-up company that sells make-up and other beauty products through individual sales persons rather than at stand-alone stores.

18. Beauty Counter would require each sales associate to have their own terminal, as well as their own account to process funds with Swype-Now.

19. Beauty Counter, a start up company, did not have the funds available to afford the cost of the terminals necessary to begin business with Swype-Now.

20. The cost of a terminal is less than $150.00.

21. In order to move forward with Beauty Counter and because of the high payouts associated with the opening of thousands of accounts, Gumino offered to cover the cost of the terminals as part of his deal with Beauty Counter. Gumino could only afford to do so if he received the $150.00 in "upfronts" also known as "term rebates" he was entitled to per the Commissions Contract.

ELECTRONICALLY FILED
8/31/2016 9:03 PM
2016-L-008689
PAGE 6 of 14

22. Gumino attempted to negotiate for $250.00 in upfronts for the first 3,000 accounts and $150.00 in upfronts on the remaining accounts.

23. Knowing the significant risk involved, on December 20, 2013, Gumino emailed with John Barrett, the President of Ignite, to ensure he would receive at least the $150.00 he was entitled. John Barrett, in response, stated "Yes we will pay the term rebates on these accounts." *See* Exhibit C.

24. These negotiations went on for months.

25. On or about June 9, 2014, Michael Rossi emailed Gumino and stated "bottom line is that no matter what, we must pay you the $150 term minimum even though Brett thinks it is too risky." *See* Exhibit D.

26. On or about June 18, 2014, Rossi emailed Gumino and stated that Gumino will "get the 150 for per approved account." *See* Exhibit E.

27. On July 1, 2014, Gumino reasonably relied upon the assertions from Rossi, Pierce, and Barrett all assuring him he would receive $150 in upfronts as per his current, written contract and Gumino entered into a contract with Beauty Counter to provide services and cover the cost of the swypers necessary. *See* Exhibit F.

28. On July 28, 2014, Gumino emailed demanding account approvals because he needed the upfronts to order swypers. Gumino stated, "This has been going on since May 28, and before anything was signed or came in I made sure Chris Klein, Brian Goudie, John Barrett, Dan Devitt, Lisa Mann and yourself agreed on the $150 per account and that risk was ok with the deals." *See* Exhibit G.

29. On August 13, 2014, Rossi emailed Gumino and stated that he told finance to release all of the funds. *See* Exhibit H.

ELECTRONICALLY FILED
8/31/2016 9:03 PM
2016-L-008689
PAGE 7 of 14

30. Gumino did not receive $150 in upfronts on every account he opened, but instead received partial upfronts on some accounts.

31. Gumino was not receiving 55% in his residual payments as per his contract.

32. On September 16, 2014, Rossi emailed Gumino stating he told finance to again change Gumino's residuals to reflect that he earns 55% on Beauty Counter. *See* Exhibit I.

33. On October 24, 2014, Brian Goudie sent a memorandum to all Independent Sales Agents to sign an agreement altering the Upfront program that was "effective October 1, 2014" *See* Exhibit J.

34. On November 4, 2014, Michael Weeks emailed Gumino and stated that 2,388 accounts are eligible for payout, but that Gumino would not receive the payout until Brian Layfield and Steve Sukeforth approved it. *See* Exhibit K.

35. Gumino never received these payments.

36. On December 10, 2014, Gumino emailed Rossi and demanded that legal provide the written agreement that week. *See* Exhibit L.

37. Rossi emailed Gumino on December 12, 2014 to retroactively alter the terms and require fees to be charged on all the Beauty Counter accounts so that Layfield and Goudie would start paying the Upfronts again. *See* Exhibit M.

38. On January 8, 2015, Gumino emailed Rossi asking if he will be paid the upfronts on the remaining 2,700 accounts, and the residuals to go up to 55%. *See* Exhibit N.

39. As a result of Ignite's lack of payment on upfronts and residuals, Gumino was in danger of breaching his contract to pay for the swypers for Beauty Counter. Gumino needed funds, and on January 14, 2015 Gumino emailed Rossi requesting approval on a loan

ELECTRONICALLY FILED
8/31/2016 9:03 PM
2016-L-008689
PAGE 8 of 14

from Ignite so that he can pay for the swypers for Beauty Counter and keep the contract going. *See* Exhibit O.

40. On January 15, 2015, Rossi emailed Gumino and stated "Don't give up on the upfronts." *See* Exhibit P.

41. On or about May 1, 2015, Ignite sent out an Addendum to Premier Agent Agreement, which states that the two parties agree that Swype-Now would receive $75.00 upfront for each swyper account with Beauty Counter since July 18, 2014, and these payments were sent in five separate installments in August 2014. It additionally states that both parties agreed the accounts must produce $100.00 in Revenue within six months to be approved, and if not approved then Gumino must pay the $75 upfront back. The terms of the agreement made it effective August 1, 2014. The addendum additionally states that if any account is cancelled, closed or terminated with or without cause, Ignite may credit from Agent's residuals the $75.00 for each account terminated. Gumino never signed this agreement. *See* Exhibit Q.

42. On May 20, 2015, Swype-Now signed as a borrower on a promissory note from Ignite for the amount of $66,000.00 to cover the cost of the swypers. *See* Exhibit R.

43. On June 26, 2015, Daniel Pappas emailed Rossi indicating that after a review of Beauty Counter's accounts, Ignite needs to establish a reserve of $400,000.00 and receive monthly credit reports so that First Data can protect its investment. *See* Exhibit S.

44. Prior to June 26, 2015, Beauty Counter as a client consistently used their accounts and paid any and all fees required. There was no indication based upon Beauty Counter's activities that suggested a $400,000.00 reserve was necessary.

45. On July 1, 2015, Beauty Counter cancelled their contracts as a result of these new demands for credit reports and held reserves.

46. On information and belief, Beauty Counter reopened each of their accounts with another Agent through Ignite and First Data.

47. On information and belief, Ignite and First Data are making money off of Beauty Counter and their thousands of accounts.

48. On or about December 16, 2015, Gumino emailed Rossi requesting the details of how to proceed with selling his residuals to First Data so that he may retire. Rossi informed Gumino that selling his residuals was not an option because they are being used as collateral in case of a lawsuit from Beauty Counter as a result of the cancellation fees charged when the contract was cancelled. *See* Exhibit T.

49. In December 2015, Gumino had $6,500.00 withheld from his residual pay, and was not paid his percentage of the Beauty Counter closure fees he was entitled to.

50. On January 19, 2016, Rossi emailed Gumino stating that he should not have had the $6,500 withheld for the loan payments, and he deserved to be reimbursed. *See* Exhibit U.

51. On January 20, 2016, both Brian Layfield and Gina (last name unknown) confirmed that Gumino's residuals should not have been withheld for his loan payment. *See* Exhibit U.

52. On or about January 25, 2016, Ignite and First Data terminated Gumino and Swype-Now.

53. On or about February 19, 2016, an email from Brian Brzezinski to Gumino stated that there was an issue in payments of residuals, and that he was working on a solution to ensure Gumino was paid.

ELECTRONICALLY FILED
8/31/2016 9:03 PM
2016-L-008689
PAGE 9 of 14

## <u>COUNT I</u>
### Breach of Contract – Residual Payments

54. Plaintiffs restate and re-allege paragraphs 1-53 as if fully set forth herein.

9

55. Ignite offered to create an Independent agency relationship with Swype-Now under the terms outlined in the Contract.

56. As part of this agreement, the parties additionally agreed to the terms set forth in the Commissions Contract.

57. Swype-Now, through its agent Gumino, accepted the terms of the Contract and the Commissions Contract, and both parties executed the documents, creating an enforceable contract.

58. At all times, Swype-Now materially complied with its obligations under both the Contract and the Commissions Contract.

59. On or about July 1, 2014, Swype-Now signed a contract with Beauty Counter.

60. Under its contract with Beauty Counter, Swype-Now was entitled to 55% revenue share for all accounts opened if more than 50 accounts were opened in a given quarter. These residuals were to continue as long as the accounts were open. Part of this revenue includes the account closure fee ultimately charged to Beauty Counter when the account was closed.

61. Swype-Now repeatedly only received 30% in residual pay through December 2015 after which the residual payments stopped entirely. Swype-Now never received any portion of the residual payment that came from the $188,000 closure fee charged to Beauty Counter (totaling at least $103,400).

62. By failing to make the payments required pursuant to the terms of the Contract and the Commissions Contract, Ignite has breached the same and Swype-Now has sustained significant damages as a result.

ELECTRONICALLY FILED
8/31/2016 9:03 PM
2016-L-008689
PAGE 10 of 14

10

**WHEREFORE**, Swype-Now respectfully requests that this Court enter judgment in its favor and against Ignite and First Data in an amount in excess of $103,400.00, plus prejudgment interest and whatever other relief this Court deems equitable and just under the circumstances.

ELECTRONICALLY FILED
8/31/2016 9:03 PM
2016-L-008689
PAGE 11 of 14

## COUNT II
### Breach of Contract – Upfront Payments

63. Plaintiffs restate and re-allege paragraphs 1-53 as if fully set forth herein.

64. Ignite offered to create an Independent agency relationship with Swype-Now under the terms outlined in the Contract.

65. As part of the Contract, the parties additionally agreed to the terms provided in the Commissions Contract.

66. Swype-Now, through its agent Gumino, accepted the terms of the Contract and the Commissions Contract, and both parties executed the documents, creating an enforceable contract.

67. At all times, Swype-Now materially complied with its obligations under both the Contract and the Commissions Contract.

68. On or about July 1, 2014, Swype-Now signed a contract with Beauty Counter.

69. Under the Commissions Contract, Swype-Now was entitled to $150 upfronts for each account it opened.

70. Through its contract with Swype-Now, Beauty Counter opened over 7,000 accounts.

71. Swype-Now was paid $75 in upfronts for 4,710 accounts despite being entitled to $150 on each and every account that was opened.

72. The amount owed to Swype-Now totals at least $696,750.00 ((4,710 x $75.00) + ($150.00 x 2,290.00)).

73. By failing to make the payments required under the Contract and Commissions Contract, Ignite has breached the same and Swype-Now has sustained significant damages as a result.

**WHEREFORE**, Swype-Now respectfully requests that this Court enter judgment in its favor against Ignite and First Data in an amount in excess of $696,750.00, plus prejudgment interest and whatever other relief this Court deems equitable and just under the circumstances.

ELECTRONICALLY FILED
8/31/2016 9:03 PM
2016-L-008689
PAGE 12 of 14

## <u>COUNT III</u>
### Breach of Contract – Continuing Offer to Purchase

74. Plaintiffs restate and re-allege paragraphs 1-53 as if fully set forth herein.

75. Ignite offered to create an Independent agency relationship with Swype-Now under the terms outlined in the Contract.

76. As part of the Contract, the parties additionally agreed to the terms provided in the Commissions Contract.

77. Swype-Now, through its agent Gumino, accepted the terms of the Contract and the Commissions Contract, and both parties executed the documents, creating an enforceable contract.

78. At all times, Swype-Now materially complied with its obligations under both the Contract and the Commissions Contract.

79. As part of the agreements between the parties, Ignite had a "continuing offer to purchase," which stated that Ignite would purchase Plaintiffs' unencumbered rights to receive residuals if Plaintiff chose to retire.

80. On or about December 16, 2015, Gumino indicated to Ignite that he wished to retire and sell his residuals to Ignite.

81. Ignite denied this request and indicated that the residuals were considered collateral in the event of Beauty Counter filing suit against Ignite.

82. By failing to purchase the Residuals and placing an arbitrary encumbrance upon the residuals, Ignite has breached the agreements between it and Swype-Now, and Swype-Now has sustained significant damages as a result.

**WHEREFORE**, Swype-Now respectfully requests that this Court enter judgment in its favor against Ignite and First Data in an amount in excess of $50,000.00, plus prejudgment interest and whatever other relief this Court deems equitable and just under the circumstances.

ELECTRONICALLY FILED
8/31/2016 9:03 PM
2016-L-008689
PAGE 13 of 14

## <u>COUNT IV</u>
### Breach of Contract – Wrongful Termination

83. Plaintiffs restate and re-allege paragraphs 1-53 as if fully set forth herein.

84. Ignite offered to create an Independent agency relationship with Swype-Now under the terms outlined in the Contract.

85. As part of the Contract, the parties additionally agreed to the terms provided in the Commissions Contract.

86. Swype-Now, through its agent Gumino, accepted the terms of the Contract and the Commissions Contract, and both parties executed the documents, creating an enforceable contract.

87. At all times, Swype-Now materially complied with its obligations under both the Contract and the Commissions Contract.

88. As part of the agreements, Plaintiffs were entitled to receive residuals for the duration of all accounts opened by it unless Plaintiffs were fired for cause for reasons of fraud, forgery, dishonesty or other willful or malicious acts.

89. On or about January 2016, Swype-Now and Gumino were terminated for fraud.

90. At no point did Gumino partake in any fraudulent, dishonest, willful or malicious acts.

91. By firing Gumino for alleged and unsubstantiated fraud, Ignite breached the Contract with Gumino.

92. By firing Swype-Now, Ignite was relieved of its contractual obligation to pay Gumino residuals as required by his contract.

93. Upon information and belief, this firing was done to relieve Ignite of paying additional funds to Gumino and Swype-Now.

94. As a result of this wrongful termination and failure to pay residuals, Gumino and Swype-Now were materially damaged in an amount to be determined at trial.

**WHEREFORE**, Swype Now and Gumino respectfully request that this Court enter judgment in their favor against Ignite and First Data in an amount in excess of $50,000.00, plus prejudgment interest and whatever other relief this Court deems equitable and just under the circumstances.

<div style="text-align:center">

Respectfully Submitted,

CHRIS GUMINO and SWYPE-NOW

*/s/ Anish Parikh*

</div>

Parikh Law Group, LLC
150 S. Wacker Drive, Suite 2600
Chicago, Illinois 60606
(312) 725-3476
Firm ID#: 49168

ELECTRONICALLY FILED
8/31/2016 9:03 PM
2016-L-008689
PAGE 14 of 14

**PREMIER AGENT AGREEMENT**

ELECTRONICALLY FILED
8/31/2016 9:03 PM
2016-L-008689
CALENDAR: N
PAGE 1 of 62
CIRCUIT COURT OF
COOK COUNTY, ILLINOIS
LAW DIVISION
CLERK DOROTHY BROWN

INTERNAL USE ONLY:
AGENT NO.: _____
DBA NAME _____

This Premier Agent Agreement (this "**Agreement**") is between Ignite Payments, LLC ("**Ignite Payments**") and ___ACS Capital Partners Inc.___ (legal name), a[n] ___IL.___ (State) [corporation/partnership/sole proprietorship/limited liability company] ("**Agent**").

Ignite Payments is an Independent Sales Organization and Member Service Provider as defined under Card Organization Rules. Ignite Payments is in the business of providing Services. Agent is a person or entity in the business of soliciting purchasers of Services. Ignite Payments and Agent wish to enter into a relationship in which Agent will represent Ignite Payments with respect to soliciting purchasers of Ignite Payments Services on the terms and conditions contained in this Agreement.

### Agreement

In consideration of the foregoing and the covenants and conditions in this Agreement, Agent and Ignite Payments agree as follows:

### 1. Agent Obligations

**1.1.     General Obligations.**

a. <u>Professional and Compliant Business Practices</u>. Agent will operate its business, including maintaining the security of related business, Prospective Merchant, Merchant and cardholder records, in a professional manner in compliance with this Agreement and all applicable laws (including Privacy Laws and USPS Move Update Requirements), regulations, court orders, Card Organization Rules and Agent Business Conduct Standards, which are incorporated into this Agreement as they may now exist or be enacted, adopted, issued or promulgated.

b. <u>Promotional Information: Use of Trade names and Trademarks</u>. Marketing materials, including business cards and stationary, and Web sites created by Agent (other than those Ignite Payments materials printed from the Ignite Payments brand center) that contain trade names, trademarks, service marks or logos of, or that reference the services provided by, Ignite Payments, Ignite Payments' sponsor bank, FDC or any Card Organization must be submitted to agent.compliance@firstdata.com for review. Agent agrees to not disseminate or publish any such materials or Web sites until Agent has received written approval from agent.compliance@firstdata.com. In compliance with the law, Agent may not send unsolicited fax advertisements that promote Ignite Payments Services to Merchants or Prospective Merchants. Because Agent is not a registered ISO, Card Organization Rules require that Agent's business telephone be listed and answered by reference to the registered ISO (i.e. "Ignite Payments") and permit Agent to also reference its approved fictitious business name.

**1.2.     Agent Representations.** To comply with legal requirements, Agent represents, warrants and covenants that:

    i.    Agent shall present, and shall cause its Representatives to present, to each person who executes a Merchant Agreement a copy of such Merchant Agreement at or before the time the person executes the Merchant Agreement.

    ii.    Agent shall use, and shall cause its Representatives to use, only the Merchant Agreement that is designated by Ignite Payments. Agent shall use, and shall cause its Representatives to use, the most current version of such Merchant Agreement.

    iii.    In Face-to-Face Agent Transactions ("**Face-to-Face Agent Transactions**" means those transactions in which Agent meets in person with a merchant, which does not include

**Exhibit A**

transactions conducted over the telephone, by facsimile, or over the Internet) where a person executes a paper, rather than an electronic, version of the Merchant Agreement, Agent shall leave, and shall cause his or her Representatives to leave, with each such person a copy of the executed Merchant Agreement.

iv.    In Face-to-Face Agent Transactions where a person executes an electronic, rather than a paper, version of the Merchant Agreement, Agent shall, and shall cause its Representatives to, either (1) advise each such person that a sample copy of the then-current version of the standard Merchant Agreement is available on the Ignite Payments Web site, or (2) leave with each such person a hardcopy or electronic copy of the executed Merchant Agreement.

v.    Agent shall not misrepresent, and shall prohibit its Representatives from misrepresenting, any term of the Merchant Agreement.

vi.    Agent shall provide, and shall cause its Representatives to provide, full and fair disclosure of the Merchant Agreement to Prospective Merchants and Merchants, including disclosures related to all charges, minimum fees, limitations, initial and renewal terms of agreements and warranty services.

vii.    Agent shall not misrepresent, and shall prohibit its Representatives from misrepresenting, the manner in which Ignite Payments provides its services or the procedures Ignite Payments follows, including services and procedures related to chargebacks, loss prevention, ATM/Debit and equipment leasing.

viii.    Agent and Agent Personnel will not make, or offer to make, any payments to, or confer, or offer to confer, any benefit upon any employee, agent or fiduciary of any third party (including any government, or agency or instrumentality thereof) with the intent to influence the conduct of such employee, agent or fiduciary in relation to the business or affairs of such third party.

ix.    If Agent becomes aware of any actual or alleged fraudulent activities or misrepresentations by it or its Representatives, whether or not related to the Ignite Payments Services, Agent will promptly advise Ignite Payments and take all necessary corrective action the Agent determines in its discretion, to be necessary or appropriate.

Agent's failure to satisfy any of the above legal requirements will constitute a breach of this Agreement and be subject to remedial and other action as provided under this Agreement.

Additionally, as Agent is engaged in a separate business, Agent represents, warrants and covenants will use its full legal name (not Agent's DBA name) (1) for Agent's bank accounts, recruiting and similar materials relating to operation of Agent's business, (2) when signing any agreements with merchants for any services offered by Agent that are not described in and billed under the Merchant Agreement including sale, lease and/or rental of point-of-sale terminals and other ancillary products or services, and (3) for any agreements that are between Agent and a third party (including any merchant, lease company, bank, Yellow Page company or other vendor) for any purchase, sale or services (including leases, rental agreements, agreements for web design services, advertising services).

Agent also represents, warrants and covenants that execution and delivery of this Agreement by Agent and the consummation of the transaction herein contemplated does not conflict in any material respect with or constitute a material breach or material default under the terms and conditions of any documents, agreements or other writings to which it is a party, including any covenant not to compete or confidentiality agreement with any third party.

**1.3.**    **Assessments.** Subject to Agent's challenge rights as noted below, the parties agree that Agent shall pay to Ignite Payments immediately upon written demand to Agent from agent.compliance@firstdata.com: (i) the amount of any fine, assessment or other amount charged to Ignite Payments by any third party relating to Agent's violation of any law, regulation, court order or Card Organization Rule; or (ii) fines to Agent by Ignite Payments for Agent's breach of a material term of this Agreement (including **Section 1.2**) or repeated breach of any term of this Agreement, which fines shall be an amount equal to the greater of $250.00 or: (1) for the first fine, an amount equal to the product

ELECTRONICALLY FILED
8/31/2016 9:03 PM
2016-L-008689
PAGE 2 of 62

Ignite Payments New Premier Agent 0113

of (A) 10% multiplied by (B) an amount equal to the average of Agent's monthly Residuals for the 3 calendar months preceding the date on which the fine is assessed ("**Three Month Average Residuals**"), or (2) for each fine thereafter, an amount equal to the product of (A) 20% multiplied by (B) Three Month Average Residuals. The parties agree that if Agent disputes any demand made to Agent by Ignite Payments pursuant to this **Section 1.3**, Agent may challenge such demand by delivering a written notice ("**Challenge Notice**") to Ignite Payments at agent.compliance@firstdata.com within 10 Business Days after Agent's receipt of Ignite Payments' written demand. The Challenge Notice must state all reasons why such demand should not have been made. If Ignite Payments fails to act on the Challenge Notice within 20 Business Days after its receipt of such, then Agent shall not be obligated to pay to Ignite Payments the amount demanded. The imposition by Ignite Payments or a third party of any assessment, fine or charge against Agent does not constitute a waiver of any legal rights or remedies Ignite Payments may have against Agent. Ignite Payments reserves the right to pursue any and all legal rights and remedies against Agent under this Agreement or applicable law.

**1.4.    Prospective Merchants; Merchants; Merchant Agreements.**

      a.    Ignite Payments will not accept Prospective Merchant types that are identified as "Unqualified/Unacceptable" in the Ignite Payments Credit Policy posted under Resources/Policies on MyAgentOffice.com, as it may be modified from time to time by Ignite Payments in its sole discretion (the "**Unacceptable List**"). Agent agrees to use best efforts to verify that each Prospective Merchant conducts or intends to conduct a bona fide, lawful business operation (e.g., by inspecting a Prospective Merchant's premises to determine if it has the proper facilities, equipment, inventory and license to conduct its business or reviewing its Internet site). Agent also agrees to use its best efforts to inform Ignite Payments of any information that could reasonably be considered relevant to a determination of any Prospective Merchant or Merchant's creditworthiness.

      b.    All Merchant Agreements are subject to review and rejection or approval by Ignite Payments in its sole discretion. Ignite Payments will not approve Merchant Agreements that are not fully completed and executed by the Prospective Merchant. Ignite Payments may terminate any Merchant Agreement at any time in accordance with its terms.

      c.    Agent may recommend to Ignite Payments and/or its sponsor bank the discount rate and fees charged to a Prospective Merchant or Merchant pursuant to the Merchant Agreement, but Ignite Payments and/or its sponsor bank in its final and sole discretion may accept or reject such recommendation. Ignite Payments or its sponsor bank in its sole discretion may change any fees charged to a Merchant under a Merchant Agreement from time to time without prior notice to Agent.

      d.    All Merchant Agreements (whether partially or fully completed), Merchant Accounts and Merchant or Prospective Merchant accounts, records and related information are owned by Ignite Payments, its sponsor bank or the applicable acquirer and may not be transferred, assigned, sold or exchanged, in whole or in part, by Agent. Accordingly, at Ignite Payments' request, Agent agrees to provide Ignite Payments with all information, files and materials related to Prospective Merchants and Merchants solicited or signed by Agent under this Agreement. If this Agreement terminates or Agent abandons a Prospective Merchant, Ignite Payments may complete the processing of such Prospective Merchant's submitted application and assist such merchant with the installation of any equipment. If this Agreement terminates, Ignite Payments shall not be required to terminate any Merchant Agreement with any Merchant.

**1.5.    Exclusivity for Sale of Services.** Agent, any former or current owner of a controlling interest in Agent, or any former or current partner, member, officer or director of Agent: (i) will not engage in any act that would injure Ignite Payments' relationship with its employees, agents, Prospective Merchants, Merchants or Ignite Payments' sponsor bank; (ii) will not directly or indirectly induce or influence any merchant to cancel or terminate any existing Merchant Account or Merchant Agreement; and, (iii) except with respect to any Prospective Merchant for which Ignite Payments cannot provide the Services such

ELECTRONICALLY FILED
8/31/2016 9:03 PM
2016-L-008689
PAGE 3 of 62

Ignite Payments New Premier Agent 0113

Prospective Merchant requires or that Ignite Payments rejects or is on the Unacceptable List, (1) shall represent only Ignite Payments with respect to soliciting Prospective Merchants for the purchase of Services within the Territory, and (2) may not engage in any other Competing Activity. Nothing in this Agreement restricts or prohibits Agent from soliciting merchants, Prospective Merchants or Merchants for the purchase any product or service that is not competitive to the Ignite Payments Services.

## 2. Agent Personnel

**2.1.      Agent Personnel.** Subject to Section 2.2, Agent shall have the right to designate suitable and desirable Agent Personnel, including Representatives. Agent shall be solely responsible for Agent Personnel and their acts, including any failure to comply with the terms of this Agreement that are applicable to Agent or failure to comply with Card Organization Rules and applicable law, regulations and court orders. Agent Personnel shall be hired at Agent's own risk, expense and supervision, and Agent Personnel shall not have any claim against Ignite Payments for salaries, residuals, benefits, commissions, items of cost, or any other form of compensation or reimbursement. Agent acknowledges and agrees that no Agent Personnel are employees of Ignite Payments, and Agent is solely responsible for any taxes, payroll reporting, workers' or unemployment compensation insurance, compensation, benefits or any other obligations or liabilities that may arise (including verification of work eligibility in U.S.) due to Agent's hiring, retention or termination of or relationship with any Agent Personnel.

**2.2.      Representative Registration.** Prior to a Representative being permitted to solicit or submit any Merchant Applications, Agent must receive written confirmation from agent.compliance@firstdata.com that Ignite Payments has registered such Representative. Agent must provide Ignite Payments with a completed Ignite Payments Sales Representative Registration Form (located under Resources/Forms at MyAgentOffice.com) for such Representative and any other documentation or information concerning the Representative requested by Ignite Payments from time to time. Ignite Payments reserves the right to refuse to register or revoke the registration of any proposed or approved Representative that Ignite Payments, in its sole discretion, determines is a detriment to the business of Ignite Payments. Agent must notify Ignite Payments in writing of the termination of any Representative within three Business Days of such termination.

## 3. Ignite Payments' Obligations

**3.1.      Grant of Authority.** Ignite Payments hereby grants to Agent the right, on a non-exclusive basis, to solicit Prospective Merchants for the purchase of the Services from Ignite Payments within the Territory as long as the merchant does not already have, and has not had in the previous 90 days, an open Merchant Account.

**3.2.      Ignite Payments Services.** Ignite Payments shall be responsible for all processing and accounting functions relating to the clearing and settlement of Card transactions, including: (i) Merchant processing and settlement; (ii) Merchant credit research; (iii) Merchant activation and approval; (iv) Merchant security and recovery; (v) Merchant customer services; (vi) Merchant chargeback and retrieval services; and (vii) all other back office services, including collecting amounts due from Merchants to Ignite Payments. Ignite Payments may contract with other persons to perform these functions on behalf of Ignite Payments but Ignite Payments remains primarily responsible for the functions. Subject to **Section 5.2**, Ignite Payments will make available to Agent training on the Ignite Payments Services.

## 4. Licensing

**4.1.      License.** Subject to Section 1.1(b) and this Section 4, Ignite Payments grants to the Agent during the Term, the limited, non-exclusive, non-assignable, revocable right to use the Trademarks displayed on **Exhibit B** (as it may be modified from time to time by Ignite Payments in its sole discretion and provided to Agent via email or on MyAgentOffice.com) in the Territory in connection with Agent's marketing materials for the Ignite Payments Services. Upon termination of this Agreement, (i) the limited rights

ELECTRONICALLY FILED
8/31/2016 9:03 PM
2016-L-008689
PAGE 4 of 62

Ignite Payments New Premier Agent 0113

granted to Agent to use the Trademarks under this **Section 4** shall immediately terminate; (ii) Agent shall immediately cease and desist from all use of the Trademarks and any trade name, trademark, service mark, or logotype associated with Cards ("**Marks**"), except to the extent such use may be authorized under a separate agreement; (iii) at Ignite Payments' request, Agent will deliver to Ignite Payments all material and papers upon which the Trademarks or Marks appear or to which the Trademarks or Marks relate, including correspondence and information on Prospective Merchants or Merchants solicited or procured while the Agent solicited on behalf of Ignite Payments; and (iv) Agent will take all necessary actions to correct information that states or suggests that Agent is connected in any manner with Ignite Payments or its Trademarks, including correction of telephone and other directories, telephone information providers, postal offices, electronic mail providers, letterhead, business cards, office signage, Web page(s) on the Internet, domain name registries (if applicable), any post domain URL path (if applicable) and other communication delivery services. Agent shall direct that all inquiries be forwarded to Ignite Payments' Moorpark office or such other place designated by Ignite Payments. If Agent fails to take any required action within 30 days of the termination of this Agreement, then Agent appoints, without power of revocation, Ignite Payments as its attorney in fact to act in Agent's place and with Agent's authority to take such corrective actions with the same legal force and effect as if such acts were performed by Agent.

**4.2.    Ownership of Trademarks**. Agent acknowledges that Ignite Payments or FDC is the owner or licensee of the Trademarks, and Card Organizations are the owners of their respective Marks. Agent acknowledges that Ignite Payments, FDC and the Card Organizations hold the exclusive right, title and interest in and to their respective marks. Agent will not at any time do or cause to be done any act or thing contesting or in any way impairing or tending to impair any part of such right, title and interest. In connection with the use of the Trademarks or Marks, Agent shall not in any manner represent that it has any ownership in the Trademarks, Marks or registrations thereof, and Agent acknowledges that use of the Trademarks or Marks do not create in the Agent's favor any right, title or interest in or to the Trademarks or Marks or the goodwill attached to and associated with the Trademarks or Marks. All uses of the Trademarks or Marks by the Agent shall inure to their respective owner. Agent will at no time during or after the Term register, adopt or use, any word or mark which is likely to be similar to or confusing with the Trademarks or Marks or any other marks owned or utilized by Ignite Payments or FDC. Agent agrees to not, at any time, use any Mark on its own behalf or suggest, imply or in any manner create an impression that it is a member of MasterCard, VISA, American Express, Discover or any other Card Organization with respect to which merchants submit transactions for processing under a Merchant Agreement. Any Card Organization may at any time and without notice prohibit Agent from using its Marks for any reason. Agent must comply with additional terms governing Agent's use of Trademarks or Marks that may be posted on MyAgentOffice.com from time to time.

## 5. Relationship of the Parties

**5.1.    Independent Contractor.** Neither Agent nor any Agent Personnel is an employee of Ignite Payments for any purpose whatsoever. Agent is an independent contractor and as such is not eligible for any compensation, benefits, insurance or other employment terms that are provided to employees of Ignite Payments or any Ignite Payments Affiliates. Ignite Payments is interested only in the results obtained by Agent and Ignite Payments has no right to control Agent or Agent Personnel, including no right to require Agent or Agent Personnel to: (i) devote a fixed or minimum number of hours to selling or any other effort, (ii) follow prescribed itineraries or instructions, (iii) bind Ignite Payments, or (iv) do anything that would alter Agent's independent contractor status. At all times, Agent has the sole right and responsibility to supervise, direct, and control Agent's business operations and Agent Personnel, including Agent office account receivables and payables and other office administration functions.

**5.2.    Expenses; Taxes**. Agent is solely responsible for all expenses and disbursements that may be incurred or due by Agent in connection with its performance of its obligations under this Agreement, including promotional materials, general selling, training, travel, entertainment, insurance, office equipment, maintenance, supplies, rental, lease, legal or accounting expenses; purchase or lease of office

ELECTRONICALLY FILED
8/31/2016 9:03 PM
2016-L-008689
PAGE 5 of 62

Ignite Payments New Premier Agent 0113

space; Agent Personnel salaries, benefits, taxes and other costs and expenses; and any federal, state or local tax or insurance obligations that may arise in connection with Agent's activities or due to receipt of payments by Agent under this Agreement.

**5.3.** **Other**. Agent does not have the right or authority to and will not, and will not permit any Agent Personnel to, hold itself out as having any right, power or authority to create any contract or obligation, either express or implied, on behalf of, in the name of or binding upon Ignite Payments, or to pledge Ignite Payments' credit, or to extend credit in Ignite Payments' name. Without the prior written consent of Agent, Ignite Payments has no right or authority to, and will not, commit Agent in any matter or use Agent's name in any way not specifically authorized by this Agreement.

<div align="center">

**6. <u>Term</u>**

</div>

**6.1.** **Term**. Provided that both Agent and Ignite Payments execute this Agreement, this Agreement is effective (the "**Effective Date**") on the first day of the calendar month in which it is signed by the last of the parties hereto. This Agreement shall remain in effect for a one year period that begins on the Effective Date (the "**Initial Term**") and automatically renew for successive terms of one year each (each a "**Renewal Term**" and together with the Initial Term, the "**Term**"), unless either party provides the other party with written notice at least 60 days before the end of the then-current term that it will terminate this Agreement at the end of the then-current term.

**6.2.** **Termination by Ignite Payments.**

    a. <u>With Cause without any Right to Cure</u>. In addition to any other rights and remedies that it may have and notwithstanding **Section 6.2.b.**, Ignite Payments in its sole discretion may terminate this Agreement upon five calendar days prior written notice to Agent if any reasonable evidence is discovered indicating (i) Agent or any Agent Personnel have: (1) violated any confidentiality or intellectual property rights protected by this Agreement; (2) violated any applicable law, regulation, court order or Card Organization Rule; or (3) committed any act of misrepresentation, fraud, forgery, dishonesty or other willful or malicious act; or (ii) Agent has ceased its operation and activity as a sales agent for Ignite Payments.

    b. <u>With Cause with a Right to Cure</u>. In addition to any other rights and remedies that it may have and notwithstanding **Section 6.2.a.**, Ignite Payments may terminate this Agreement if Agent is in breach of any of the terms, conditions, representations, warranties or covenants of this Agreement or Agent Business Conduct Standards or for any violation of **Section 1.5**, but only upon giving Agent written notice of such breach and Agent's failure to cure such breach within 10 Business Days after receipt of such notice; provided, however, that if a cure cannot reasonably be accomplished within such 10-day period, Ignite Payments, in its sole discretion, may toll the cure period so long as the Agent commences a cure within such 10-day period and thereafter diligently pursues such cure as promptly as practical, but in no event will a cure period exceed 90 calendar days.

    c. <u>Agent Insolvency</u>. If Agent makes any assignment of assets or business for the benefit of creditors, or if a trustee or receiver is appointed to administer or conduct its business or affairs, or if it is adjudged in any legal proceeding to be either a voluntary or involuntary bankruptcy, then the rights granted herein to Agent shall forthwith cease and terminate without prior notice or legal action by Ignite Payments.

**6.3.** **Termination by Agent**. In addition to any other rights and remedies that it may have, Agent may terminate this Agreement if Ignite Payments is in breach of its obligations under **Section 7**, but only upon giving Ignite Payments written notice of such breach and Ignite Payments' failure to cure such breach within 10 Business Days after receipt of such notice, unless a cure cannot reasonably be accomplished within such business. In that case, the cure period will be tolled so long as Ignite Payments commences a

ELECTRONICALLY FILED
8/31/2016 9:03 PM
2016-L-008689
PAGE 6 of 62

Ignite Payments New Premier Agent 0113

cure within such 10-day period and thereafter diligently pursues such cure as promptly as practical, but in no event may a cure period exceed 90 calendar days.

**6.4.    Termination by Mutual Agreement.** The parties may terminate this Agreement at any time in a writing signed by both parties.

<h3 style="text-align:center">7. <u>Payments</u></h3>

**7.1.    Right to Payment.**

a.    Ignite Payments shall pay Residuals and certain other amounts set forth in this **Section 7** to Agent during the Term and after termination of this Agreement subject to the terms of this Agreement, including this **Section 7** and **Section 8**.

b.    Ignite Payments in its sole discretion may immediately discontinue payment of any amounts due to Agent after termination of this Agreement if: (i) Ignite Payments terminates this Agreement pursuant to **Sections 6.2.a (i), 6.2.b** and **6.2.c** above; (ii) Agent, any former or current owner of a controlling interest in Agent, or any former or current partner, member, officer or director of Agent: (1) engages in any act that would injure Ignite Payments' relationship with its employees, agents, Prospective Merchants, Merchants or Ignite Payments' sponsor bank; (2) directly or indirectly induces or influence any merchant to cancel or terminate any existing Merchant Account or Merchant Agreement; or, (3) engages in a Competing Activity; (iii) Agent fails to remain in compliance with all terms and conditions of this Agreement that survive termination of this Agreement; (iv) Agent fails to remain current on all obligations to Ignite Payments and Ignite Payments' sponsor bank(s); (v) Ignite Payments is unable, after good faith efforts for a period of 90 days, to locate Agent and make payment of Residuals to Agent; or (vi) Agent's monthly Residual payment falls below $250.00.

**7.2.    Payment for Services.** Subject to the terms of this Agreement,

a.    On or about the 20th day of each calendar month Ignite Payments shall pay to Agent a Residual for Merchant Accounts boarded by Agent on or after the Effective Date that are Open Accounts in accordance with the terms set forth in **Exhibit C**.

b.    At least monthly Ignite Payments shall pay to Agent payments for certain third party or other products and services subject to the terms set forth under Resources/Forms on MyAgentOffice.com. Ignite Payments may change the terms, including the amounts, of any such payments by providing Agent with at least 30 days prior written notice of such changes.

Agent must request an adjustment to any amounts paid to or by Agent pursuant to this **Section 7** within the 90 day period following the initial credit or debit or Ignite Payments has no obligation to make such adjustment.

**7.3.    Merchant Losses.** Ignite Payments shall bear the risk for Merchant Losses (other than those caused by the gross negligence or willful misconduct of Agent or Agent Personnel) and shall not deduct such Merchant Losses from any amounts due to Agent under this Agreement.

**7.4.    Right to Offset.** Agent hereby authorizes Ignite Payments at any time and from time to time, without notice or demand to Agent or to any other person (any such notice and demand being hereby expressly waived), to set off, recoup and to appropriate and apply any and all funds of Agent held by Ignite Payments, Ignite Payments' Affiliates or Ignite Payments' sponsor bank, against and on account of Agent's obligations to Ignite Payments or any Ignite Payments' Affiliates under this Agreement or any other agreement, including fees for equipment or the Services, whether such obligations are liquidated, unliquidated, fixed, contingent, matured or unmatured. Agent is prohibited from setting-off, offsetting or otherwise reducing or applying against any amounts due and owing to Ignite Payments under this Agreement or otherwise, any amounts owed or alleged to be owed to Agent by Ignite Payments under this

Agreement or otherwise. Ignite Payments may in its sole discretion exercise the rights described in this **Section 7.4** by direct debit to Agent's bank account. This offset right is in addition to all other rights and remedies available to Ignite Payments.

**7.5.    Right to Debit and Credit Agent's Bank Account.** All financial transactions between Agent and Ignite Payments, including payment for equipment purchases, may be automatically debited and credited by Ignite Payments, in its sole discretion, directly through Agent's bank account. Agent irrevocably consents to the debiting and crediting of its bank account(s) as provided herein. With respect to equipment transactions only, Ignite Payments shall provide 10 days advance written notice to Agent prior to initiating a debit entry. In order to activate automatic debit and credit service, Agent shall provide Ignite Payments with the required depository information and execute ACH Authorization Agreement Direct payments (Debits) Form and ACH Authorization Agreement Direct Payments (Credits) Form provided to Agent by Ignite Payments or any other form that Ignite Payments may request from time to time to accomplish the purposes set forth in this **Section 7.5.**

**7.6.    Loan.** Once every 12 months during the Term, Agent is eligible to receive a loan from Ignite Payments in an amount equal to the product of two multiplied by Three Month Average Residuals subject to the terms and conditions of a promissory note in the form provided by Ignite Payments and executed by Agent if Agent: (i) is not in breach of its obligations under this Agreement; (ii) is current on all financial obligations to Ignite Payments and Ignite Payments Affiliates; and (iii) has not had a promissory note payable to Ignite Payments outstanding at any time within the preceding 30 days. Notwithstanding the foregoing, Ignite Payments is not obligated under this **Section 7.6** to loan agent an amount less than $5,000.00 or greater than $500,000.00 during any 12 month period; and Ignite Payments may modify or discontinue the loan program described in this **Section 7.6** at any time without notice to Agent.

## 8. Purchase and Sale of Agent Residual Rights

**8.1.    Continuing Offer to Purchase.** During the Term, Ignite Payments hereby offers to purchase Agent's unencumbered right to receive future Residuals (excluding Residuals for Referral Open Accounts) subject to the terms and conditions regarding Ignite Payments' online Residual rights buyout process found set forth under Resources/Forms on MyAgentOffice.com, including the Acceptance of Ignite Payments Offer to Purchase Agent's Residual Rights form.

**8.2.    Offer to Purchase Upon Retirement.** During the Term, Ignite Payments hereby offers to purchase Agent's unencumbered rights to receive future Residuals if Agent ceases to conduct the business of soliciting merchants for the purchase of Services from Ignite Payments and any and all competitors of Ignite Payments ("**Retirement**") subject to the terms and conditions set forth under Resources/Forms on MyAgentOffice.com, including the Acceptance of Ignite Payments Offer to Purchase Agent's Residual Rights (Retirement) form.

**8.3.    Right to Receive Future Residuals; Right of First Refusal.** Subject to **Section 9**, at any time during the Term, Agent may sell its right to receive future Residuals under this Agreement ("**Right to Receive Future Residuals**") to an Unrelated Third Party subject to the following terms and conditions:

(i)    The terms governing the rate at which Residuals are being paid to Agent as of the date of Agent's sale of Residuals pursuant to an Offer (as defined below) will be fixed and apply to the calculation of future Residuals subject to the Offer.

(ii)    Agent hereby grants to Ignite Payments a right of first refusal to purchase Agent's Right to Receive Future Residuals. If Agent receives a bona fide offer from a willing and able Unrelated Third Party buyer to purchase Agent's Right to Receive Future Residuals (an "**Offer**"), Agent shall notify Ignite Payments of the amount and terms of such Offer. Ignite Payments shall have the first right to purchase Agent's Right to Receive Future Residuals on terms equal to the Offer, and Agent shall not sell or in any way transfer Agent's Right to Receive Future Residuals without

ELECTRONICALLY FILED
8/31/2016 9:03 PM
2016-L-008689
PAGE 8 of 62

Ignite Payments New Premier Agent 0113

first presenting Ignite Payments with the opportunity to match any Offer. Ignite Payments shall have 15 days to notify Agent of its decision whether or not to exercise its right to purchase Agent's Right to Receive Future Residuals.

(iii)  If Ignite Payments does not exercise its right of first refusal, provided that Agent and Unrelated Third Party buyer execute and provide to Ignite Payments a residual re-direction letter in the form required by Ignite Payments, Agent may sell its Right to Receive Future Residuals in accordance with the terms of this **Section 8.3** and the Offer.

(iv)  Nothing in this **Section 8.3** shall be construed or interpreted to impair any of Ignite Payments' rights under this Agreement, including **Section 9**, or to allow Agent to sell any interest in a Merchant, Merchant Agreement or Merchant Account, except for the sale of Agent's Right to Receive Future Residuals as set forth in this **Section 8.3**.

(v)  **"Unrelated Third Party"** means any person who is not and is not a relative of, Agent, any former or current owner of a controlling interest in Agent, or any former or current partner, member, officer or director of Agent or any entity in which Agent, any former or current owner of a controlling interest in Agent, or any former or current partner, member, officer or director of Agent has ownership interest or employment relationship.

## 9.  Confidentiality

**9.1.**  **Restrictions on Use or Disclosure of Confidential Information.** Each of Ignite Payments and Agent agree that, without the written consent of the other, it will not divulge or disclose to third parties, directly or indirectly, any Confidential Information or use such Confidential Information except to the extent required in its business relationship with the other party or to carry out its obligations under this Agreement. For the avoidance of doubt, Agent shall keep the terms, conditions and existence of this Agreement strictly confidential, and under no circumstance may Agent distribute this Agreement or any other Ignite Payments Confidential Information for any purpose, including with respect to Agent's rights under **Section 8.3**, without Ignite Payments' prior written consent. No party will obtain any proprietary rights to any Confidential Information of the other party. Each party shall retain Confidential Information in its possession and control and shall protect the secrecy of such Confidential Information using the degree of care it uses to protect the secrecy of its own Confidential Information, but in no event less than a commercially reasonable degree of care.

**9.2.**  **Exceptions.** Notwithstanding the foregoing: Ignite Payments shall not be prohibited from disclosing Confidential Information to the extent that it is related to Merchant Agreements, Merchant Accounts and Merchant or Prospective Merchant accounts, records and related information and other information relating to Ignite Payments business or Ignite Payments Services, but excluding any other information regarding the business of Agent, to the extent that such disclosure by Ignite Payments is for a bona fide business purpose; and, Agent's Confidential Information may be made available by or on behalf of Ignite Payments at Ignite Payments or Ignite Payments sponsor bank's direction to any Card Organization or to any other supervisory or regulatory authority to which Ignite Payments may be subject, upon their written request.

## 10. Indemnity and Limitation of Liability

**10.1.**  **Indemnification.** Agent shall indemnify, defend and hold harmless Ignite Payments and its officers, directors, shareholders, employees, agents and representatives against any and all Damages incurred directly or indirectly by Ignite Payments, whether or not litigation is commenced, incurred by or asserted against Ignite Payments, arising from or related to: (i) any debts incurred by Agent or Agent Personnel, including debts incurred with telephone, utility, and express mail companies; (ii) any claim of any officer, director, shareholder of the Agent or any Agent Personnel made against Ignite Payments for any compensation, benefit or other payment to such person; (iii) any activity or representation by Agent

ELECTRONICALLY FILED
8/31/2016 9:03 PM
2016-L-008689
PAGE 9 of 62

Ignite Payments New Premier Agent 0113

or any Agent Personnel in marketing, advertising, promoting or otherwise engaging in any activity arising from or related to this Agreement; (iv) any claim arising from the unauthorized use of the Trademarks or other Ignite Payments or Card Organization intellectual property; (v) any actions concerning alleged Agent or Representative improprieties in the solicitation, sale or leasing of the Ignite Payments Services or equipment; (vi) any breach of any term or condition of this Agreement, any Card Organization Rules, law, regulation or court order or Business Conduct Standards; (vii) any representation, warranty or covenant of Agent made in or in connection with this Agreement being false or misleading; or (viii) losses experienced by Ignite Payments attributable to chargebacks, fines, penalties and other amounts due from a Merchant to Ignite Payments caused by the gross negligence or willful misconduct of Agent or Agent Personnel. As stated in elsewhere in this Agreement, Agent is acting hereunder as an independent contractor and neither Agent nor any Agent Personnel shall be considered to be an employee of Ignite Payments or its Affiliates or Ignite Payments' sponsor bank (collectively "Ignite Payments" for purposes of this **Section 10.1**). Notwithstanding anything to the contrary in **Section 10.4**, if (a) Agent or any Agent Personnel assert that Agent or any Agent Personnel is an employee of Ignite Payments; or (b) a federal, state or local governmental agency or court asserts or determines Agent or any Agent Personnel are employees of Ignite Payments, then Agent shall indemnify, defend and hold harmless Ignite Payments, its Affiliates, and their respective officers, directors and employees from any and all Damages and exemplary, punitive or special damages associated with such claim and/or determination whether or not litigation is commenced, incurred by or asserted against Ignite Payments.

**10.2.    Statute of Limitations.** Notwithstanding the fact that the statute of limitations for bringing a legal action on a written contract, or other limitation period that could apply based upon the type of action or act, omission or violation being alleged, may be shorter or longer, the parties agree that any action, legal or equitable, based on, related to or arising out of the subject matter of this Agreement, and whether based on contract, tort, strict liability or some other legal or equitable theory of recovery, must be commenced by a party within one year after the earlier of (i) the date on which such party knew or should have known of the first alleged act, omission or violation, or (ii) with respect to obligations that do not survive termination of this Agreement, the date of termination of this Agreement.

**10.3.    Limitation of Liability.** Notwithstanding anything contained in this Agreement or otherwise, Ignite Payments' cumulative liability to Agent and anyone claiming by through or under Agent, for all Damages arising out of or related to this Agreement, and regardless of the form of action or legal theory shall not exceed, in the aggregate, the lesser of aggregate Residuals paid to agent in the twelve months preceding the act giving rise to the claim or $500,000.00. Agent understands the limitation on damages to be a reasonable allocation of risk and expressly consents to such risk allocation.

**10.4.    Exclusion of Damages.** Except as set forth in this Agreement, in no event shall either party, its parents, Affiliates or any of its or their directors, officers, employees, agents or sub-contractors be liable under any theory of tort, contract, strict liability or other legal or equitable theory for lost profits, exemplary, punitive, special, incidental, indirect or consequential damages, each of which is hereby excluded by agreement of the parties regardless of whether such damages were foreseeable or whether either party or any entity has been advised of the possibility of such damages.

## 11. General Provisions

**11.1.    Definitions; Word Usage.** Capitalized terms have the meanings set forth in **Exhibit A**. Unless the context clearly requires otherwise, (i) the plural and singular numbers shall each be deemed to include the other; (ii) **"shall," "will,"** or **"agrees"** are mandatory, and **"may"** is permissive; (iii) **"or"** is not exclusive; and (iv) **"includes"** and **"including"** are not limiting.

**11.2.    Effect of Headings.** Subject headings of sections and subsections of this Agreement are included for convenience only and shall not affect the construction or interpretation of any of its provisions.

ELECTRONICALLY FILED
8/31/2016 9:03 PM
2016-L-008689
PAGE 10 of 62

Ignite Payments New Premier Agent 0113

**11.3.    Entire Agreement.** This Agreement, including the exhibits hereto, constitutes the sole and exclusive terms and conditions and agreement between the parties relating to the subject matter hereof, and supersedes all prior or contemporaneous discussions, writings, negotiations, understandings and agreements with respect thereto.

**11.4.    Waiver or Modification Ineffective Unless in Writing.** Except as set forth in this Agreement, no amendment of any provision of this Agreement will be valid unless the same will be in writing and signed by each of the parties. No waiver by any party of any provision of this Agreement or any default, misrepresentation, or breach of warranty or covenant hereunder, whether intentional or not, will be valid unless the same will be in writing and signed by the party making such waiver nor will such waiver be deemed to extend to any prior or subsequent waiver, default, misrepresentation, or breach of warranty or covenant hereunder or affect in any way any rights arising by virtue of any prior or subsequent waiver, default, misrepresentation, or breach of warranty or covenant except pursuant to its express terms.

**11.5.    Assignment.** The rights and obligations of Agent under this Agreement are personal. Except as otherwise expressly provided in this Agreement, Agent shall not assign, subcontract, license, franchise, or in any manner attempt to transfer or extend to any third party this Agreement or any right or obligation of Agent under this Agreement, by operation of law or otherwise, without the prior written consent of Ignite Payments, which may be granted or withheld at the sole discretion of Ignite Payments. For purposes of this Agreement, any transfer of ownership or voting control of Agent shall be considered an assignment or transfer hereof. This Agreement shall be binding upon and inure to the benefit of the parties hereto and their permitted successors and assigns.

**11.6.    Written Notice.** Unless otherwise specified in this Agreement, all notices and other communications required or permitted under this Agreement shall be in writing and shall be deemed delivered and effective when given by personal delivery, telefax (confirmed by a mailed copy) or first-class mail, postage prepaid, addressed as follows: (i) if to Agent, to the address set forth below Agent's signature line in this Agreement; and (ii) if to Ignite Payments to 5898 Condor Drive, Suite 220, Moorpark, CA 93021, Attention: Senior Vice President (Facsimile: 402.916.6610); with a copy to First Data Corporation, 6200 South Quebec Street, Suite 360, Greenwood Village, Colorado 80111, Attention: Legal Department (Facsimile: 303.967.5216). A party may change its address or addresses set forth above by giving the other party notice of the change in accordance with the provisions of this **Section 11.6**. In addition, Agent and Ignite Payments each may update its address through MyAgentOffice.com, and Ignite Payments may change the location of any documents, information or forms referenced in this Agreement and located on MyAgentOffice.com or the Ignite Payments brand center on notice to Agent via email or MyAgentOffice.com.

**11.7.    Cooperation.** Ignite Payments and Agent will each timely furnish to the other any and all information and materials that the other may, from time to time, reasonably request in connection with all matters contemplated by this Agreement. Each party also shall take the action as the other may, from time to time, reasonably request in order that the purposes of this Agreement will be fully accomplished and that all matters contemplated hereby will comply with all applicable laws, regulations, court orders and Rules.

**11.8.    Severability.** The invalidity of any paragraph or subparagraph hereof shall not affect the validity of any other paragraph or subparagraph hereof.

**11.9.    Governing Law and Waiver.** This Agreement shall be governed by the laws of the State of New York. Agent waives personal service of process and consents that service of process upon it may be made by certified or registered mail, return receipt requested, at the address provided below the signature line of this Agreement.

ELECTRONICALLY FILED
8/31/2016 9:03 PM
2016-L-008689
PAGE 11 of 62

Ignite Payments New Premier Agent 0113

**11.10.  Survival of Terms.** The parties agree that those provisions of this Agreement that logically should survive its termination in order to accomplish the fundamental purposes of it will do so, including Sections 1.1.a, 1.2 (v), (vii) and (ix), 1.3., 1.4.b – d, 1.5, 2.1, 4, 5, 7.1 – 7.5, 9, 10, 11.

**11.11.  Third Party Beneficiaries.** This Agreement is made for the benefit of Ignite Payments, Agent and their respective successors and assigns. In addition, Ignite Payments' sponsor bank is a third party beneficiary of this Agreement and may enforce and this Agreement against Agent. No other person or entity has or acquires any rights by virtue of this Agreement.

**11.12.  Authority.** The person executing this document on behalf of Agent warrants that they have the full right, capacity and authority to cause such party to enter into this Agreement and that such party has all necessary authority to perform this Agreement.

**11.13.  No Presumption Against Drafter.** Ignite Payments and Agent have jointly participated in the negotiation of the terms of this Agreement. This Agreement shall be construed as if drafted jointly by Ignite Payments and Agent, and no presumptions arise favoring any party by virtue of the authorship of any provision of this Agreement.

In consideration of the foregoing, the parties hereby execute this Agreement.

ELECTRONICALLY FILED
8/31/2016 9:03 PM
2016-L-008689
PAGE 12 of 62

**Agent:**                                                              **Ignite Payments, LLC**

**Signature:** _Cl A_                                      **By:** _____

**Printed Name:** _Christ Gamino_                  **Name:** _____

**Title:** _President_                                         **Title:** _____

**Date:** _4/2/13_                                             **Date:** _____

**Address:** _577 S. Hillside Ave_

_Elmhurst Il. 60126_

Ignite Payments New Premier Agent 0113

**Exhibit A**
**Definitions**

**Affiliate** means any entity that directly or indirectly controls, is controlled by or is under common control with a party.

**Agent Business Conduct Standards** means the business conduct standards that may be established or modified by Ignite Payments from time to time and posted under Policies on MyAgentOffice.com.

**Agent Personnel** means Representatives and any other personnel or contractors of Agent.

**Business Day** means any calendar day other than Saturdays, Sundays, or California or federal holidays.

**Buy Rates** means the amounts set forth under Resources/Forms on MyAgentOffice.com.

**Card** means a credit, debit or other card issued by a member of a Card Organization, including MasterCard, Visa and Discover, and bearing its respective trade name, Mark, or trade symbol, which is of the type accepted for processing under the Merchant Agreement.

**Card Organization** means an entity formed to govern the proper administration and promotion of credit, debit and other cards, including MasterCard, Visa, American Express, Discover and any other entity whose cards may be accepted by merchants for payment for goods or services under the Merchant Agreement.

**Card Organization Rules** means the rules and regulations now existing, as they may be modified in the future, and any rules and regulations hereafter promulgated by any Card Organization, including the rules and regulations contained in: (i) the Visa U.S.A. Inc. ("**Visa**") Operating Regulations, (ii) MasterCard International Incorporated ("**MasterCard**") Operations Manual, (iii) Discover Financial Services, LLC ("**Discover**") operating regulations, (iv) American Express Travel Related Services Company, Inc. ("**American Express**") operating regulations, as applicable.

**Competing Activity** means, whether directly or indirectly, the ownership, management, operation, control, participation in, performance of services for, the solicitation of merchants for, or otherwise carrying on, a business similar to or competitive with the electronic transaction processing business of Ignite Payments, including the Services (whether as a principal, agent, independent contractor, partner, employer, proprietor, stockholder, director or otherwise), anywhere in the Territory.

**Confidential Information** means all proprietary, secret or confidential information or data relating to a party and its Affiliates, operations, employees, products or services, clients, customers, potential customers and Ignite Payments' Services. Confidential Information shall include proprietary information of Card Organizations, pricing information, Merchant Agreements (whether partially or fully completed), Merchant Accounts and Merchant or Prospective Merchant accounts, records and related information, customer lists, cardholder account numbers, Personal Data, computer access codes, instruction and/or procedural manuals and this Agreement and the terms and conditions of this Agreement. Information shall not be considered Confidential Information to the extent, but only to the extent, that such information: (i) is already known to the receiving party free of any restriction at the time it is obtained; (ii) is subsequently learned from an independent third party free of any restriction and without breach of this Agreement; (iii) becomes publicly available through no wrongful act of the receiving party; (iv) is independently developed by the receiving party without reference to any Confidential Information of the other; or (v) is required to be disclosed under law, provided that the receiving party first gives the disclosing party prompt written notice of the required disclosure and commercially reasonable time to allow the disclosing party to seek a protective order or other appropriate remedy.

ELECTRONICALLY FILED
8/31/2016 9:03 PM
2016-L-008689
PAGE 13 of 62

Ignite Payments New Premier Agent 0113

**Current Level of Account Production** means the number of new Merchant Accounts for Merchants boarded by Agent during the specified time period.

**Damages** means demands, claims, actions or causes of action, assessments, losses, damages, liabilities, judgments, settlement amounts, costs and expenses, including interest, fines, penalties and reasonable expert witness fees and expenses, and attorneys' fees and expenses.

**FDC** means First Data Corporation or its successors or assigns.

**Gross Processing Revenue - Premier** means all Income - Premier collected on Open Accounts, excluding those for which Ignite Payments has purchased the Residual rights, minus: Card Organization interchange fees; Card Organization dues and assessments; Buy Rates; Refunds caused by processing errors or the gross negligence or willful misconduct of Agent or Agent Personnel; and Merchant Losses caused by the gross negligence or willful misconduct of Agent or Agent Personnel.

**Ignite Payments' sponsor bank** means the bank that is the sponsoring bank or acquiring bank for Card transactions processed pursuant to the Merchant Agreement, as applicable.

**Income - Premier** consists of the following items on all Open Accounts: (1) all discount fees (qualified, mid-qualified, and non-qualified) on MasterCard, Visa, Discover, Diners, debit and JCB transactions; (2) transaction fees, (3) batch header fees, (4) address verification service fees, (5) monthly minimum fees, (6) customer support fees, (7) statement fees, (8) monthly Ignite Payments merchant cub fees, (9) American Express residuals, (10) JCB fees, (11) chargeback/retrieval fees, (12) annual fees (13) account closure fees and (14) early termination fees.

**Marks** are defined in **Section 4.1.**

**Merchant** means an entity that submits a Merchant Agreement to Ignite Payments that indicates such entity was solicited by Agent and results in a Merchant Account.

**Merchant Account** means a Merchant Agreement that has been approved and entered into by Ignite Payments and Ignite Payments sponsor bank.

**Merchant Agreement** means the form of merchant application and merchant agreement in use by Ignite Payments and its sponsor bank in connection with the Ignite Payments Services, as it may be modified from time to time by Ignite Payments and its sponsor bank in their sole discretion.

**MCC Codes** means the four digit Merchant Category Classification codes created by Visa International, Inc. and listed in the Visa USA Merchant Data Manual to identify a particular merchant's principal trade, profession or line of business.

**Merchant Losses** means all losses experienced by Ignite Payments attributable to chargebacks, fines, penalties and other amounts due from a Merchant to Ignite Payments in excess of a Merchant's reserve account.

**Open Account** means a Merchant Account for a Merchant that is classified as "open" on an Ignite Payments settlement platform and has not been cancelled or terminated.

**Personal Data** means any information that is "personally identifiable" within the meaning of the Gramm-Leach-Bliley Act (15 USC § 6801, et seq.) and its implementing regulations (or any superseding or replacement laws, regulations or guidelines), as they may now exist or be enacted, adopted, issued or promulgated.

ELECTRONICALLY FILED
8/31/2016 9:03 PM
2016-L-008689
PAGE 14 of 62

Ignite Payments New Premier Agent 0113

**Privacy Laws** means all laws, regulations and guidelines applicable to the use, disclosure and processing of Personal Data on behalf of Ignite Payments or its Affiliates, including the Gramm-Leach-Bliley Act (GLBA) and the Healthcare Insurance Portability and Accountability Act (HIPAA), as they may now exist or be enacted, adopted, issued or promulgated.

**Prospective Merchant** means any entity solicited by Agent for Services to be provided by Ignite Payments pursuant to a Merchant Agreement.

**Referral Open Account** means an Open Account resulting from a lead from a third party referral source to Agent with respect to which Ignite Payments is obligated to pay such third party a referral fee.

**Refunds** means refunds to Merchants of any billed and collected amounts.

**Representative** means all salespersons, employees, agents or representatives appointed or designated by Agent to act on Agent's behalf in connection with performance of Agent's obligations under this Agreement.

**Residuals** means the payments due to Agent by Ignite Payments pursuant to **Section 7.2.a.** of this Agreement.

**Services** means electronic transaction processing of Card and certain other transactions and related services and support systems as described in the Merchant Agreement.

**Term** is defined in **Section 6.1.**

**Territory** means the United States, as currently defined by Visa.

**Three Month Average Residuals** is defined in **Section 1.3.**

**Tier I Merchants** means those merchants that have been assigned a MCC Code by Ignite Payments that corresponds with a MCC Code designated by Ignite Payments in its sole discretion, as a Tier I MCC Code at My Office/Compensation/Rev Share Profile on MyAgentOffice.com. Tier I Merchants are intended to be those merchants engaging in face-to-face transactions (which do not include transactions conducted over the telephone, by facsimile, or over the Internet) with cardholders that Ignite Payments in its sole discretion determines are operating businesses in low to moderate risk industries and Internet merchants with Tier 1 MCC codes that have also been processing with Ignite Payments for a period of greater than one year.

**Tier II Merchants** means all merchants that do not qualify as Tier I Merchants. Tier II Merchants are intended to be those merchants that Ignite Payments in its sole discretion determines are operating businesses in high risk industries and Internet merchants that have been processing with Ignite Payments for less than a period of one year.

**Trademarks** means the marks set forth on **Exhibit B.**

**Unacceptable List** is defined in **Section 1.4.**

**USPS Move Update Requirements** means the requirements established by the United States Postal Service for First-Class Mail presorted and automation rates, including but not limited to the Move Update requirements for addresses.

ELECTRONICALLY FILED
8/31/2016 9:03 PM
2016-L-008689
PAGE 15 of 62

Ignite Payments New Premier Agent 0113

**Exhibit B**

**<u>Trademarks</u>**

(1) **IGNITE PAYMENTS**™

(2)



ELECTRONICALLY FILED
8/31/2016 9:03 PM
2016-L-008689
PAGE 16 of 62

16 of 17

Ignite Payments New Premier Agent 0113

## Exhibit C

**Residuals paid for Merchants Boarded on or after the Effective Date ("Premier")**

A. Residuals for Premier Open Accounts for a calendar month shall be an amount equal to the product of Gross Processing Revenue - Premier for Premier Open Accounts for the prior calendar month multiplied by the applicable percentage from the **"Premier Residual Schedule" ("Premier Schedule")** at My Office/Compensation/Rev Share Profile on MyAgentOffice.com.

The Premier Schedule percentage shall be determined based upon the number of new Open Accounts at the end of each calendar month under this Agreement. The percentage shall be recalculated by the first day of the last month of each calendar quarter and shall be effective as of the first day of each calendar quarter (each a **"Premier Recalculation Effective Date"**). The quarterly recalculation may result in an increase, decrease or no change to Premier Schedule percentage. The Premier Schedule percentage will be increased if the average number of new Open Accounts for the three calendar month review period for such calendar quarter is in a higher tier on the Premier Schedule. The Premier Schedule Revenue share percentage will only be reduced if the average number of new Premier Open Accounts per month in the applicable six calendar month review period for such calendar quarter is in a lower tier on the Premier Schedule. The following schedule summarizes the trigger dates regarding the calculation of the percentage that will be used to calculate Residuals:

ELECTRONICALLY FILED
8/31/2016 9:03 PM
2016-L-008689
PAGE 17 of 62

| Calendar Quarter | Review Period that may result in increased Premier % for such quarter | Review Period that may result in decreased Premier % for such quarter | Date of recalculation for such quarter – no later than: | Premier Recalculation Effective Date | Period Residuals Paid |
|---|---|---|---|---|---|
| 1st | Aug. 1 - Oct. 31 | May 1 – Oct. 31 | Dec. 1 | Jan. 1 - Mar.31 | Feb. – Apr. |
| 2nd | Nov. 1 - Jan 31 | Aug. 1 – Jan.1 | Mar. 1 | Apr. 1 - June 30 | May – Jul. |
| 3rd | Feb. 1 – Apr. 30 | Nov. 1 – Apr. 1 | June 1 | Jul. 1 - Sept. 30 | Aug. – Oct. |
| 4th | May 1 – July 1 | Feb. 1 – Jul. 1 | Sept. 1 | Oct. 1 – Dec. 31 | Nov. – Jan. |

B.      Notwithstanding anything to the contrary in this **Exhibit C**, Agent's initial Residuals for Premier Open Accounts during the first 12 full calendar months following the execution of this Agreement shall be fixed at 50% of Gross Processing Revenue - Premier.

C.      Ignite Payments in its sole discretion may modify the Premier Schedule in so far as it affects Ignite Payments Residual obligations prospectively, with respect to any existing Open Accounts subject to the Premier Schedule or both, by giving Agent 90 days prior written notice; provided, however, that Agent may terminate this Agreement within 90 days of receiving such notice from Ignite Payments by giving Ignite Payments written notice of termination within such 90 day period.

D.      Ignite Payments may, in its sole discretion, credit Agent for Referral Open Accounts. To **"credit Agent"** means that Ignite Payments will pay Agent Residuals for such Merchant, provided, however, that Agent's Residuals for such Merchant will be reduced by 100% of any recurring referral fee paid by Ignite Payments to the third party referral source during each month preceding payment of Agent's Residuals for the referral. The adjustments to Agent's Residuals referenced above will apply to all recurring referral fees paid by Ignite Payments after the execution of this Agreement including referral fees paid with respect to Merchants referred by third parties prior to the execution of this Agreement. Agent's Residuals will also be reduced by 100% of any non-recurring referral fees such as one-time commissions paid by Ignite Payments to any third party referral source.

17 of 17

Ignite Payments New Premier Agent 0113

Form **W-9**
(Rev. December 2011)
Department of the Treasury
Internal Revenue Service

# Request for Taxpayer
# Identification Number and Certification

Give Form to the
requester. Do not
send to the IRS.

Name (as shown on your income tax return)

*ACS Capital Partners Inc.*

Business name/disregarded entity name, if different from above

*Swype-Now.com*

Check appropriate box for federal tax classification:

☐ Individual/sole proprietor  ☐ C Corporation  ☒ S Corporation  ☐ Partnership  ☐ Trust/estate

☐ Limited liability company. Enter the tax classification (C=C corporation, S=S corporation, P=partnership) ▶

☐ Other (see instructions) ▶

☐ Exempt payee

Address (number, street, and apt. or suite no.)

*577 S. Hillside Ave*

City, state, and ZIP code

*Elmhurst IL. 60126*

Requester's name and address (optional)

List account number(s) here (optional)

*Print or type*
*See Specific Instructions on page 2.*

## Part I    Taxpayer Identification Number (TIN)

Enter your TIN in the appropriate box. The TIN provided must match the name given on the "Name" line to avoid backup withholding. For individuals, this is your social security number (SSN). However, for a resident alien, sole proprietor, or disregarded entity, see the Part I instructions on page 3. For other entities, it is your employer identification number (EIN). If you do not have a number, see *How to get a TIN* on page 3.

**Note.** If the account is in more than one name, see the chart on page 4 for guidelines on whose number to enter.

Social security number

[ ][ ][ ] – [ ][ ] – [ ][ ][ ][ ]

Employer identification number

## Part II    Certification

Under penalties of perjury, I certify that:

1. The number shown on this form is my correct taxpayer identification number (or I am waiting for a number to be issued to me), and

2. I am not subject to backup withholding because: (a) I am exempt from backup withholding, or (b) I have not been notified by the Internal Revenue Service (IRS) that I am subject to backup withholding as a result of a failure to report all interest or dividends, or (c) the IRS has notified me that I am no longer subject to backup withholding, and

3. I am a U.S. citizen or other U.S. person (defined below).

**Certification instructions.** You must cross out item 2 above if you have been notified by the IRS that you are currently subject to backup withholding because you have failed to report all interest and dividends on your tax return. For real estate transactions, item 2 does not apply. For mortgage interest paid, acquisition or abandonment of secured property, cancellation of debt, contributions to an individual retirement arrangement (IRA), and generally, payments other than interest and dividends, you are not required to sign the certification, but you must provide your correct TIN. See the instructions on page 4.

Sign
Here

Signature of
U.S. person ▶

Date ▶  *4/2/13*

ELECTRONICALLY FILED
8/31/2016 9:03 PM
2016-L-008689
PAGE 51 of 81

## General Instructions

Section references are to the Internal Revenue Code unless otherwise noted.

## Purpose of Form

A person who is required to file an information return with the IRS must obtain your correct taxpayer identification number (TIN) to report, for example, income paid to you, real estate transactions, mortgage interest you paid, acquisition or abandonment of secured property, cancellation of debt, or contributions you made to an IRA.

Use Form W-9 only if you are a U.S. person (including a resident alien), to provide your correct TIN to the person requesting it (the requester) and, when applicable, to:

1. Certify that the TIN you are giving is correct (or you are waiting for a number to be issued),

2. Certify that you are not subject to backup withholding, or

3. Claim exemption from backup withholding if you are a U.S. exempt payee. If applicable, you are also certifying that as a U.S. person, your allocable share of any partnership income from a U.S. trade or business is not subject to the withholding tax on foreign partners' share of effectively connected income.

**Note.** If a requester gives you a form other than Form W-9 to request your TIN, you must use the requester's form if it is substantially similar to this Form W-9.

**Definition of a U.S. person.** For federal tax purposes, you are considered a U.S. person if you are:

• An individual who is a U.S. citizen or U.S. resident alien,

• A partnership, corporation, company, or association created or organized in the United States or under the laws of the United States,

• An estate (other than a foreign estate), or

• A domestic trust (as defined in Regulations section 301.7701-7).

**Special rules for partnerships.** Partnerships that conduct a trade or business in the United States are generally required to pay a withholding tax on any foreign partners' share of income from such business. Further, in certain cases where a Form W-9 has not been received, a partnership is required to presume that a partner is a foreign person, and pay the withholding tax. Therefore, if you are a U.S. person that is a partner in a partnership conducting a trade or business in the United States, provide Form W-9 to the partnership to establish your U.S. status and avoid withholding on your share of partnership income.

Cat. No. 10231X

Form **W-9** (Rev. 12-2011)

Form W-9 (Rev. 12-2011)                                                                                                      Page **2**

The person who gives Form W-9 to the partnership for purposes of establishing its U.S. status and avoiding withholding on its allocable share of net income from the partnership conducting a trade or business in the United States is in the following cases:

• The U.S. owner of a disregarded entity and not the entity,

• The U.S. grantor or other owner of a grantor trust and not the trust, and

• The U.S. trust (other than a grantor trust) and not the beneficiaries of the trust.

**Foreign person.** If you are a foreign person, do not use Form W-9. Instead, use the appropriate Form W-8 (see Publication 515, Withholding of Tax on Nonresident Aliens and Foreign Entities).

**Nonresident alien who becomes a resident alien.** Generally, only a nonresident alien individual may use the terms of a tax treaty to reduce or eliminate U.S. tax on certain types of income. However, most tax treaties contain a provision known as a "saving clause." Exceptions specified in the saving clause may permit an exemption from tax to continue for certain types of income even after the payee has otherwise become a U.S. resident alien for tax purposes.

If you are a U.S. resident alien who is relying on an exception contained in the saving clause of a tax treaty to claim an exemption from U.S. tax on certain types of income, you must attach a statement to Form W-9 that specifies the following five items:

1. The treaty country. Generally, this must be the same treaty under which you claimed exemption from tax as a nonresident alien.

2. The treaty article addressing the income.

3. The article number (or location) in the tax treaty that contains the saving clause and its exceptions.

4. The type and amount of income that qualifies for the exemption from tax.

5. Sufficient facts to justify the exemption from tax under the terms of the treaty article.

*Example.* Article 20 of the U.S.-China income tax treaty allows an exemption from tax for scholarship income received by a Chinese student temporarily present in the United States. Under U.S. law, this student will become a resident alien for tax purposes if his or her stay in the United States exceeds 5 calendar years. However, paragraph 2 of the first Protocol to the U.S.-China treaty (dated April 30, 1984) allows the provisions of Article 20 to continue to apply even after the Chinese student becomes a resident alien of the United States. A Chinese student who qualifies for this exception (under paragraph 2 of the first protocol) and is relying on this exception to claim an exemption from tax on his or her scholarship or fellowship income would attach to Form W-9 a statement that includes the information described above to support that exemption.

If you are a nonresident alien or a foreign entity not subject to backup withholding, give the requester the appropriate completed Form W-8.

**What is backup withholding?** Persons making certain payments to you must under certain conditions withhold and pay to the IRS a percentage of such payments. This is called "backup withholding." Payments that may be subject to backup withholding include interest, tax-exempt interest, dividends, broker and barter exchange transactions, rents, royalties, nonemployee pay, and certain payments from fishing boat operators. Real estate transactions are not subject to backup withholding.

You will not be subject to backup withholding on payments you receive if you give the requester your correct TIN, make the proper certifications, and report all your taxable interest and dividends on your tax return.

**Payments you receive will be subject to backup withholding if:**

1. You do not furnish your TIN to the requester,

2. You do not certify your TIN when required (see the Part II instructions on page 3 for details),

3. The IRS tells the requester that you furnished an incorrect TIN,

4. The IRS tells you that you are subject to backup withholding because you did not report all your interest and dividends on your tax return (for reportable interest and dividends only), or

5. You do not certify to the requester that you are not subject to backup withholding under 4 above (for reportable interest and dividend accounts opened after 1983 only).

Certain payees and payments are exempt from backup withholding. See the instructions below and the separate Instructions for the Requester of Form W-9.

Also see *Special rules for partnerships* on page 1.

**Updating Your Information**

You must provide updated information to any person to whom you claimed to be an exempt payee if you are no longer an exempt payee and anticipate receiving reportable payments in the future from this person. For example, you may need to provide updated information if you are a C corporation that elects to be an S corporation, or if you no longer are tax exempt. In addition, you must furnish a new Form W-9 if the name or TIN changes for the account, for example, if the grantor of a grantor trust dies.

**Penalties**

**Failure to furnish TIN.** If you fail to furnish your correct TIN to a requester, you are subject to a penalty of $50 for each such failure unless your failure is due to reasonable cause and not to willful neglect.

**Civil penalty for false information with respect to withholding.** If you make a false statement with no reasonable basis that results in no backup withholding, you are subject to a $500 penalty.

**Criminal penalty for falsifying information.** Willfully falsifying certifications or affirmations may subject you to criminal penalties including fines and/or imprisonment.

**Misuse of TINs.** If the requester discloses or uses TINs in violation of federal law, the requester may be subject to civil and criminal penalties.

**Specific Instructions**

**Name**

If you are an individual, you must generally enter the name shown on your income tax return. However, if you have changed your last name, for instance, due to marriage without informing the Social Security Administration of the name change, enter your first name, the last name shown on your social security card, and your new last name.

If the account is in joint names, list first, and then circle, the name of the person or entity whose number you entered in Part I of the form.

**Sole proprietor.** Enter your individual name as shown on your income tax return on the "Name" line. You may enter your business, trade, or "doing business as (DBA)" name on the "Business name/disregarded entity name" line.

**Partnership, C Corporation, or S Corporation.** Enter the entity's name on the "Name" line and any business, trade, or "doing business as (DBA) name" on the "Business name/disregarded entity name" line.

**Disregarded entity.** Enter the owner's name on the "Name" line. The name of the entity entered on the "Name" line should never be a disregarded entity. The name on the "Name" line must be the name shown on the income tax return on which the income will be reported. For example, if a foreign LLC that is treated as a disregarded entity for U.S. federal tax purposes has a domestic owner, the domestic owner's name is required to be provided on the "Name" line. If the direct owner of the entity is also a disregarded entity, enter the first owner that is not disregarded for federal tax purposes. Enter the disregarded entity's name on the "Business name/disregarded entity name" line. If the owner of the disregarded entity is a foreign person, you must complete an appropriate Form W-8.

**Note.** Check the appropriate box for the federal tax classification of the person whose name is entered on the "Name" line (individual/sole proprietor, Partnership, C Corporation, S Corporation, Trust/estate).

**Limited Liability Company (LLC).** If the person identified on the "Name" line is an LLC, check the "Limited liability company" box only and enter the appropriate code for the tax classification in the space provided. If you are an LLC that is treated as a partnership for federal tax purposes, enter "P" for partnership. If you are an LLC that has filed a Form 8832 or a Form 2553 to be taxed as a corporation, enter "C" for C corporation or "S" for S corporation. If you are an LLC that is disregarded as an entity separate from its owner under Regulation section 301.7701-3 (except for employment and excise tax), do not check the LLC box unless the owner of the LLC (required to be identified on the "Name" line) is another LLC that is not disregarded for federal tax purposes. If the LLC is disregarded as an entity separate from its owner, enter the appropriate tax classification of the owner identified on the "Name" line.

ELECTRONICALLY FILED
8/31/2016 9:03 PM
2016-L-008689

ELECTRONICALLY FILED
8/31/2016 9:03 PM
2016-L-008689

**Other entities.** Enter your business name as shown on required federal tax documents on the "Name" line. This name should match the name shown on the charter or other legal document creating the entity. You may enter any business, trade, or DBA name on the "Business name/ disregarded entity name" line.

## Exempt Payee

If you are exempt from backup withholding, enter your name as described above and check the appropriate box for your status, then check the "Exempt payee" box in the line following the "Business name/ disregarded entity name," sign and date the form.

Generally, individuals (including sole proprietors) are not exempt from backup withholding. Corporations are exempt from backup withholding for certain payments, such as interest and dividends.

**Note.** If you are exempt from backup withholding, you should still complete this form to avoid possible erroneous backup withholding.

The following payees are exempt from backup withholding:

1. An organization exempt from tax under section 501(a), any IRA, or a custodial account under section 403(b)(7) if the account satisfies the requirements of section 401(f)(2),

2. The United States or any of its agencies or instrumentalities,

3. A state, the District of Columbia, a possession of the United States, or any of their political subdivisions or instrumentalities,

4. A foreign government or any of its political subdivisions, agencies, or instrumentalities, or

5. An international organization or any of its agencies or instrumentalities.

Other payees that may be exempt from backup withholding include:

6. A corporation,

7. A foreign central bank of issue,

8. A dealer in securities or commodities required to register in the United States, the District of Columbia, or a possession of the United States,

9. A futures commission merchant registered with the Commodity Futures Trading Commission,

10. A real estate investment trust,

11. An entity registered at all times during the tax year under the Investment Company Act of 1940,

12. A common trust fund operated by a bank under section 584(a),

13. A financial institution,

14. A middleman known in the investment community as a nominee or custodian, or

15. A trust exempt from tax under section 664 or described in section 4947.

The following chart shows types of payments that may be exempt from backup withholding. The chart applies to the exempt payees listed above, 1 through 15.

| IF the payment is for . . . | THEN the payment is exempt for . . . |
|---|---|
| Interest and dividend payments | All exempt payees except for 9 |
| Broker transactions | Exempt payees 1 through 5 and 7 through 13. Also, C corporations. |
| Barter exchange transactions and patronage dividends | Exempt payees 1 through 5 |
| Payments over $600 required to be reported and direct sales over $5,000 [1] | Generally, exempt payees 1 through 7 [2] |

[1] See Form 1099-MISC, Miscellaneous Income, and its instructions.

[2] However, the following payments made to a corporation and reportable on Form 1099-MISC are not exempt from backup withholding: medical and health care payments, attorneys' fees, gross proceeds paid to an attorney, and payments for services paid by a federal executive agency.

## Part I. Taxpayer Identification Number (TIN)

**Enter your TIN in the appropriate box.** If you are a resident alien and you do not have and are not eligible to get an SSN, your TIN is your IRS individual taxpayer identification number (ITIN). Enter it in the social security number box. If you do not have an ITIN, see *How to get a TIN* below.

If you are a sole proprietor and you have an EIN, you may enter either your SSN or EIN. However, the IRS prefers that you use your SSN.

If you are a single-member LLC that is disregarded as an entity separate from its owner (see *Limited Liability Company (LLC)* on page 2), enter the owner's SSN (or EIN, if the owner has one). Do not enter the disregarded entity's EIN. If the LLC is classified as a corporation or partnership, enter the entity's EIN.

**Note.** See the chart on page 4 for further clarification of name and TIN combinations.

**How to get a TIN.** If you do not have a TIN, apply for one immediately. To apply for an SSN, get Form SS-5, Application for a Social Security Card, from your local Social Security Administration office or get this form online at *www.ssa.gov*. You may also get this form by calling 1-800-772-1213. Use Form W-7, Application for IRS Individual Taxpayer Identification Number, to apply for an ITIN, or Form SS-4, Application for Employer Identification Number, to apply for an EIN. You can apply for an EIN online by accessing the IRS website at *www.irs.gov/businesses* and clicking on Employer Identification Number (EIN) under Starting a Business. You can get Forms W-7 and SS-4 from the IRS by visiting IRS.gov or by calling 1-800-TAX-FORM (1-800-829-3676).

If you are asked to complete Form W-9 but do not have a TIN, write "Applied For" in the space for the TIN, sign and date the form, and give it to the requester. For interest and dividend payments, and certain payments made with respect to readily tradable instruments, generally you will have 60 days to get a TIN and give it to the requester before you are subject to backup withholding on payments. The 60-day rule does not apply to other types of payments. You will be subject to backup withholding on all such payments until you provide your TIN to the requester.

**Note.** Entering "Applied For" means that you have already applied for a TIN or that you intend to apply for one soon.

**Caution:** *A disregarded domestic entity that has a foreign owner must use the appropriate Form W-8.*

## Part II. Certification

To establish to the withholding agent that you are a U.S. person, or resident alien, sign Form W-9. You may be requested to sign by the withholding agent even if item 1, below, and items 4 and 5 on page 4 indicate otherwise.

For a joint account, only the person whose TIN is shown in Part I should sign (when required). In the case of a disregarded entity, the person identified on the "Name" line must sign. Exempt payees, see *Exempt Payee* on page 3.

**Signature requirements.** Complete the certification as indicated in items 1 through 3, below, and items 4 and 5 on page 4.

**1. Interest, dividend, and barter exchange accounts opened before 1984 and broker accounts considered active during 1983.** You must give your correct TIN, but you do not have to sign the certification.

**2. Interest, dividend, broker, and barter exchange accounts opened after 1983 and broker accounts considered inactive during 1983.** You must give the certification or backup withholding will apply. If you are subject to backup withholding and you are merely providing your correct TIN to the requester, you must cross out item 2 in the certification before signing the form.

**3. Real estate transactions.** You must sign the certification. You may cross out item 2 of the certification.



Ignite Payments, LLC Independent Sales Agent
Application

Email to: Agent.Administration@firstdata.com OR Fax to (402) 916-6903

For Ig▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓

**Please complete all fields. Missing or illegible information will delay the application p▓▓▓▓▓.**

## BUSINESS INFORMATION

Legal Name of Business
ACS Capital Partners Inc.

Fictitious name (DBA) of Business (pending Ignite Payments review)
~~ddddllllll~~ Swype-Now.Com

Form of Entity: Check only one
☑ Corporation  ☐ Partnership  ☐ Sole Proprietorship  ☐ Limited Liability Company  ☐ Other

If Business is a Corporation or an LLC, what state is it registered? IL.
Date Established 4/2013

Owner's Name (s)
Christ Gumino

Office contact person (Please choose one person as a contact)
Christ Gumino

Business Phone Number
(847) 652-3005

Business Facsimile
(847) 652-3005

Physical Address
577 S. Hillside
Unit #
City Elmhurst
State IL
Zip 60126

Billing Address ☑ same as primary
Unit #
City
State
Zip

Mailing ☑ same as primary
Unit #
City
State
Zip

Business E-mail (For notices and all other communication)
ChrisG@Swype-Now. ▓▓▓▓▓▓▓▓▓▓▓▓▓▓ .Com

Business Office URL
www.Swype-Now.Com ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

List name (s) of all Principal owner(s), position held with company and percentage of ownership (must add up to 100%).
If there are more than two principals, please complete an additional application.

Name
Christ Gumino

Position Held
President

Ownership Percentage
100%

Name

Position Held

Ownership Percentage

## PERSONAL INFORMATION

Last Name
Gumino
First Name
Christ
Middle Name
Date of Birth 12/7/75
Social Security Number
Home Phone (630) 279-5288

Address
577 S. Hillside
Unit #
City Elmhurst
State IL
Zip 60126

State Issuing Driver's License IL
License Expiration Date 12/07/2021

Personal Email Address
ChrisG@IgnitePayments5.com

How were you referred to Ignite Payments, LLC?
Sales CMDS

Have you ever registered, been employed by or contracted with any agent office, Ignite Payments, LLC or First Data Corp. (FDC)? If yes, please briefly explain and include relevant dates. If applicable, include name of agent office. If necessary, use a separate sheet of paper.
☐ No ☑ Yes  CMDS

Do you have any relatives working for any other agent office, Ignite Payments, LLC or FDC? If yes, list name (s), relationship and agent office, if applicable. If necessary, use a separate sheet of paper.
☑ No ☐ Yes

12/2010

ELECTRONICALLY FILED 10/31/2016 9:33 PM 2016-L-010689 PAGE 2 of 62

Have you used any name other than the name you are currently using?

☒ No ☐ Yes If yes, please list:

Have you ever been convicted of a felony? ☒ No ☐ Yes
If yes, please explain in detail as to date, place, nature, and number of convictions. (use a separate sheet of paper).
Have you ever been convicted of a misdemeanor? ☒ No ☐ Yes
If yes, please explain in detail as to date, place, nature, and number of convictions. (use a separate sheet of paper).

**An affirmative answer to any of these questions may not necessarily disqualify you from consideration for registration.**

IDENTIFY ALL LITIGATION THAT YOU HAVE BEEN A PARTY TO FOR THE PAST FIVE YEARS WHERE YOU HAVE BEEN NAMED AS A ***DEFENDANT*** AND THE AMOUNT DEMANDED WAS IN EXCESS OF $5,000.00. (Please attach an additional sheet if necessary.)

| Date Lawsuit Filed | Court in Which Lawsuit Was Filed | Case Name | Case Number |
|---|---|---|---|
| | | | |

Final Disposition of the Matter (if any)

IDENTIFY ALL LITIGATION THAT YOU HAVE BEEN A PARTY TO FOR THE PAST FIVE YEARS WHERE YOU HAVE BEEN NAMED AS A ***PLAINTIFF*** AND THE AMOUNT DEMANDED WAS IN EXCESS OF $5,000.00. (Please attach an additional sheet if necessary.)

| Date Lawsuit Filed | Court In Which Lawsuit Was Filed | Case Name | Case Number |
|---|---|---|---|
| | | | |

Final Disposition of the Matter (if any)

## PERSONAL INFORMATION

| Last Name | First Name | Middle Name | Date of Birth | Social Security Number | Home Phone |
|---|---|---|---|---|---|
| | | | | | ( ) |

| Address | Unit # | City | State | Zip |
|---|---|---|---|---|
| | | | | |

| Driver's License Number | State Issuing Driver's License | License Expiration Date |
|---|---|---|
| | | |

Personal Email Address

How were you referred to Ignite Payments, LLC?

Have you ever registered, been employed by or contracted with any agent office, Ignite Payments, LLC or First Data Corp. (FDC)? If yes, please briefly explain and include relevant dates. If applicable, include name of agent office. If necessary, use a separate sheet of paper.

☐ No ☐ Yes

Do you have any relatives working for any other Ignite Payments, LLC agent office or FDC? If yes, list name (s), relationship and agent office, if applicable. If necessary, use a separate sheet of paper.

☐ No ☐ Yes

ELECTRONICALLY FILED
8/31/2016 9:03 PM
2016-L-008689
PAGE 2 of 62

Have you used any name other than the name you are currently using?

☐ No ☐ Yes If yes, please list:

Have you ever been convicted of a felony? ☐ No ☐ Yes
If yes, please explain in detail as to date, place, nature, and number of convictions. (use a separate sheet of paper).
Have you ever been convicted of a misdemeanor? ☐ No ☐ Yes
If yes, please explain in detail as to date, place, nature, and number of convictions. (use a separate sheet of paper).

**An affirmative answer to any of these questions may not necessarily disqualify you from consideration for registration.**

IDENTIFY ALL LITIGATION THAT YOU HAVE BEEN A PARTY TO FOR THE PAST FIVE YEARS WHERE YOU HAVE BEEN NAMED AS A ***DEFENDANT*** AND THE AMOUNT DEMANDED WAS IN EXCESS OF $5,000.00. (Please attach an additional sheet if necessary.)

| Date Lawsuit Filed | Court in Which Lawsuit Was Filed | Case Name | Case Number |
|---|---|---|---|
| | | | |

Final Disposition of the Matter (if any)

IDENTIFY ALL LITIGATION THAT YOU HAVE BEEN A PARTY TO FOR THE PAST FIVE YEARS WHERE YOU HAVE BEEN NAMED AS A ***PLAINTIFF*** AND THE AMOUNT DEMANDED WAS IN EXCESS OF $5,000.00. (Please attach an additional sheet if necessary.)

| Date Lawsuit Filed | Court In Which Lawsuit Was Filed | Case Name | Case Number |
|---|---|---|---|
| | | | |

Final Disposition of the Matter (if any)

 ® Ignite Payments, LLC

1. I certify that all information provided on this application is correct to the best of my knowledge. I understand that willful omission or deliberate falsification of information on this application may result in my failure to receive an approval of registration or, if I am registered, immediate termination of my registration.

2. I declare under penalty of perjury under the laws of the State of California and of the state in which my business is located, that all of the information contained in this application form is true and correct.

3. I hereby acknowledge and understand that my business is a separate and distinct legal entity from Ignite Payments, LLC. I hereby acknowledge and understand that this application form does not constitute an application for employment with Ignite Payments, LLC and if approved, I will not be deemed an employee of Ignite Payments, LLC.

## FAIR CREDIT REPORTING ACT CONSUMER DISCLOSURE
## AND GENERAL AUTHORIZATION ("Disclosure and Authorization")
### For Independent Contractors – Non Employees

In connection with my application for assignment as an independent sales agent of Ignite Payments, LLC (Company") and, if applicable, my continued assignment with a business unit of the Company, I understand that a consumer report as defined in the Federal Fair Credit Reporting Act as amended ("FCRA"), 15 U.S.C. 1681 et.seq., may be obtained by the Company from a consumer reporting agency ("CRA"). I understand that this report may include information with respect to public record information, criminal records, motor vehicle operation history, education records, names and dates of previous employers, reason for termination of employment and work experience, and/or credit worthiness, capacity and standing, character, general reputation, personal characteristics, or mode of living, such information may be used to evaluate whether I am an appropriate candidate for assignment with the Company and this determination may be adverse to me. The information obtained will not be provided to any parties other than to designated authorized representatives of the Company. I further understand that the Agency may not give out information about me to the Company without my written consent.

I hereby authorize the Company now, or at any time while I am assigned as an agent of the Company, to obtain a consumer report on me. This authorization does not include the release of my medical information. A photocopy or facsimile of this Disclosure and Authorization form shall be considered as effective and valid as the original.

I understand that in the event any adverse action is taken against me based in whole or in part on the consumer report, I shall be provided with the name of the CRA and a copy of the report as well as a description of my rights under the FCRA.

☐ California, Minnesota, and Oklahoma residents, please check box if you would like a copy of any consumer credit report requested by the Company.

☐ New York residents, please check box if? you would like to be informed if a consumer credit report has been requested on you by the Company as well as the name of the agency providing the report.

I have read and understand the above and authorize Ignite Payments, LLC to perform the above investigations.

_Christ Gumino_
Principal Owner (Please Print)                    Principal Owner (Please Print)

_[signature]_
Signature                                          Signature

_4/2/13_
Date                                               Date

ELECTRONICALLY FILED
8/31/2016 9:03 PM
2016-L-008689
PAGE 2 of 3

01/2013                          Page 3 of 3                    ® Ignite Payments, LLC



# 2011 Premier Agent Incentive
# Commissions and Residuals Summary

ELECTRONICALLY FILED
8/31/2016 9:03 PM
2016-L-008689
PAGE 24 of 62

### Premier Agent Program
#### Residuals

- Residuals for Premier Open Accounts for a calendar month shall be an amount equal to the product of **Gross Processing Revenue - Premier** for Premier Open Accounts for the prior calendar month multiplied by the applicable revenue share percentage.

- **Gross Processing Revenue - Premier** means all GPR Components collected on Open Accounts, minus: Card Organization interchange fees; Card Organization dues and assessments; Buy Rates; Refunds caused by processing errors or the gross negligence or willful misconduct of Agent or Agent Personnel; and Merchant Losses caused by the gross negligence or willful misconduct of Agent or Agent Personnel.

- The initial Revenue Share percentage is 50% for a period of one year. After the initial one year period is over, the revenue share is determined based on the Premier Schedule below.

| New Open Accounts | Revenue Share |
|---|---|
| 0 to 10 | 40% |
| 11 to 20 | 45% |
| 21 to 50 | 50% |
| >50 | 55% |

- The Premier Schedule percentage shall be determined based upon the number of new Open Accounts at the end of each calendar month under this Agreement (or the Superseded Agreement for purposes of the initial calculation). The percentage shall be recalculated by the first day of the last month of each calendar quarter and shall be effective as of the first day of each calendar quarter (each a "**Premier Recalculation Effective Date**").The quarterly recalculation may result in an increase, decrease or no change to Premier Schedule percentage. The Premier Schedule percentage will be increased if the average number of new Open Accounts for the three calendar month review period for such calendar quarter is in a higher tier on the Premier Schedule. The Premier Schedule Revenue share percentage will only be reduced if the average number of new Premier Open Accounts per month in the applicable six calendar month review period for such calendar quarter is in a lower tier on the Premier Schedule. The following schedule summarizes the trigger dates regarding the calculation of the percentage that will be used to calculate Residuals:

Summary of Trigger Dates Schedule:

| Calendar Quarter | Review Period that may result in increased CAAP % for such quarter | Review Period that may result in decreased CAAP % for such quarter | Date of recalculation for such quarter -- no later than: | CAAP Recalculation Effective Date | Period Residuals Paid |
|---|---|---|---|---|---|
| 1st | Aug. 1 - Oct. 31 | May 1 – Oct. 31 | Dec. 1 | Jan. 1 - Mar.31 | Feb. – Apr. |
| 2nd | Nov. 1 - Jan 31 | Aug. 1 – Jan.1 | Mar. 1 | Apr. 1 - June 30 | May – July |
| 3rd | Feb. 1 – Apr. 30 | Nov. 1 – Apr. 1 | June 1 | Jul. 1 - Sept. 30 | Aug. – Oct. |
| 4th | May 1 – July 1 | Feb. 1 – Jul. 1 | Sept. 1 | Oct. 1 – Dec. 31 | Nov. – Jan. |

**Exhibit B**

- Buyrates
  Annual Fee - $20.00 per annual fee billing (Tier 1 and 2).
  - Prorated if Monthly PCI billing is chosen
  Bin Sponsorship - 15 bps on MC/Visa/Discover Volume (Tier 2 only).
  Account on file fee - $5.00 per month (Tier 2 only).

- (GPR) Components
  - Address Verification Service (AVS) fees
  - American Express® monthly fee residual (if applicable)
  - American Express® processing residual
  - Authorization fees (all card types)
  - Voice authorization fees
  - Batch closure fees
  - Batch settlement fees
  - FDMS® Gift Card Program transaction fee
  - Chargeback/retrieval fees
  - Discount Fees – mid-qualified*
  - Discount Fees – non-qualified*
  - Discount Fees – qualified*
  - Discover® Card processing
  - JCB® fees
  - Monthly access fee for JCB
  - Monthly account fees
  - Monthly Cardservice Merchant Club (CMC) fees
  - Monthly customer service fees
  - Monthly minimum fees
  - Monthly settlement statement fees
  - Debit/ATM transaction fees
  - EBT fees
  - Debit card monthly card fee (after six months, as stipulated by the Cardservice Merchant Application and Agreement)
  - Monthly minimum fee for Diners Club$^{SM}$
  - Diners Club processing residual
  - PCI Annual/Monthly Compliance Fees
  - PCI Non-compliance monthly Fees
  - Early Cancellation Fees
  - Closure Fees

Note: Discount fees include MasterCard®,Visa®, and Discover® credit transactions, MasterCard and Visa signature debit, Diners Club, and JCB transactions.

ELECTRONICALLY FILED
8/31/2016 9:03 PM
2016-L-008689
PAGE 25 of 62

ELECTRONICALLY FILED
8/31/2016 9:03 PM
2016-L-008689
PAGE 26 of 62

**Multi Year Contracts**
 **Commission**
- The up-front commission offers apply only to new Tier 1 businesses with a multi year contract. Internet businesses and mail-order/telephone-order merchants who use an Internet gateway to process payments are *not* eligible. Tier designation is determined by FDIS at its sole discretion and is subject to change. **Accounts with pricing exceptions approved by corporate will be paid the up-front or high-volume commission at the sole discretion of the FDIS profitability department.**

| Length of Agreement | Commission Per Eligible Account |
|---|---|
| Two years | $100 |
| Three years | $150 |

- Up Front Commission for High-Volume Accounts eligible under multi-year contracts that are not a part of another agent commission program.

| Monthly Bankcard Processing Volume* | Commission Per Eligible Account |
|---|---|
| $10,000 to $19,999 | $100 |
| $20,000 to $29,999 | $150 |
| $30,000 to $39,999 | $200 |
| $40,000 to $49,999 | $300 |
| $50,000+ | $400 |

*Based on the actual bankcard volume processed during the account's first *full* month with FDIS.

**Any up front commission paid on a merchant account will be charged back to your agent office if that account closes for any reason within 180 days of the subsequent month in which the account was boarded.

**American Express One Point®**
 **Residual**
- Fifty Basis points of the charge volume is included in GPR up to the maximum of $750,000 in *charge volume**.

*Charge volume is defined as the total charges on net purchases less Chargebacks, Credits, and any other amounts owed to American Express by a New Program Merchant.

**Note: The $750,000 maximum charge volume is reset to zero after the first day of each contract year(12 month period).

**American Express ESA®**
 **Residual**
- Year 1 - Forty Basis Points of the Charge Volume included in GPR

- Year 2 and 3 – Twenty Basis Points of the Charge Volume included in GPR
  Included in GP

### Merchant Club (MC)
#### Commission
- One-Time payment of $25 per approved account after 60 days.
#### Residual
- Included in GPR

### Debit
#### Commission
- One-time payment of $10 per approved account after 60 days.
#### Residual
- Included in GPR

### Monthly Global Gateway Access Fee
#### Residual
- Global Monthly Gateway Access Fee may be marked up from the following buy rate options to a cap of $50. The agent receives 100% of the markup.
    - Monthly Gateway Access Fee of $10 + $0.00 trans fee
    - Monthly Gateway Access Fee of $8 + $.05 trans fee

  *Note: For alternative payments, each sale, authorization, and/or capture message, refunds, reauthorizations may count as individual transactions for billing purposes

### Money Network
#### Commisison
- $0.50 per funded (activated) card per month.  A funded (activated) card is a card that has money loaded on it.

### TeleCheck Warranty and ECA®
#### Upfront Commission**
- One-time payment of $75 upon activation of TeleCheck account.
#### Setup Fee
- 50% of amount billed over minimum fee.
#### Inquiry Rate
- 50% of amount billed over minimum fee.
#### Transaction Fee
- 50% of amount billed over minimum fee.
#### Monthly Minimum Fee
- 50% of amount billed over minimum fee.

  **No commission will be paid if the merchant:(a) is already subscribing to the Services at the time of the sale (or has subscribed within the preceding 180 day period) unless the merchant has new ownership and a new federal tax identification number has been issued; (b) is currently in the process of negotiating of the Services at the time of the referral or the merchant has already been referred to

ELECTRONICALLY FILED
8/31/2016 9:03 PM
2016-L-008689
PAGE 27 of 62

TeleCheck by another entity who will be due a commission under another agreement; or (c) has not paid in full the billings to which the commissions relate.

Telecheck upfront commissions is payable upon accounts activation. Activation is defined as submission of a Telecheck transaction, not including test transactions. Commission is due back from the agent if account is suspended, in collections, or closed within five months upon activation.

**Wireless**
    **Residual**
- Wireless monthly access fee may be marked up from the buy rate specific to the wireless terminal. Agent receives 100% of the markup.

- Transaction fee included in GPR.

**Miscellaneous – 100% Agent Revenue**
- **Equipment**
- **Application Fees**
- **Set Up Fees**

The First Data Independent Sales agent program is operated by Cardservice International, Inc. Cardservice International, Inc. DBA First Data Independent Sales is a registered ISO/MSP for the following FDIC-insured banks: First Financial Bank, Englewood, CO; Wells Fargo Bank, N.A., Walnut Creek, CA. American Express. © 2008 First Data Corporation. All Rights Reserved. All trademarks, service marks and trade names referenced in this material are the property of their respective owners.

ELECTRONICALLY FILED
8/31/2016 9:03 PM
2016-L-008689
PAGE 28 of 62

**Sent:** Friday, December 20, 2013 11:43 AM
**To:** 'Barrett, John B'
**Subject:** RE: BC Opportunity


John,


Sounds good … I may need help since it is around 4000 accounts.  I think rola has a reapp option which may help.


Thanks


Chris


ELECTRONICALLY FILED
8/31/2016 9:03 PM
2016-L-008689
PAGE 29 of 62


**From:** Barrett, John B [mailto:John.Barrett@firstdata.com]
**Sent:** Friday, December 20, 2013 10:18 AM
**To:** chris
**Subject:** RE: BC Opportunity


Chris


We are excited to get these accounts in before years end, yes we will pay the term rebates on these accounts.  If you need any help getting all of these accounts in, please contact national accounts.  We look forward to this opportunity, good work.


John Barrett


**From:** chris [mailto:chrisg@chargefdis.com]
**Sent:** Friday, December 20, 2013 8:03 AM
**To:** Barrett, John B
**Subject:** BC Opportunity


**Exhibit C**

John,

Just wanted to fill you in on Beauty Counter, I have them ready to sign the proposal and merchant application. They have 4000 reps as of now and they are growing by 500 reps per month. All these beauty reps again will need swipers and apps which I am covering the cost for this including the database. They are a start up and do not have the funds. I need a guarantee that I will be getting at least the $150 term rebate that's in my contract or I cannot do the deal.. Dan Devitt stated there should not be a problem, as we have always paid on approved accounts. Thanks again

Thank you,

**Chris Gumino**
*118 N Clinton Suite 6*

*Chicago, IL 60661*
312-474-9225
312-474-9227-Fax

chrisg@chargefdis.com

www.chargefdis.com

<image001.jpg>

The information in this message may be proprietary and/or confidential, and protected from disclosure. If the reader of this message is not the intended recipient, or an employee or agent responsible for delivering this message to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify First Data immediately by replying to this message and deleting it from your computer.

ELECTRONICALLY FILED
8/31/2016 9:03 PM
2016-L-008689
PAGE 30 of 62

-----Original Message-----
From: Rossi, Michael [mailto:Michael.Rossi@firstdata.com] Sent: Monday, June 09, 2014 5:57 PM
To: Swype-now.com
Subject: RE: BC pricing

Chris
Brett is being a pain in the ass. The model I put together supports a full revshare, 250 term rebate and 1/2 off on swipers at 20 and 10. Even if we increase to 25 and 10 he is saying we have no way of guaranteeing volume and should not support even 100 term. Maybe he cannot do math...even at 4000 volume per month its ok. Bottom line is that no matter what, we must pay you the 150 term minimum even though Brett thinks it is too risky. Michael

> >
> >

ELECTRONICALLY FILED
8/31/2016 9:03 PM
2016-L-008689
PAGE 31 of 62

**Exhibit D**

ELECTRONICALLY FILED
8/31/2016 9:03 PM
2016-L-008689
PAGE 32 of 62

**From:** Rossi, Michael [mailto:Michael.Rossi@firstdata.com]
**Sent:** Wednesday, June 18, 2014 7:52 PM
**To:** Swype-now.com
**Subject:** RE: BC

Chris

Either way, we all agreed that 150 UF is ok and 250 is possible if the volume can support it. Had this deal been just 1000 accounts max, 250 UF would be ok. Part of the problem is that we are using volume estimates and have nothing to prove the estimate. Noel said there is no way you could get that many accounts through with the term rebate without it being flagged at 500. We should have finality on this tomorrow.

Michael

**Exhibit E**

**From:** swype-now.com [mailto:chrisq@swype-now.com]
**Sent:** Wednesday, June 18, 2014 6:46 PM
**To:** Rossi, Michael
**Subject:** Re: BC

Yea with.20 and .10 cents they have always been paid on them . I have over 200 cabs with lower rates and they are paid out ... Thanks again probably should have just Entered accounts in

Sent from my iPhone

On Jun 18, 2014, at 7:14 PM, "Rossi, Michael" <Michael.Rossi@firstdata.com> wrote:

Chris

Call went well.  Goudie and Finance are concerned about the level of processing that will be coming in from these accounts.  Typically FD MobilePay accts are small volume.  They claim that the UF bonus is not guaranteed for FD Mobilepay… eventhough legal told me otherwise.  I gave them an conservative estimates of 4200/mth on average based on your latest emails too me.  If Brett and Brian Layfield use a earn-out clause or increase the claw-back it could prove to be a logistical nightmare in terms of tracking so I am not sure if they can achieve Goudie's suggestion.

If we cannot find an easy way to track the earnout or clawback, there is a possibility they may want to reduce the UF to 150 with the possibility of raising the UF in the future if the volume/production is there.  You will get the $150 per approved account. Brett is running the numbers again.  Should have them in a few hours

Michael

The information in this message may be proprietary and/or confidential, and protected from disclosure. If the reader of this message is not the intended recipient, or an employee or agent responsible for delivering this message to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify First Data immediately by replying to this message and deleting it from your computer.

--

ELECTRONICALLY FILED
8/31/2016 9:03 PM
2016-L-008689
PAGE 33 of 62

# MERCHANT PROCESSING APPLICATION AND AGREEMENT (MPA)

| | | | |
|---|---|---|---|
| Agent Office (Print) Swype-now.com | Agent Telephone (866) 652-8990 | | Lead No. |
| Sales Representative (Print) Chris Gumino | Promo Code | Program Code | Dual Board ☐ |

## (1) MERCHANT INFORMATION

| | |
|---|---|
| Legal Name of Business **Counter Brands, LLC.** | DBA (Doing Business As) (only 22 characters including spaces) **Beauty Counter** |

| | | | |
|---|---|---|---|
| Physical Address (No P.O. Boxes) **1727 Berkeley St #1** | City **Santa Monica** | State **CA** | ZIP **90404** |
| Mailing Address (If different from Physical Address) | City | State | ZIP |

| | | | |
|---|---|---|---|
| Business Telephone **(310) 828-0111** | Business Fax Telephone **(310) 828-0111** | Merchant Customer Service Telephone **(310) 828-0111** | Age of Business Yrs. **3** Mos. **0** |
| Merchant E-Mail **Info@beautycounter.com** | | Merchant Customer Service E-Mail **Info@beautycounter.com** | |
| List Type of Business/Products/Services Sold and How (Be specific) **Beauty Products** | | Merchant URL **www.beautycounter.com** | Authorized Business Rep **Jordan** |

| | |
|---|---|
| IATA/ARC Number | a. Is your business located outside of the 50 United States, in the District of Columbia or in a U.S. territory? (if Yes, please attach IRS Form W-8) ☐ Yes ☒ No |
| Tax Filing Name (as it appears on your income tax return) **Counter Brands, LLC.** Federal Tax ID # ___ our income tax return) | b. Does your business currently hold a non-profit status letter from the IRS? (if Yes, please attach IRS Determination Letter) ☐ Yes ☒ No |
| **NOTE:** Failure to provide accurate information may result ... withholding of Merchant funding per IRS regulations. See Part IV, Section A.3 of your Program Guide for further information. | c. Is your business part of a Government Entity such as a state or federal agency? ☐ Yes ☒ No |

## (2) OWNERSHIP

**100% ownership for a partnership or proprietorship, must be accounted for on the application.**

| | | | | | |
|---|---|---|---|---|---|
| ☒ Sole Proprietorship | ☐ Private Corp. | ☐ Public Corp. | ☐ Government (federal/state/local) | ☐ Medical or Legal Corporation | ☐ International Org. |
| ☐ Partnership | ☐ Limited Liability Co. | ☐ Non-Profit Corp. | ☐ Associations/Estates and Trusts | ☐ Tax-Exempt Org. (501C) | |

| | | | | |
|---|---|---|---|---|
| Principal's Name **Susan Renfrew** | Ownership % **100** | Date Business Acquired (Required by American Express) | Title **President** | Home Telephone **(310) 828-0111** |
| Date of Birth (mm/dd/yyyy) (Required) **03/24/1968** | | Driver's License No. and State/State Issued ID (Required) | | Expiration Date (Required) |
| Street Address (Physical Address – No P.O. Boxes) **326 Amalfi Dr** | City **Santa Monica** | State **CA** | ZIP **90404** | Country (Required by American Express) **USA** |
| Second Principal's Name | Ownership % | Date Business Acquired (Required by American Express) | Title | Home Telephone |
| Date of Birth (mm/dd/yyyy) (Required) | Social Security No. (Required) | Driver's License No. and State/State Issued ID (Required) | | Expiration Date (Required) |
| Street Address (Physical Address – No P.O. Boxes) | City | State | ZIP | Country (Required by American Express) |

## (3) SETTLEMENT ACCOUNT (you MUST attach a voided check)

**We will automatically debit your Settlement Account for any amounts owed to us under the Merchant Agreement. The Transit Routing Number and Account Number must match the information listed on the voided check.**

| | | | | |
|---|---|---|---|---|
| Bank Name **Chase** | Transit Routing Number **322271627** | Account Number **639377022** | Telephone **(818) 706-9576** | Bank Contact **Martha** |

## (4) MARKETING METHOD

| | |
|---|---|
| Combined Estimated Monthly Volume (MC/Visa/Discover® Network) | $ **800,000.00** |
| Est. Monthly Volume (American Express) | $ **25,000.00** |
| Typical Ticket/Sales Amount | $ **125.00** |
| Estimated Highest Ticket/Sales Amount | $ **5,000.00** |

| | |
|---|---|
| Face to Face | **100** % |
| Mail Order (MO) | **0** % |
| Telephone Order (TO) | **0** % |
| Internet | **100** % |
| **Total** | **100** % |

| | |
|---|---|
| Swiped | **100** % |
| Keyed With Imprint | **0** % |
| Keyed Without Imprint | **0** % |
| **Total** | **100** % |

## (5) EQUIPMENT/SOFTWARE

| | |
|---|---|
| ☐ NEW EQUIPMENT ☒ REPROGRAM ☐ RAPID CONNECT | |
| ☒ Terminal **First Data Mobile pay** | No. Units **4,700** |
| ☐ Printer | No. Units |
| ☐ PIN Pad | No. Units |
| ☐ Other | No. Units |
| ☒ Software Product **Authorize.net** | |
| ☒ Turnkey/VAR **First Data Mobile Pay** | |
| ☐ Other | |
| ☐ TeleCharge IVR* *Notwithstanding anything to the contrary in the MPA, the term for a TeleCharge Merchant account is month to month. | |

Petroleum Integrated Equipment:
- ☐ VeriFone Ruby
- ☐ Gas Boy
- ☐ Gilbarco
- ☐ Auto Gas
- ☐ Other: _____

Select Platform:
- ☐ CARDnet Platform
- ☐ Omaha Platform
- ☒ Nashville Platform
- ☐ Buypass Platform
- ☐ Compass Platform

PIN Debit
- ☐ Cash-Back Limit $ _____

IPL0613 page 1 of 4 c0214wall
Ignite Payments, LLC is a registered ISO of Wells Fargo Bank, N.A., Walnut Creek, CA.
All trademarks, service marks and trade names referenced in this material are the property of their respective owners.

**Exhibit F**

ELECTRONICALLY FILED 8/31/2016 9:03 PM 2016-L-008822 PAGE 34

ELECTRONICALLY FILED
8/31/2016 9:03 PM
2016-L-008689

## (6) SITE INSPECTION

1. Person/authorized company performing site visitation:

2. Visitation Date:

3. How Many Employees: 4700

4. Location: ☐ Mall ☒ Office ☐ Home ☐ Shopping Area
   ☐ Mixed ☐ Apartment ☐ Isolated

5. Zone: ☒ Business District ☐ Industrial ☐ Residential

6. Return Policy: ☒ Full Refund ☐ Exchange Only ☐ None
7. Do you have a refund policy for MC/Visa/Discover/American Express Sales? ☒ Yes ☐ No
   If Yes, check one: ☐ Full Refund ☐ Store Credit ☒ MC/Visa/Discover/American Express Credit
8. If MC/Visa/Discover/American Express Credit,
   within how many days do you submit credit transactions? ☒ 0-3 ☐ 4-7 ☐ 8-14 ☐ Over 14
9. What is the timeframe from the transaction to delivery of product/service?
   100 % 0-7 days ____% 8-14 days ____% 15-30 days ____% 30+ days

## (7) PROCESSOR

1. Are you now processing or have you ever processed MC/Visa/Discover/American Express? ☒ Yes ☐ No (If yes, attach a previous processor's statement)

2. Name of Processor:

3. Have you ever had a payment card processing relationship terminated? ☐ Yes ☒ No (If yes, attach explanation)

4. Do you use any Third Party Processor (TPP) to store, process or transmit cardholder data? ☐ Yes ☒ No   If yes, give name and address of TPP

## (8) FEE SCHEDULE (Charged by Processor)

All fees are subject to change as provided below. For further details, read the entire Merchant Application and Program Guide.

### DISCOUNT RATES FOR MASTERCARD / VISA / DISCOVER

Acceptance of all MasterCard, Visa and Discover transactions is presumed unless you indicate which service(s) you do not want by checking that service below. (See Section 1.9 of your Program Guide.)
**Note:** If you select Bundled Debit Pricing in Section 9, the Non-PIN Debit rate line items in this Section 8 are not applicable. The Non-PIN Debit rate line items in this Section 8 only apply if you have NOT selected Bundled Debit Pricing in Section 9 and elect to accept Non-PIN Debit Transactions.

☐ Visa Credit Transactions            ☐ MC Credit Transactions
☐ Visa Non-PIN Debit Trans.           ☐ MC Non-PIN Debit Transactions
☐ Discover Transactions

| | | | |
|---|---|---|---|
| Qualified Rates: | Credit | 1.49 % | |
| | Non-PIN Debit | 1.49 % | |
| Mid-Qualified Rates: | | | |
| Credit | Qualified Rate plus | .95 % + $ | |
| Non PIN Debit | Qualified Rate plus | .95 % + $ | |
| Non-Qualified Rates: | | | |
| Credit | Qualified Rate plus | 1.95 % + $ | |
| Non-PIN Debit | Qualified Rate plus | 1.95 % + $ | |

Non-Qualified Surcharge Fee ____% (plus Non-Qualified Interchange Fees, See Section 18.1 of your Program Guide) Applies to non-qualified MasterCard, Visa, Discover Credit and/or Non-PIN Debit transactions.

### AMERICAN EXPRESS ONEPOINT

(Merchants with existing American Express or Non-Full Service must complete the American Express section located on page 3.)
☒ Check here to enable

American Express Credit Discount Rate and Transaction Fee*
   2.65 % + $0

American Express Prepaid Discount Rate and Transaction Fee*
   ____% + $

*A 0.30% downgrade will be charged by American Express for transactions whenever a CNP or Card Not Present Charge occurs. CNP means a Charge for which the Card is not presented at the point of purchase. Applicable to transactions made on all American Express Cards including Prepaid Cards for Retail key-entered, Restaurant key-entered and Travel Agencies/Tour Operators key-entered programs.

*An inbound fee of 0.40% will be applied on any Charge made using a Card that was issued outside the United States (as used herein, the United States does not include Puerto Rico, the U.S. Virgin Islands and other U.S. territories and possessions), including Prepaid. This fee is applicable to all industries except Education in the following categories: Sporting & Recreation Camps (MCC 7032), Elementary & Secondary Schools (MCC 8211), Colleges, Universities, Professional Schools (MCC 8220), and Child Care Services (MCC 8351).

### ADMINISTRATIVE FEES

| | | |
|---|---|---|
| Chargeback Fee for MC/Visa/Discover/American Express | $ | 20.00 (per occurrence) |
| Checking Account Change, ACH Reject, and Account Closure fees | $ | 30.00 (per occurrence) |
| Compliance Service Fee: ☐ Monthly ☐ Annually | $ | 119.00 |

Early Cancellation Fee* An amount equal to your Monthly Minimum Fee MC/Visa/Discover Monthly Customer Service Fee, and Monthly Account Fee multiplied by the number of months remaining in your initial term, as designated in the Initial Term of Merchant Agreement section of this MPA.
*Not applicable to TeleCharge Merchant accounts.

### MONTHLY FEES

| | | |
|---|---|---|
| Monthly Minimum Fee for MC/Visa/Discover | $ | 0 |
| Non-Receipt of PCI Data Validation Fee (only charged after 3 months and each month thereafter if we have not received Merchant's validation of PCI compliance – see glossary for details) | $ | 24.95 (if applicable) |
| Monthly Customer Service Fee | $ | 0 |
| Monthly Account Fee | $ | 0 |
| Merchant Statement Fee* | $ | 9.95 |
| Statement SpendTrend Fee (Optional)** | $ | 2.95 |

*TeleCharge Merchants will receive a paper statement will be charged $5.00 per month. To discontinue your paper statement and to receive your Monthly Statement exclusively online at no charge, you must register at Mymerchantoffice.com.

**First Data SpendTrend – The SpendTrend product suite offers a comprehensive, real-time view of U.S. consumer buying behavior by industry, payment type and geographic region. For more information and to enroll, please click the "Click here for more information" link on the Statement Tab on Mymerchantoffice.com.

### AUTHORIZATION/AVS AND BATCH FEES

| | | | | |
|---|---|---|---|---|
| Auth Fee for MC/Visa/Discover | $ | .10 | Access Fee | $ 0.0299 |
| Auth Fee for American Express* | $ | .10 | Batch Closure Fee | .15 |
| Voice Auth Fee | $ | .75 | Batch Settlement Fee | .15 |
| AVS Fee (per inquiry) | $ | .05 | | |

### OTHER RATES & FEES (Charged as Applicable)

MasterCard License Volume Fee - .019%.
Please note that you may also be charged, if applicable, Card Organization pass through fees and costs for your transactions as described in the Interchange Qualification Matrix.

## (9) OPTIONAL SERVICES FEE SCHEDULE (Charged by Processor)

### PLATINUM SERVICE PACKAGE

☐ Platinum Service Package Monthly Fee $ 14.95 per location (No charge for the first 2 billing cycles)

Platinum Service Package includes TranArmor® solution, OfferWise℠ solution, SpendTrend® analytics and an Equipment Replacement Program. OfferWise℠ solution and SpendTrend® analytics require a separate enrollment. Equipment Replacement Program for Eligible Equipment only and selected supplies at no additional charge (shipping and handling charges may apply to supplies orders).

Complete Platinum Service Package Terms and Conditions, including Equipment Replacement restrictions and limitations may be found at www.firstdata.com/ipl/platinumservicepackage/psp0214.pdf

### DEBIT

Debit Card Monthly Fee $5.00

| | | | |
|---|---|---|---|
| ☐ PIN Debit/ Non-PIN Debit Bundled | PIN Debit/ Non-PIN Debit Discount Rate | ____% | Debit Auth Fee $ |
| ☐ PIN Debit | PIN Debit/ ATM Trans Fee $ | (plus network processing fee) | |

### PETROLEUM

| Pay at the Pump: ☐YES ☐NO | Discount Rate | Auth Fee | Chargeback Fee (per occurrence) | Monthly Sales Vol. |
|---|---|---|---|---|
| ☐ Voyager | 3.40 % | $ | $ | $ |
| ☐ WEX Full Service | ____% | $ | | |
| ☐ WEX Non-Full Svc | (Discount Rate charged by WEX Inc. Please see your WEX Inc. Agreement.) | | | |

IPL0613

page 2 of 4

c0214wall

### TRANSARMOR

☐ Token & Encryption   Token $ 0.02 (Per Item)   TransArmor Monthly Minimum Fee $ _____   TransArmor Monthly Fee $ _____

### GATEWAY

Technical Support Name _____   Technical Support Phone _____   Technical Support Email _____

|  | Monthly Gateway Fee | Gateway Transaction Fee |  | Monthly Gateway Fee | Gateway Transaction Fee |
|---|---|---|---|---|---|
| ☐ Global Gateway e4 | $ _____ | $ _____ | ☐ Fraud FlexDetect | $ _____ | $ _____ |
| ☐ Standard Gateway | $ _____ | $ _____ | (Available with Standard Gateway only) |  |  |

### CART / WIRELESS ACCESS

LinkPointCart Fee: $ _____   ☒ First Data Mobile Pay™   Monthly User Fee $ 0.00   Set-up Fee: $ 5.00 (Per Unit)   No. of Units: 1

No. Units: _____   ☐ Wireless (Other)   Monthly Wireless Access Fee: $ _____ (Per Unit)   No. of Wireless Units (Other): _____

### ELECTRONIC BENEFITS TRANSFER (EBT)

☐ Food Stamps   ☐ Cash Benefit   SNAP/FNS #: _____   ☐ Dial-Up   ☐ Wireless

EBT Auth Fee: $ _____   Balance Inquiry Fee: $ _____   EBT Transaction Fee: $ _____

### OTHER ENTITLEMENTS

#### AMERICAN EXPRESS NON-FULL SERVICE (Charged on American Express Statement)

Initials: _____   ☐ New   ☐ Existing   Existing American Express Merchant No. _____   Cap No. _____

Annual Volume $ _____   Estimated Average Ticket $ _____   Franchise Name: _____   American Express Monthly Fee $ 7.95

American Express Credit Discount Rate and Transaction Fee _____ % + $ _____   American Express Prepaid Discount Rate and Transaction Fee _____ % + $ _____

* A 0.30% downgrade will be charged by American Express for transactions whenever a CNP or Card Not Present Charge occurs. CNP means a Charge for which the Card is not presented at the point of purchase. Applicable to transactions made on all American Express Cards, including Prepaid Cards for Retail key-entered, Restaurant key-entered and Travel Agencies/Tour Operators key-entered programs.

* An inbound fee of 0.40% will be applied on any Charge made using a Card that was issued outside the United States (as used herein, the United States does not include Puerto Rico, the U.S. Virgin Islands and other U.S. territories and possessions), including Prepaid. This fee is applicable to all industries except Education in the following categories: Sporting & Recreation Camps (MCC 7032), Elementary & Secondary Schools (MCC 8211), Colleges, Universities, Professional Schools (MCC 8220), and Child Care Services (MCC 8351).

#### EXISTING DISCOVER NETWORK

Existing Discover Number _____   Franchise Number _____

### (10) SPECIAL REQUESTS

ACS Capital Partners will provide Beauty Counter with 300K to build its mobile pay app, database, and swypers. Beauty Counter will use ACS for all CC processing for 5 years. A 100k early termination fee will be accessed if account is closed before contract term.

### (11) INITIAL TERM OF MERCHANT AGREEMENT

Length of Initial Term: 5 year(s)   0 month(s) _____ (Init.)

### (12) THIRD PARTY AGREEMENTS

#### FIRST DATA GLOBAL LEASING

Lease Company: First Data Global Leasing   Lease Term: _____ mos   Annual Tax Handling Fee: $ 10.20

Total Monthly Lease Charge: $ _____   w/o taxes, late fees, or other charges that may apply – See the Equipment Lease Agreement Section of your Program Guide for details.

This is a non-cancellable lease for the full term indicated. First Data Global Leasing will automatically debit the Settlement Account identified on page 1 for all amounts owing under the lease.

The equipment/products to be leased are referenced in the Equipment/Software section of this MPA, located on page 1.   (Merchant's Initials: _____ )

### TELECHECK

#### ECA WARRANTY OR PAPER WARRANTY

WARRANTY TYPE (select only one):

☐ ECA® Warranty   ☐ Paper Warranty   ☐ Mail Order Warranty   ☐ Multiple Hold Check Warranty   ☐ COD Warranty

Monthly Check Volume $ _____   Average Dollar Amount $ _____   December Risk Surcharge 0.10 %   Custom Requested Operator Call $ 2.50

Inquiry Rate _____ %   Transaction Fee $ _____   Monthly Processing Fee $ 5.00   Monthly Minimum Fee $ _____

Warranty Maximum* $ _____   Other: _____   ☐ Monthly Reporting (Included at No Charge)

*Warranty maximum for ECA is $25,000; Paper Warranty is face value of check; Vertical Market programs: Grocery is $300; Convenience, Medical, Beauty/Barber is $200. (See Agreement for definitions, warranty requirements and any additional fees.)

#### INTERNET CHECK ACCEPTANCE (ICA)

☐ Warranty   ☐ Verification

December Risk Surcharge 0.10 %   Monthly Check Volume $ _____   Average Dollar Amount $ _____   # of Websites/Call Centers _____

Setup Fee $ _____   Inquiry Rate _____ %   Transaction Fee $ _____   Monthly Processing Fee $ _____   Monthly Minimum Fee: $ _____

Corporate check processing service add-on selected? ☐ Yes ☐ No   Maximum Warranty (ICA): $ 2,500.00

#### CHECKS BY PHONE (CBP)

☐ Warranty   ☐ Verification

December Risk Surcharge 0.10 %   Monthly Check Volume $ _____   Average Dollar Amount $ _____   # of Websites/Call Centers _____

Setup Fee $ _____   Inquiry Rate _____ %   Transaction Fee $ _____   Monthly Processing Fee $ _____   Monthly Minimum Fee: $ _____

Order Confirmation Letter Fee** (CBP only) $ 0.75   Corporate check processing service add-on selected? ☐ Yes ☐ No   Maximum Warranty (CBP): $ 5,000.00

** **Opt-Out: Subscriber agrees to send written confirmation to consumer per NACHA.

Ignite Payments, LLC is a registered ISO of Wells Fargo Bank, N.A., Walnut Creek, CA.
All trademarks, service marks and trade names referenced in this material are the property of their respective owners.

ELECTRONICALLY FILED
8/31/2016 9:03 PM
2016-006...
PAGE...

ELECTRONICALLY FILED
8/31/2016 9:03 PM

## (12) THIRD PARTY AGREEMENTS (cont'd)

**ADDITIONAL TELECHECK INFORMATION (Required for all TeleCheck Services)**

Merchant:

1. Is a publicly traded corporation. ☐ Yes ☐ No
2. Is a subsidiary of a publicly traded corporation. ☐ Yes ☐ No
3. Is federally-insured. ☐ Yes ☐ No
4. Is a government entity. ☐ Yes ☐ No
5. Sells anti-telemarketing devices. ☐ Yes ☐ No
6. Sells "credit enhancements" services/products. ☐ Yes ☐ No
7. Sells identity theft protection services/products. ☐ Yes ☐ No
8. Sells services/products that facilitate the obtaining of grant. ☐ Yes ☐ No
9. Has annual revenues of $_____
10. Has been the subject of a law enforcement or government investigation. (If yes, please explain) ☐ Yes ☐ No

11. Has any state-issued or business license revoked. (If yes, please explain) ☐ Yes ☐ No

12. Has used another TEL Processor within the past two (2) years. (If yes, please explain why Company is now seeking the services of another TEL Processor) ☐ Yes ☐ No

13. Obtains _____% of annual revenues from sales solicitations initiated by Company via telephone, fax or e-mail to customers for which the Company has had no existing relationship with for the past two (2) years.

14. Describe Company's specific type of business and product lines for the past two (2) years:

**Term and Termination.** TeleCheck will provide the TeleCheck Services selected in the TeleCheck Application for an initial term of twelve (12) months from the effective date. Thereafter, the TeleCheck Services shall automatically renew for successive 12-month terms until terminated as provided for in the TeleCheck Service Agreement.

**Damages.** Upon your breach or unauthorized termination of the TeleCheck Services, TeleCheck shall be entitled to recover from you liquidated damages in an amount equal to ninety percent (90%) of the total aggregate charges payable for the unexpired portion of the then-current term of the TeleCheck Services.

**Payment.** All fees and charges are due upon receipt. You authorize TeleCheck to debit from your financial institution account as provided to TeleCheck by you, all payments and other amounts owed. You agree to pay TeleCheck a $25.00 fee for any check or ACH debit that is not paid by your financial institution upon presentment.

## (13) AGREEMENT APPROVAL

Client certifies that all information set forth in the completed Merchant Processing Application and Agreement (MPA) is true. Client acknowledges having received and read of the copy of the MPA (consisting of Sections 1-13), the Program Guide (which includes terms and conditions for each of the services, Operating Procedures, Third Party Agreement(s) and a Confirmation Page (version IpI0613) and agrees to be bound by all provisions as printed therein as modified from time to time. Client acknowledges and agrees that we, our Affiliates and our third party subcontractors and/or agents may use automatic telephone dialing systems to contact Client at the telephone number(s) Client has provided in this MPA and/or may leave a detailed voice message in the event that Client is unable to be reached, even if the number provided is a cellular or wireless number or if Client has previously registered on a Do Not Call list or requested not to be contacted for solicitation purposes. Client hereby consents to receiving commercial electronic mail messages from us or our Affiliates from time to time, Client further agrees that Client will not accept more than 20% of its card transactions via mail, telephone or internet order. However, if your MPA is approved based upon contrary information stated in Section 4, Marketing Method above, you are authorized to accept transactions in accordance with the percentages indicated in that section. This signature page also serves as a signature page to the Third Party Agreement(s) appearing in the Third Party Section of the Program Guide.

By signing below, I represent that I have read and am authorized to sign and submit this application for the above entity, which agrees to be bound by the American Express® Card Acceptance Agreement ("Agreement"), and that all information provided herein is true, complete, and accurate. I authorize Ignite Payments, LLC and American Express Travel Related Services Company, Inc. ("American Express") and American Express's agents and Affiliates to verify the information in this application and receive and exchange information about me personally, including by requesting reports from consumer reporting agencies from time to time, and disclose such information to their agent, subcontractors, Affiliates and other parties for any purpose permitted by law. I authorize and direct Ignite Payments, LLC and American Express and American Express agents and Affiliates to inform me directly, or inform me indirectly about, about the contents of reports about me that they have requested from consumer reporting agencies. Such information will include the name and address of the agency furnishing the report. I also authorize American Express to use the reports on me from consumer reporting agencies for marketing and administrative purposes. I am able to read and understand the English language. Please read the American Express Privacy Statement at http://www.americanexpress.com/privacy to learn more about how American Express protects your privacy and how American Express uses your information. I understand that I may opt out of marketing communications by visiting this website or contacting American Express at 1-800-528-5200.

I understand that upon American Express's approval of the application, the entity will be provided with the Agreement and materials welcoming it either to American Express's program for Ignite Payments, LLC to perform services for American Express or to American Express's standard Card acceptance program which has different servicing terms (e.g. different speeds of pay), I understand that if the entity does not qualify for the Ignite Payments, LLC servicing program (that the entity may be enrolled in American Express's standard Card acceptance program) and the entity would then automatically may terminate the Agreement. By accepting the American Express Card for the purchase of goods and/or services, or otherwise indicating its intention to be bound, the entity agrees to be bound by the Agreement.

By signing below, each of the undersigned authorizes us, our Affiliates and our third party subcontractors and/or agents and the applicable Card Organizations to verify the information contained in this MPA and to request and obtain from any consumer reporting agency and other sources, including bank references, personal and business consumer reports and other information and to disclose such information amongst each other for any purpose permitted by law. If this MPA is approved, each of the undersigned also authorizes us, our Affiliates and our third party subcontractors and/or agents to obtain subsequent consumer reports and other information from other sources, including bank references, in connection with the review, maintenance, updating, renewal or extension of the Agreement or for any other purpose permitted by law and to release any information about their businesses and financial information to us, our Affiliates and our third party subcontractors and/or agents. Each of the undersigned authorizes us, our Affiliates and our third party subcontractors and/or agents and the applicable Card Organizations to provide amongst each other the information contained in this Merchant Processing Application and Agreement and any information received subsequent thereto from all references, including banks and consumer reporting agencies for any purpose permitted by law. It is our policy to obtain certain information in order to verify your identity while processing your account application. As part of our approval process and services, continuing fraud prevention and account review processes, the undersigned consents to the use of information gathered online or that you submit to us, and/or authorizes us to make computer security screening, by us of our third party vendors.

The Authorize Ignite Payments, LLC and Bank and their similar affiliates to debit Client's designated bank account via Automated Clearing House (ACH) for costs associated with equipment hardware, software and shipping. You further acknowledge and agree that you will not use your merchant account and/or the Services for illegal transactions, for example, those prohibited by the Unlawful Internet Gambling Enforcement Act, 31 U.S.C. Section 5361 et seq, as may be amended from time to time, or processing and/or acceptance of transactions in certain jurisdictions pursuant to 31 CFR Part 500 et seq, and other laws enforced by the Office of Foreign Assets Control (OFAC).

**Client certifies, under penalties of perjury, that the federal taxpayer identification number and corresponding filing name provided herein are correct.**

I agree that if I process Card transactions, I will comply with the Program Guide for all transactions I process. The current Program Guide is available online at www.firstdata.com/merchants/operatingprocedures/ipl0613.pdf.

I understand that I also may request a copy of the Program Guide from my sales representative at any time. I further understand that a sample copy of this MPA (version number c0214wall) is available for me to view or copy online at www.firstdata.com/billmerchant/agreement/c0214wall.pdf. I further understand that no strikeouts, interlineations, additions or modifications to this preprinted MPA may be made and that this MPA may be transmitted to or from Processor and/or retained electronically by Processor, which will constitute an original.

Client agrees to all the terms of this MPA. This MPA shall not take effect until Client has been approved and this Agreement has been accepted by Ignite Payments, LLC and Bank.

| Sean Renfrew | X _(signature)_ | 7/1/2014 |
|---|---|---|
| Print Name of Principal or Corporate Officer | Signature (Title) | Date |

| | X | |
|---|---|---|
| Print Name of Principal or Corporate Officer | Signature (Title) | Date |

### ACH AUTHORIZATION

**ACH Debit and Credit Authorization:** Client authorizes its Financial Institution to pay and charge to its account the amount(s) due TeleCheck under this TeleCheck Services Agreement and to accept all credits and debits made to its account by TeleCheck via electronic funds transfer in connection with this TeleCheck's services under this TeleCheck Services Agreement. This authorization shall remain in effect thirty days after revoked in writing.

| X _Signature_ | | |
|---|---|---|
| Authorized Signature on TeleCheck Account for ACH | Print Name/Title: | Date |

**Personal Guaranty:** In exchange for Ignite Payments, LLC and Wells Fargo Bank, N.A., American Express and TeleCheck Services, Inc. (the Guaranteed Parties) acceptance of, as applicable, the Agreement, the American Express Card Acceptance Agreement and/or the applicable Third Party Agreement(s), the undersigned unconditionally and irrevocably guarantees the full payment and performance of Client's obligations under the foregoing agreements, as applicable, as they now exist or as modified from time to time, whether before or after termination or expiration of such agreements and whether or not the undersigned has received notice of any amendment of such agreements. The undersigned agrees to be bound by and to indemnify the Guaranteed Parties for any and all amounts due from Client under the foregoing agreements. The Guaranteed Parties shall not be required to first proceed against Client to enforce any remedy before proceeding against the undersigned. This is a continuing personal guaranty and shall not be discharged or affected for any reason. The undersigned understands that this is a Personal Guaranty of payment and not of collection and that the Guaranteed Parties are relying upon this Personal Guaranty in entering into the foregoing agreements, as applicable.

| Susan Renfrew | X _(signature)_ | 7/1/2014 |
|---|---|---|
| Print Name of Personal Guarantor | Signature, as an individual (No Title) | Date |

| | X | |
|---|---|---|
| Print Name of Personal Guarantor | Signature, as an individual (No Title) | Date |

| Ignite Payments, LLC, on behalf of itself and on behalf of Wells Fargo Bank, N.A. (for Visa and MasterCard transactions) | | |
|---|---|---|
| Signature X | For internal use only: SIC/MCC Code | |

| IPL0613 | page 4 of 4 | c0214wall |
|---|---|---|

Ignite Payments, LLC is a registered ISO of Wells Fargo Bank, N.A., Walnut Creek, CA.
All trademarks, service marks and trade names referenced in this material are the property of their respective owners.

ELECTRONICALLY FILED
8/31/2016 9:03 PM
2016-L-008689
PAGE 38 of 62

**CHASE**

June 27, 2014

Dear Susan Renfrew,

This letter is to state the Counter Brands, LLC, DBA; Beaut Counter has an open and active checking account with our bank. The account number is                    and the routing number is                    Please let me know if you need anything else.

Sincerely,

Mark Williams

Customer Service

1-808-706-9576

-----Original Message-----
From: Rossi, Michael [mailto:Michael.Rossi@firstdata.com] Sent: Monday, July 28, 2014 11:13 AM
To: Swype-now.com
Subject: RE: BC

Chris
I sent an email this morning. They said they will try for today, tomorrow at the latest. The approval must show in our system then the money can be moved..hands are tied on this from Brian.

We have all that we need from BC. Just need to sit tight and wait for the approval.
Michael

-----Original Message-----
From: Swype-now.com [mailto:chrisg@swype-now.com] Sent: Monday, July 28, 2014 9:01 AM
To: Rossi, Michael
Subject: BC

Michael
Morning

We need to push Philip to get this account approved today .. I am in breach of my contract and getting calls from their lawyer everyday .. I need to be funded today for the accounts.. Please have a call with goudie and Philip this morning please .. I need to wire the money for the swypers today by 3pm ... This has to happen today or this has been a complete waste of money and time. There projections in 3 years is 262 million lets get this done , I am not sure what else they need to look at .. Thanks again ( this has been going on since may 28 , and before anything was signed or came in I made sure Chris Klein, Brian Goudie, John Barrett, Dan Devitt, Lisa Mann, and yourself agreed on the $150 per account and that risk was ok with the deals. He was on multiple calls so not sure why it even went to NA )

Chris

Sent from my iPhone

The information in this message may be proprietary and/or confidential, and protected from disclosure. If the reader of this message is not the intended recipient, or an employee or agent responsible for delivering this message to the intended recipient, you are hereby notified that

ELECTRONICALLY FILED
8/31/2016 9:03 PM
2016-L-008689
PAGE 39 of 62

**Exhibit G**

any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify First Data immediately by replying to this message and deleting it from your computer.

ELECTRONICALLY FILED
8/31/2016 9:03 PM
2016-L-008689
PAGE 40 of 62

ELECTRONICALLY FILED
8/31/2016 9:03 PM
2016-L-008689
PAGE 1 of 62

-----Original Message-----
From: Rossi, Michael [mailto:Michael.Rossi@firstdata.com]
Sent: Wednesday, August 13, 2014 5:56 PM
To: Swype-now.com
Subject: RE: BC

Chris
I spoke with Finance just now and asked them to send you the final payment. I told them that Reid in legal was sent the agreement and that it was forthcoming.   Layfield says he wants to wait to release any more funds since we greatly exceeded the original number of accounts that we agreed to pay you on (went from 3300 to 4700).  I think he wants to see them become active before we make more payments.  I will check with Brian on this.  In Atlanta meeting on all of the other stuff going on, i.e comp plan, fees, etc. etc.  I will keep you updated

MIchael

**EXHIBIT H**

**From:** Rossi, Michael [mailto:Michael.Rossi@firstdata.com]
**Sent:** Tuesday, September 16, 2014 3:28 PM
**To:** Swype-now
**Subject:** RE: GPR

They said your residuals would be calculated immediately at 55%.

Michael

ELECTRONICALLY FILED
8/31/2016 9:03 PM
2016-L-008689
PAGE 42 of 62

**From:** Swype-now [mailto:chrisg@swype-now.com]
**Sent:** Tuesday, September 16, 2014 2:25 PM
**To:** Rossi, Michael
**Subject:** RE: GPR

Ok will my payout this month be 50% or 55% thanks for the help..

Thank you,

Chris Gumino

President

www.Swype-now.com | 110 E Schiller #310| Elmhurst IL. 60126

p 866-652-8990| f 630-563-0815 | m 847-652-3005

chrisg@swype-now.com | www.swype-now.com

**Exhibit I**



 

**From:** Rossi, Michael [mailto:Michael.Rossi@firstdata.com]
**Sent:** Tuesday, September 16, 2014 1:24 PM
**To:** Swype-now.com
**Subject:** GPR

ELECTRONICALLY FILED
8/31/2016 9:03 PM
2016-L-008689
PAGE 43 of 62

Chris,

I had compensation make this change again (50-55%)in CAAP but will not update until the 20th

Michael

The information in this message may be proprietary and/or confidential, and protected from disclosure. If the reader of this message is not the intended recipient, or an employee or agent responsible for delivering this message to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify First Data immediately by replying to this message and deleting it from your computer.

# MEMORANDUM

FINAL

**To:** All Independent Sales Agents
**From:** Brian Goudie
**Date:** October 24, 2014
**Subject:** Fourth Quarter Upfront Program

Ignite Payments is pleased to announce a new Fourth Quarter Upfront Program designed to help incentivize Clover™ Solution sales, and reward agents for signing multi-year, high volume agreements. Under the new program all merchants (Tier 1 and 2), including card not present (CNP), are eligible as long as they are producing at least $2,000 in monthly bankcard processing volume*.

4th Quarter Upfront Program

Effective October 1, 2014, the Fourth Quarter Upfront Program will replace all former upfront bonus commission programs and incentives.

The new 4th Quarter Upfront Program blends a base commission for multi-year agreements with at least $2,000 in monthly bankcard processing volume, and a bonus commission for signing high-volume accounts. It also adds a 50% premium for Clover™ Solution sales.

Take advantage of this program to generate upfront revenue and finish the year strong.

ELECTRONICALLY FILED
8/31/2016 9:03 PM
2016-L-008689
PAGE 44 of 62

| Monthly Bankcard Processing Volume | "Non-Clover" Bonus Commission Per Eligible Merchant Account* | "Clover" Bonus Commission Per Eligible Merchant Account* |
|---|---|---|
| Base Commission Per Eligible Multi-Year Agreement over $2,000 | $100 | $150 |
| $10,000-19,999 | $200 | $300 |
| $20,000-29,999 | $250 | $375 |
| $30,000-39,999 | $300 | $450 |
| $40,000-49,999 | $400 | $600 |
| $50,000+ | $500 | $750 |

*Based on the actual bankcard volume processed during the account's first *full* month with Ignite Payments.

Program Rules
- Payments require a two year term agreement, at a minimum
- Payments require monthly bankcard processing volume of $2,000, at a minimum
- Payments made based on volume after first full month of processing*
- Program applies only to new merchant accounts opened on or after October 1, 2014
- To be eligible for a Clover premium, the merchant account must have at least one new Clover Station equipment bundle

**Exhibit J**

**MEMO 2373     1014**

*To obtain a reprint of a memo, please call Agent Service Advisory at (800) 456-5929 and request the memo by number.*

- Any Upfront Payment paid on a merchant account will be charged back to your agent office if that account closes for any reason within 6 months of the following month in which the account was opened
- Payments are paid on merchant accounts sold at standard pricing only. Merchant accounts with exception pricing processed through the Ignite Payments finance group are not eligible except on a case-by-case basis.
- Ignite Payments reserves the right to modify or eliminate the Upfront Program at any time at its sole discretion.

Contact Agent Service Advisory at (800) 456-5929 or arm@firstdata.com if you have questions.

ELECTRONICALLY FILED
8/31/2016 9:03 PM
2016-L-008689
PAGE 45 of 62

**MEMO 2373    1014**

*To obtain a reprint of a memo, please call Agent Service Advisory at (800) 456-5929 and request the memo by number.*

**From:** Weeks, Michael F [mailto:Michael.Weeks@firstdata.com]
**Sent:** Tuesday, November 04, 2014 1:41 PM
**To:** 'Swype-now'
**Subject:** RE: BC

Chris,

ELECTRONICALLY FILED
8/31/2016 9:03 PM
2016-L-008689
PAGE 46 of 62

Please see below summary of accounts. I 'am showing 6,098 in Open status and 30 in Declined status. You have been paid an upfront on 4,710 accounts. So as of today, only counting the Open status accounts, you have  2,388 that could be eligible for payout.

Chris please note that until Brian Layfield and Steve Sukeforth give approval, no more upfront bonus will be paid on these accounts

| Row Labels | Count of clsd_stat |
|---|---|
| D | 30 |
| O | 6098 |
| **Grand Total** | **6128** |

**Exhibit K**

-----Original Message-----
From: Rossi, Michael [mailto:Michael.Rossi@firstdata.com]
[Quoted text hidden]
> Sent: Wednesday, December 10, 2014 9:37 AM
> To: Rossi, Michael
> Subject: BC
>
> I sent Dan an email from BC , they don't know what they need besides the
cash in the bank and balance sheet .. This company is low risk and I'm sure
once she speaks with CEO of First Data next week there won't be any issues
going forward , she is going to let him know what nightmare this has been
and how bad Phil is .. Just an FYI , I need that agreement from legal this
week can't hold my lawyer off any longer .. He's not charging me so I really
don't care , who do I need to contact in your legal I am sure Brian Layfield
someone to contact .. Please send to me , you are not approving accounts in
a timely matter and not paying in them , I am about to get sued by sales rep
so shit runs down hill .. If I dint get paid this deal is dead anyway so I
can careless .. Thanks
>
> Chris Gumino
> CEO
> Swypenow.com
>
> The information in this message may be proprietary and/or confidential,
and protected from disclosure. If the reader of this message is not the
intended recipient, or an employee or agent responsible for delivering this
message to the intended recipient, you are hereby notified that any
dissemination, distribution or copying of this communication is strictly
prohibited. If you have received this communication in error, please notify
First Data immediately by replying to this message and deleting it from your
computer.

ELECTRONICALLY FILED
8/31/2016 9:03 PM
2016-L-008689
PAGE 47 of 62

**Exhibit L**

**From:** Rossi, Michael [mailto:Michael.Rossi@firstdata.com]
**Sent:** Friday, December 12, 2014 3:16 PM
**To:** Chris Gumino
**Subject:** RE: BC

ELECTRONICALLY FILED
8/31/2016 9:03 PM
2016-L-008689
PAGE 48 of 62

Chris

We have put off charging any fees on these accounts since they started processing in August.  We need to show Layfield and Goudie that we are generating some revenue.  Every month I tell them we will start charging fees, ordering Clovers, and we never do anything.  They just sent me an email asking to update them on BC and how much we have charged in fees.  We need to post something before year end, the fees are in fact much less than what our original model showed.

The fees are 12.90 per merchant.  We are not just arbitrarily charging them.  We are charging them for 1 month, that's it.

I want to ask for payment to you on the up-fronts again but we need to show we have started charging fees.

Michael

**Exhibit M**

-----Original Message-----
From: Rossi, Michael [mailto:Michael.Rossi@firstdata.com] Sent: Thursday, January 08, 2015 10:40 AM To: Chris Gumino
Subject: RE: Need some answers

Chris
I will call you to discuss all of this. Simple solution. Attached is the Clover amendment.

MichEL

-----Original Message-----
From: Chris Gumino [mailto:chrisg@swype-now.com] Sent: Thursday, January 08, 2015 10:35 AM To: Rossi, Michael
Subject: Need some answers

ELECTRONICALLY FILED
8/31/2016 9:03 PM
2016-L-008689
PAGE 49 of 62

1. Need the contract for Clover
2. Need to know about the Loan
3. Need to know if I am going to get paid on the 2700 that are in 4. Need the % corrected on BC to 55% and back paid the 3700 I am missing 5. How am I going to get paid on these going forward, this needs to be figured out or I will have no chose but to send to another processor that will pay 6. If app company does not get paid on the extra 2700 accounts they will shutoff and BC will cancel, it's been over 6 months so there will be no clawback on me FD will be out the upfront they already paid .. This needs to happen , you guys have been ignoring me for 7 months.. Again , I have an agreement I am not an employee ..

If this does not happen I really have no chose but to get Plumeri involved , Michael I have no problem flying to New York to meet with him and throwing everyone in this company under the bus on how things have been handled and this account and with all agents .. I mean you have agents talking about a class action lawsuit against Fd and ignite WTF .. Come let's fix this ,

Chris Gumino
**CEO**
Swypenow.com

The information in this message may be proprietary and/or confidential, and protected from disclosure. If the reader of this message is not the intended recipient, or an employee or agent responsible for delivering this message to the intended recipient, you are hereby notified that

**Exhibit N**

-----Original Message-----
From: Rossi, Michael [mailto:Michael.Rossi@firstdata.com] Sent: Wednesday, January 14, 2015 1:32 PM To: Chris Gumino
Subject: RE: Loan

Chris
We should talk before our call just so I can fill you in as to what we will discuss. Very low key call mostly just an update.

Michael

-----Original Message-----
From: Chris Gumino [mailto:chrisg@swype-now.com] Sent: Wednesday, January 14, 2015 11:10 AM To: Rossi, Michael
Subject: Loan

Try and get approval for loan from Goudie in case they refuse to pay upfronts tomorrow .. I know it needs to go in front of board I am willing to wait , I need the funds to keep this going .. Susan is waiting from you for approval

Chris Gumino
**CEO**
Swypenow.com

The information in this message may be proprietary and/or confidential, and protected from disclosure. If the reader of this message is not the intended recipient, or an employee or agent responsible for delivering this message to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify First Data immediately by replying to this message and deleting it from your computer.

ELECTRONICALLY FILED
8/31/2016 9:03 PM
2016-L-008689
PAGE 50 of 62

**Exhibit O**

ELECTRONICALLY FILED
8/31/2016 9:03 PM
2016-L-008689
PAGE 51 of 62

**From:** Rossi, Michael [mailto:Michael.Rossi@firstdata.com]
**Sent:** Thursday, January 15, 2015 5:36 PM
**To:** Chris Gumino
**Subject:** RE: BC

You heard him say, giving more up-fronts after already paying 350k with no new fees or clovers to show for makes him look incompetent.  Giving you a loan removes that element so I think he will say ok.

Michael

**From:** Chris Gumino [mailto:chrisg@swype-now.com]
**Sent:** Thursday, January 15, 2015 6:33 PM
**To:** Rossi, Michael
**Subject:** Re: BC

Ok , I really need him to agree on loan .. You think he will

Chris Gumino

CEO

Swypenow.com

On Jan 15, 2015, at 5:30 PM, Rossi, Michael <Michael.Rossi@firstdata.com> wrote:

Ok go through eva for the clovers

https://mail.google.com/mail/u/1/?ui=2&ik=814fc72941&view=pt&q=rossi%20clovers&qs=true&search=query&msg=154f42b19dacc825&siml=154f42b19dacc825        1/2

**Exhibit P**

Don't give up on up-fronts yet. They wanted to see fees charged.

Michael

ELECTRONICALLY FILED
8/31/2016 9:03 PM
2016-L-008689
PAGE 52 of 62

ADDENDUM TO PREMIER AGENT AGREEMENT

This addendum between **ACS Capital Payments, Inc.**, dba SwypeNow.com ("**Agent**") and **Ignite Payments, LLC**, f/k/a Cardservice International, LLC ("**Ignite**") (the "**Addendum**") is made and entered into as of May \_\_\_\_, 2015.

### RECITALS

     **A.**     Agent and Ignite have previously entered into a Premier Agent Agreement dated July 31, 2013, as amended (the "**Agreement**") and this Addendum attaches to and is made a part of the Agreement.

     **B.**     Ignite agreed to pay Agent, upfront, a bonus of $75.00 ("**Bonus**") for each new Mobile Pay swiper account that Agent "boards" or "boarded" with respect to its Merchant Account for Counter Brands LLC, d/b/a Beauty Counter ("**BC Swiper Account**"), as evidenced by that certain electronic correspondence between Agent and Ignite on or about July 18, 2014.

     **C.**     Ignite paid Agent, the Bonuses, in five separate installments, on the 1st, 4th, 5th & 7th of August 2014, as evidenced by that certain electronic correspondence between Agent and Ignite on or about November 12, 2014.

     **D.**     Agent and Ignite agreed that each BC Swiper Account is required to produce $100.00 in Revenue within six (6) Months from the date that the application for each BC Swiper Account is approved by Ignite (the "**Threshold**"). If a BC Swiper Account does not (or did not) meet the Threshold, Agent agrees to pay back the Bonus to Ignite for each respective BC Swiper Account that does not (or did not) meet the Threshold from the Agent's Residuals.

     **E.**     Agent and Ignite desire to append to the Agreement as set forth herein.

### AGREEMENT

In consideration of the foregoing, Agent and Ignite hereby agree as follows:

ELECTRONICALLY FILED
8/31/2016 9:03 PM
2016-L-008689
PAGE 53 of 62

1. The terms of this Amendment are retroactive and effective as of August 1, 2014 (the "**Effective Date**").

2. Agent and Ignite hereby ratify the acts and agreements performed by both parties as described above in Recitals B, C & D.

3. Agent agrees that if a BC Swiper Account does not (or did not) meet the Threshold, Ignite may credit from Agent's Residuals the Bonus amount for each respective BC Swiper Account that does not (or did not) meet the Threshold as of the Effective Date.

4. Agent agrees that if a BC Swiper Account is cancelled, closed and or terminated, as the case may be, with or without cause, prior to the expiration of its then current term ("**Early Termination**"), Ignite may credit from Agent's Residuals a fee in the amount of $75.00 for each Early Termination of a BC Swiper Account.

5. Agent agrees to allow Ignite to audit the BC Swiper Accounts, as it relates to determining Thresholds and Early Terminations, every month, effective as of the Effective Date.

6. This Addendum constitutes the entire agreement between the parties regarding the subject matter of this Addendum and supersedes all prior and contemporaneous agreements and understandings regarding such subject matter. In the event of a conflict between this Addendum and the Agreement as it relates to the subject matter hereof, the terms of this Addendum will control. Otherwise, all terms and conditions of the Agreement will remain in full force and effect and likewise apply to this Addendum.

[SIGNATURES ON FOLLOWING PAGE]

1

Michael Rossi/sam/052815

**Exhibit Q**

By the signatures of their respective authorized representatives, the parties agree to the terms of this Addendum.

**Ignite Payments, LLC**                    **ACS Capital Payments, Inc.**

By: _____          By: _____

Name: _____          Name: _____

Title: _____          Title: _____

Date:_____          Date:_____

ELECTRONICALLY FILED
8/31/2016 9:03 PM
2016-L-008689
PAGE 54 of 62

2

Michael Rossi/sam/052815

Certified Statement of Business Purpose of Loan

[illegible faded paragraph] ACS Capital Partners, Inc. ("Borrower") in the amount of $[illegible] of Loan Proceeds [illegible] immediately Notice by made by Borrower in favor of Holder on or above the date of this [illegible] and Borrower's certify that the Loan Proceeds will be used in Borrower's Business obtained [illegible] solely for business purposes.

Borrower has its principal place of business at 517 S. Hillside, Elmhurst, Illinois 60126.

Sole Member or Manager [illegible] of designation of Borrower's for its creditors

Sole Member or Manager [illegible] contact designation Address: 517 S Hillside Ave, Elmhurst, IL 60126

Borrower is in the business of selecting merchants on behalf of Holder for the purchase of transaction card processing and related services and products ("Borrower's Business"). Borrower certifies that it will use Loan Proceeds in Borrower's Business solely for the following business purpose(s):

My Cap Partners

Borrower [illegible] that it has never represented to Holder or any employee, officer, agent or representative of Holder, that the Loan proceeds will be used for any purpose(s) other than those set forth above. Borrower acknowledges and agrees that this Certified Statement of Business Purpose of Loan is a material inducement to Holder to extend and maintain credit to the Borrower.

IN WITNESS WHEREOF, Borrower has executed this Certified Statement of Business Purpose of Loan on this 22 day of April 2015

ACS Capital Partners, Inc.

Signature: _____

Printed Name: Chris Giannino

Title: President

Date: 7/22/15

Notary Public, State of Illinois Wisconsin

My Commission Expires _____

Acting in the County of _____

On this 22nd day of April 2015, Chris Giannino known to me to be the individual described in the foregoing Certified Statement of Business Purpose of Loan, personally appeared before me and executed the foregoing Certified Statement of Business Purpose of Loan.

Notary Public _____

Printed Name: _____

ELECTRONICALLY FILED
8/31/2016 9:03 PM
2016-L-008689
PAGE 56 of 62

**Exhibit R**

On Jun 29, 2015, at 8:42 AM, Rossi, Michael <Michael.Rossi@firstdata.com> wrote:

Chris

Just received this from Tenenbaum. We MUST get this info from Beauty Counter. I will work on having them receive it on a quarterly basis after this as I agree that what they are asking for, especially after a year of clean processing is unreasonable.

You need to get this to me asap though.

Michael

**From:** Tenenbaum, Robert
**Sent:** Monday, June 29, 2015 9:37 AM
**To:** Pappas, Daniel M.; Rossi, Michael
**Subject:** RE: Counter Brands/BeautyCounter

Michael

I do not agree with the response or rationale here

Clean processing here is duly noted yet we are being asked to fly in the blind with regard to following for monthly cash balances and financials to ensure we are protected via the merchants operating performance

Pretty simple request that all, including the merchant, agreed to doing when McDermott agreed to release the $400K in collateral. As a reminder, the collateral requirement was something that was part of the original underwriting

**Exhibit S**

ELECTRONICALLY FILED
8/31/2016 9:03 PM
2016-L-008689
PAGE 56 of 62

I will escalate this as I feel we have been more than patient

I do not like losing business and this is far from being our intent

Having said that, credit integrity here is being breached and without the proper credit reporting to validate unsecured processing, combined with merchant being uncooperative and unresponsive, I am not willing to provide any long term extensions

I plan to escalate this accordingly if we do not have all the data provided by end of day today

Dan:

We can discuss at our weekly meeting this morning

Prepare the letter and be ready to send tomorrow

ELECTRONICALLY FILED
8/31/2016 9:03 PM
2016-L-008689
PAGE 57 of 62

<image003.png>

Robert Tenenbaum

Vice President / Senior Credit Officer

First Data Merchant Services

**From:** Pappas, Daniel M.
**Sent:** Friday, June 26, 2015 3:53 PM
**To:** Rossi, Michael
**Cc:** Tenenbaum, Robert
**Subject:** RE: Counter Brands/BeautyCounter

The agreement when we released the reserve was that they provide quarterly financial statements timely and monthly cash balances. The 3/31/15 1stq financial statements were never provided and we have not received monthly cash balances for several months. Your email below even confirms that they have not responded to your request for this information. Please call me when you have a chance or first thing on Monday morning.

Thank you

**From:** Rossi, Michael
**Sent:** Friday, June 26, 2015 3:45 PM
**To:** Pappas, Daniel M.
**Subject:** RE: Counter Brands/BeautyCounter

I will try one last attempt to get the financials. These guys have been processing for almost a year with no issues and you want a reserve? I think at this point we also need to evaluate whether we can work with quarterly numbers instead of monthly.

**From:** Rossi, Michael
**Sent:** Friday, June 26, 2015 2:27 PM
**To:** Pappas, Daniel M.
**Subject:** RE: Counter Brands/BeautyCounter

Dan

Thanks for the update. I will advise the Merchant and my Agent of your decision to impose a reserve since they have not been forthcoming with my repeated requests for the requested Financials. Having said that, I prefer you not contact the merchant directly since we are in the middle of other issues with respect to their mobile application not working properly. I will have the Agent make the company aware of the reserve requirement.

Thanks

Michael

ELECTRONICALLY FILED
8/31/2016 9:03 PM
2016-L-008689
PAGE 58 of 62

**From:** Pappas, Daniel M.
**Sent:** Friday, June 26, 2015 2:12 PM
**To:** Rossi, Michael
**Subject:** Counter Brands/BeautyCounter

Michael

Please be advised that we have completed a review of the credit card processing account. Based on the information available coupled with the lack of current financial statements as well as monthly cash balances not being provided, we have determined the need to establish a reserve of the $400,000.00.

Also, you previously confirmed that they are not a Multi-level Marketer and only do direct selling. Please be advised that the clearing bank has advised if they ever plan to do so, this must be approved including by the clearing bank.

We will be communicating our reserve action in writing to the merchant. Please feel free to call me should you have any questions.

Thank you

The information in this message may be proprietary and/or confidential, and protected from disclosure. If the reader of this message is not the intended recipient, or an employee or agent responsible for delivering this message to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify First Data immediately by replying to this message and deleting it from your computer.

ELECTRONICALLY FILED
8/31/2016 9:03 PM
2016-L-008689
PAGE 59 of 62

ELECTRONICALLY FILED
8/31/2016 9:03 PM
2016-L-008689
PAGE 60 of 62

-----Original Message-----
From: Rossi, Michael [mailto:Michael.Rossi@firstdata.com] Sent: Wednesday, December 16, 2015 10:56 AM To: Chris
Subject: RE: Let me know about retirement buyout, thanks I need to know who to talk too about it

Chris
I don't think they will let you do a buy-out since the residuals you have are still being used as collateral (along with the BC funds) on your loan. If BC sues us and we buy your residual rights, we cannot collect. I don't think Brian G or Brian L will ok this right now.

MIchael

-----Original Message-----
From: Chris [mailto:chrisg@swype-now.com] Sent: Wednesday, December 16, 2015 9:21 AM
To: Rossi, Michael
Subject: Let me know about retirement buyout, thanks I need to know who to talk too about it

Sent from my iPhone

The information in this message may be proprietary and/or confidential, and protected from disclosure. If the reader of this message is not the intended recipient, or an employee or agent responsible for delivering this message to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify First Data immediately by replying to this

**Exhibit T**

-----Original Message-----
From: Rossi, Michael [mailto:Michael.Rossi@firstdata.com]
Sent: Wednesday, January 20, 2016 7:40 PM
To: Chris
Subject: RE: Loan

I contacted Layfield and Gina and explained that your loan should be paid
from the balance of the ACF generated from Beauty Counter.  None of your
regular residuals should be charged for the loan.  There were 2 other emails
back and forth confirming this so we should hear back tomorrow and get an
ACH out to you then.

Michael

-----Original Message-----
From: Chris [mailto:chrisg@swype-now.com]
Sent: Wednesday, January 20, 2016 6:12 PM
To: Rossi, Michael
Subject: Re: Loan

Should I contact Gina? Do you know anything yet? Thanks

Sent from my iPhone

> On Jan 20, 2016, at 10:08 AM, Rossi, Michael <Michael.Rossi@firstdata.com>
wrote:
>
> Chris
> No response yet but I will call her and try to get an ACH out today for
you.
>
> Michael
>
> -----Original Message-----
> From: Chris [mailto:chrisg@swype-now.com]
> Sent: Wednesday, January 20, 2016 7:58 AM
> To: Rossi, Michael
> Subject: Re: Loan
>
> Please let me know what you find out, I really need the money.. In hoping
they can send it today. Thanks again
>
> Sent from my iPhone

ELECTRONICALLY FILED
8/31/2016 9:03 PM
2016-L-008689
PAGE 61 of 62

1/2

**Exhibit U**

wrote:
>>
>> Chris
>> Finding out now.  Should not have charged your residuals.  I will have
them put it back
>>
>> Michael

ELECTRONICALLY FILED
8/31/2016 9:03 PM
2016-L-008689
PAGE 62 of 62

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

CHRIS GUMINO;

ACS CAPITAL PARTNERS, INC.

v.

FIRST DATA CORPORATION;

IGNITE PAYMENTS, LLC

**No.** 2016-L-008689

Defendant Address:

FIRST DATA CORPORATION

R/A CORPORATION SERVICE COMPANY

2711 CENTERVILLE RD

SUITE 400

WILMINGTON, DE 19808

### ☑ SUMMONS ☐ ALIAS - SUMMONS

To each defendant:

YOU ARE SUMMONED and required to file an answer to the complaint in this case, a copy of which is hereto attached, or otherwise file your appearance, and pay the required fee, in the Office of the Clerk of this Court at the following location:

☑ Richard J. Daley Center, 50 W. Washington, Room 801 ,Chicago, Illinois 60602

☐ District 2 - Skokie
5600 Old Orchard Rd.
Skokie, IL 60077

☐ District 3 - Rolling Meadows
2121 Euclid 1500
Rolling Meadows, IL 60008

☐ District 4 - Maywood
Maybrook Ave.
Maywood, IL 60153

☐ District 5 - Bridgeview
10220 S. 76th Ave.
Bridgeview, IL 60455

☐ District 6 - Markham
16501 S. Kedzie Pkwy.
Markham, IL 60428

☐ Richard J. Daley Center
50 W. Washington, LL-01
Chicago, IL 60602

You must file within 30 days after service of this Summons, not counting the day of service.

IF YOU FAIL TO DO SO, A JUDGMENT BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE RELIEF REQUESTED IN THE COMPLAINT.

To the officer:

This Summons must be returned by the officer or other person to whom it was given for service, with endorsement of service and fees, if any, immediately after service. If service cannot be made, this Summons shall be returned so endorsed. This Summons may not be served later than thirty (30) days after its date.

☐ Atty. No.: 49168

Name: PARIKH LAW GRP LLC

Atty. for: CHRIS GUMINO

Address: 150 S WACKER#2600

City/State/Zip Code: CHICAGO, IL 60606

Telephone: (312) 725-3476

Primary Email Address: anish@plgfirm.com

Secondary Email Address(es):

Witness: Wednesday, 31 August 2016

DOROTHY BROWN, Clerk of Court

Date of Service:

(To be inserted by officer on copy left with Defendant or other person)

**Service by Facsimile Transmission will be accepted at:

(Area Code)    (Facsimile Telephone Number)

**DOROTHY BROWN, CLERK OF THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS**

**Page 1 of 1**

Summons - Alias Summons                                                                                    (12/31/15) CCG N001

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

CHRIS GUMINO;

ACS CAPITAL PARTNERS, INC.

v.

FIRST DATA CORPORATION;

IGNITE PAYMENTS, LLC

**No.** 2016-L-008689

Defendant Address:

IGNITE PAYMENTS, LLC

5898 CONDOR DRIVE

SUITE 220

MOORPARK, CA 93021

☑ **SUMMONS** ☐ **ALIAS - SUMMONS**

To each defendant:

YOU ARE SUMMONED and required to file an answer to the complaint in this case, a copy of which is hereto attached, or otherwise file your appearance, and pay the required fee, in the Office of the Clerk of this Court at the following location:

☑ Richard J. Daley Center, 50 W. Washington, Room 801 ,Chicago, Illinois 60602

☐ District 2 - Skokie ☐ District 3 - Rolling Meadows ☐ District 4 - Maywood

  5600 Old Orchard Rd.   2121 Euclid 1500   Maybrook Ave.
  Skokie, IL 60077   Rolling Meadows, IL 60008   Maywood, IL 60153

☐ District 5 - Bridgeview ☐ District 6 - Markham ☐ Richard J. Daley Center

  10220 S. 76th Ave.   16501 S. Kedzie Pkwy.   50 W. Washington, LL-01
  Bridgeview, IL 60455   Markham, IL 60428   Chicago, IL 60602

You must file within 30 days after service of this Summons, not counting the day of service.

IF YOU FAIL TO DO SO, A JUDGMENT BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE RELIEF REQUESTED IN THE COMPLAINT.

To the officer:

This Summons must be returned by the officer or other person to whom it was given for service, with endorsement of service and fees, if any, immediately after service. If service cannot be made, this Summons shall be returned so endorsed. This Summons may not be served later than thirty (30) days after its date.

☐ Atty. No.: 49168

Name: PARIKH LAW GRP LLC

Atty. for: CHRIS GUMINO

Address: 150 S WACKER#2600

City/State/Zip Code: CHICAGO, IL 60606

Telephone: (312) 725-3476

Primary Email Address: anish@plgfirm.com

Secondary Email Address(es):

Witness: Wednesday, 31 August 2016

DOROTHY BROWN, Clerk of Court

Date of Service:

(To be inserted by officer on copy left with Defendant or other person)

**Service by Facsimile Transmission will be accepted at:

(Area Code)   (Facsimile Telephone Number)

**DOROTHY BROWN, CLERK OF THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS**

**Page 1 of 1**