UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| CHRIS GUMINO and ) | |
| ACS CAPITAL PARTNERS, INC. ) | |
| D/B/A SWYPE-NOW, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | No. 16 C 9419 |
| v. ) | |
| ) | Judge Sara L. Ellis |
| FIRST DATA CORPORATION and ) | |
| IGNITE PAYMENTS, LLC ) | |
| ) | |
| Defendants. ) | |

## OPINION AND ORDER

ACS Capital Partners, Inc. ("ACS") and its owner, Christopher Gumino, allege multiple breach of contract claims against Ignite Payments, LLC ("Ignite") and First Data Corporation ("FDC"). ACS and Gumino allege that Ignite and FDC failed to make various payments to which ACS and Gumino were entitled under their contracts with Ignite and FDC. Ignite and FDC filed a motion to dismiss all the claims against them [8]. In addition, FDC filed a separate motion to dismiss all claims against it because it was not a party to any contracts at issue [11]. Because Gumino is not a proper plaintiff to this action, the Court grants in part FDC and Ignite's motion to dismiss. Additionally, the Court dismisses FDC from this action because ACS and Gumino fail to plead facts sufficient to state a claim against FDC as a non-party to the contracts.

## BACKGROUND[1]

ACS is an Illinois corporation, owned and operated by Gumino, that sells credit card processing services to various merchants. ACS does business in Illinois under the name Swype-Now.com.[2] Ignite is a California limited liability company and an Independent Sales Organization of Wells Fargo Bank that provides credit card processing services and equipment. FDC, a Delaware corporation, owns Ignite and performs the credit card processing services provided by Ignite.

In April 2013, ACS entered into a Premier Agent Agreement ("the Agent Contract") with Ignite in which ACS agreed to solicit merchants to purchase Ignite's credit card processing services and products. The Agent Contract provides for payments to ACS called "residuals," which are based on the number of merchant accounts opened by ACS in a given time period. ACS and Ignite also entered into an additional agreement titled "2011 Premier Agent Incentive Commissions and Residuals Summary" ("the Commissions Contract"). The Commissions Contract outlines specific calculations and policies related to residual payments and upfront commission payments.

In December 2013, Gumino identified an opportunity to sell Ignite's services to Beauty Counter, a start-up company that uses individual sales associates rather than brick and mortar stores to sell beauty products. Beauty Counter would require thousands of individual accounts

---

[1] The facts in the background section are taken from ACS and Gumino's complaint and exhibits attached thereto and are presumed true for the purpose of resolving Ignite and FDC's motions to dismiss. *See Virnich v. Vorwald*, 664 F.3d 206, 212 (7th Cir. 2011); *Local 15, Int'l Bhd. of Elec. Workers, AFL-CIO v. Exelon Corp.*, 495 F.3d 779, 782 (7th Cir. 2007).

[2] In this opinion, the Court will refer to the corporation as ACS Capital Partners, Inc. or "ACS," instead of Swype-Now.com.

and terminals[3] to process credit card transactions through Ignite. To secure Beauty Counter's business, Gumino offered to cover the cost of each terminal, which was less than $150 per terminal. Gumino could afford this cost if ACS[4] received $150 in upfront payments from Ignite, as set forth in the Commissions Contract, for each Beauty Counter account. On December 20, 2013, Gumino contacted John Barrett, the President of Ignite, to confirm that ACS would receive the $150 upfront payments and Barrett responded in the affirmative. However, negotiations regarding the amount of the upfront payments continued into 2014. In June 2014, Gumino communicated with Michael Rossi, an FDC employee, regarding the upfront payments. On June 9, 2014, Rossi stated in an email to Gumino, "no matter what, we must pay you the 150 term minimum even though Brett thinks it is too risky." Doc. 1-1 ¶ 25. On June 18, 2014, Rossi wrote to Gumino "we all agreed that 150 UF is ok and 250 is possible if the volume can support it." Doc. 1-1 at 47.

On July 1, 2014, Beauty Counter completed a Merchant Processing Application and Agreement with Ignite, with Gumino as the sales representative and ACS as the "agent office" on the contract. Doc. 1-1 at 49. Relying on the statements by Rossi, Barrett, and another FDC employee, Gumino agreed to cover the cost of Beauty Counter's terminals. However, ACS did not receive $150 in upfront payments on every account and instead only received partial upfront payments on some accounts. In addition, ACS did not receive the 55% residual payments for Beauty Counter accounts to which it was entitled under the Agent Contract and Commissions Contract with Ignite.

---

[3] ACS and Gumino use the word "terminals" and "swypers" in their Complaint when referring to this product. For consistency, the Court will use "terminals" throughout this Opinion.

[4] In the complaint, Gumino and ACS are referred to interchangeably (ACS is referred to as Swype-Now).

Gumino continued communicating with Rossi and requesting the upfront and residual payments. In December 2014, Rossi indicated in an email that certain fees would need to be charged to the Beauty Counter accounts in order to secure the upfront payments. Later, in May 2015, Ignite sent ACS an "Addendum to the Premier Agent Agreement" ("the Addendum"), which provided $75 upfront payments for each Beauty Counter account that produced $100 in revenue within six months. Doc. 1-1 at 68. The terms of the Addendum were to be retroactive and effective from August 1, 2014. Gumino and ACS did not sign the Addendum. In May 2015, ACS secured a promissory note from Ignite for a $66,000 loan to cover the cost of the Beauty Counter terminals.

In July 2015, Beauty Counter cancelled its contracts with Ignite. ACS was not paid a residual payment from the closure fee charged to Beauty Counter. Months later, in December 2015, Gumino attempted to retire and sell ACS's rights to future residuals to Ignite under the "offer to purchase upon retirement" clause set forth in the Agent Contract. Doc. 1-1 at 23. Ignite denied the request because ACS was using its residuals as collateral. In January 2016, Ignite terminated ACS for alleged fraud. Gumino, however, asserts that he did not partake in any fraudulent, dishonest, willful, or malicious acts. Gumino believes that Ignite terminated ACS to relieve itself of any contractual obligations to pay residual payments to ACS.

## LEGAL STANDARD

A motion to dismiss under Rule 12(b)(6) challenges the sufficiency of the complaint, not its merits. Fed. R. Civ. P. 12(b)(6); *Gibson v. City of Chicago*, 910 F.2d 1510, 1520 (7th Cir. 1990). In considering a Rule 12(b)(6) motion to dismiss, the Court accepts as true all well-pleaded facts in the plaintiff's complaint and draws all reasonable inferences from those facts in the plaintiff's favor. *AnchorBank, FSB v. Hofer*, 649 F.3d 610, 614 (7th Cir. 2011). To survive

a Rule 12(b)(6) motion, the complaint must not only provide the defendant with fair notice of a claim's basis but must also be facially plausible. *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009); *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

## ANALYSIS

**I.    FDC as a Party**

FDC argues that the Court should dismiss all four claims against it because FDC is not a party to the Agent Contract or the Commissions Contract and a breach of contract action cannot lie against an entity not party to the contract. Under New York law[5], an essential element for a breach of contract claim is the existence of a contract between the plaintiff and the defendant. *Diesel Props S.r.l. v. Greystone Bus. Credit II LLC*, 631 F.3d 42, 53 (2d Cir. 2011). "Under New York law, a party who is not a signatory to a contract generally cannot be held liable for breaches of that contract." *TransformaCon, Inc. v. Vista Equity Partners, Inc.*, No. 15-cv-3371, 2015 WL 4461769, at *3 (S.D.N.Y. July 21, 2015) (citing *Black Car & Livery Ins., Inc. v. H & W Brokerage, Inc.*, 813 N.Y.S.2d 751, 752 (N.Y. App. Div. 2006); *Bellino Schwartz Padob Adver., Inc. v. Solaris Mktg. Grp., Inc.*, 635 N.Y.S.2d 587, 588 (N.Y. App. Div. 1995); *Smith v. Fitzsimmons*, 584 N.Y.S.2d 692, 695 (N.Y. App. Div. 1992)).

Here, ACS and Gumino do not argue that FDC is in fact a party to the contracts at issue. The Agent Contract clearly states that it is "between Ignite Payments, LLC ('Ignite Payments') and ACS Capital Partners Inc." Doc. 1-1 at 16. The Agent Contract further states:

---

[5] The Agent Contract contains a provision stating that the contract "shall be governed by the laws of the State of New York." Doc. 1-1 at 26. Therefore, the Court will apply New York law unless otherwise noted.

> This Agreement is made for the benefit of Ignite Payments, [ACS] and their respective successors and assigns. In addition, Ignite Payments' sponsor bank is a third party beneficiary of this Agreement and may enforce this Agreement against [ACS]. No other person or entity has or acquires any rights by virtue of this Agreement.

*Id.* at 27. The Commissions Contract does not identify the specific parties to the contract. *Id.* at 39. The complaint alleges only that the Commissions Contract was "entered into and executed by the Parties hereto," without specifying which parties entered into and executed the contract. Doc. 1-1 ¶ 15.

ACS and Gumino argue that FDC is a proper defendant because FDC can be held liable for Ignite's breach of contract under New York's corporate veil-piercing theory.[6] Under certain circumstances, a corporate relationship between a parent and its subsidiary can be "sufficiently close to justify piercing the corporate veil and holding one corporation legally accountable for the actions of the other." *Jalili v. Xanboo Inc.*, No. 11 Civ 1200, 2011 WL 4336690, at *3 (S.D.N.Y. Sept. 15, 2011). Piercing the corporate veil requires "showing that: (1) the owners exercised complete domination over the corporation in respect to the transaction attacked; and (2) that such domination was used to commit a fraud or wrong against the plaintiff which resulted in plaintiff's injury." *P.A.C. Consolidators Ltd v. United Cargo Sys. Inc.*, No. 10 CV 1981, 2011 WL 3099887, at *4 (E.D.N.Y. July 25, 2011). However, "[a]ctual domination, rather than the opportunity to exercise control, must be shown" to justify piercing the corporate

---

[6] FDC asserts that the complaint does not plead corporate veil-piercing and the Court, therefore, should not consider this argument. However, under New York law, "piercing the corporate veil does not constitute an independent cause of action, but a theory of liability." *Highland CDO Opportunity Master Fund, L.P. v. Citibank, N.A.*, 12 Civ. 2827, 2016 WL 1267781, at *22 (S.D.N.Y. Mar. 30, 2016). District courts in the Seventh Circuit have ruled that a plaintiff may allege new facts or legal theories about a claim in its brief in opposition to a motion to dismiss if they are consistent with the complaint. *Milazzo v. O'Connell*, 925 F. Supp. 1331, 1340 (N.D. Ill. 1996) (citing *Dausch v. Rykse*, 52 F.3d 1425, 1428 n.3 (7th Cir. 1994); *Bartholet v. Reishauer A.G. (Zurich)*, 953 F.2d 1073, 1078 (7th Cir. 1992)); *Mart v. Forest River, Inc.*, 854 F. Supp. 2d 577, 583–84 (N.D. Ind. 2012). Accordingly, the Court will consider ACS and Gumino's piercing the corporate veil theory because it is consistent with the complaint and does not allege a new claim.

veil. *Jalili*, 2011 WL 4336690 at *3. To determine "actual domination," a court considers the following factors:

> the intermingling of corporate and shareholder funds, undercapitalization of the corporation, failure to observe corporate formalities such as the maintenance of separate books and records, failure to pay dividends, insolvency at the time of a transaction, siphoning off of funds by the dominant shareholder, and the inactivity of other officers and directors.

*Id.* The fact that a corporation exerts some control over another corporation's business affairs does not rise to the level of actual domination. *See id.* Common management among two corporate entities or duplication of some or all of the directors or executive officers is also insufficient to show domination. *Capmark Fin. Grp. Inc. v. Goldman Sachs Credit Partners L.P.*, 491 B.R. 335, 349 (Bankr. S.D.N.Y. 2013) (citing *United States v. Bestfoods*, 524 U.S. 51, 61–62, 118 S. Ct. 1876, 141 L.Ed.2d 43 (1998); *In re Digital Music Antitrust Litig.*, 812 F. Supp. 2d 390, 418 (S.D.N.Y. 2011)).

Here, in support of their veil-piercing theory of liability, ACS and Gumino allege that "nearly all" of their communications were with FDC rather than Ignite and that their interactions with FDC did not indicate that any individuals from Ignite exerted control over managing contracts or made decisions. ACS and Gumino base these allegations on several email exchanges regarding the residual and upfront payments for ACS's Beauty Counter accounts, which they attached as exhibits to their complaint. While these communications demonstrate some control by FDC, they do not show "actual domination." FDC's involvement or authority in determining residual or upfront payments does not rise to the level of intermingling or siphoning of funds, undercapitalization, failure to observe corporate formalities, or Ignite's insolvency or inactivity. ACS and Gumino's allegations are insufficient to make out a claim against FDC

based on piercing the corporate veil.[7] *See Jalili*, 2011 WL 4336690 at *3 (conduct showing some control over a subsidiary's business affairs that does not rise to the level of the factors considered for actual domination is insufficient to plead piercing the corporate veil); *Capmark Fin. Grp. Inc.*, 491 B.R. at 349 (plaintiff did not sufficiently state a veil-piercing claim where plaintiff failed to allege that any corporate formalities were disrespected in any way).

Because FDC is not a party to the contracts at issue, and because ACS and Gumino do not plead facts sufficient to allege piercing the corporate veil, the Court dismisses all claims against FDC.

## II. Gumino's Standing

FDC and Ignite argue that Gumino is not a proper plaintiff to this lawsuit because he is not a party to the contracts at issue. As noted above, an essential element for a breach of contract claim under New York law is the existence of a contract between the plaintiff and the defendant. *Diesel Props S.r.l.*, 631 F.3d at 53. A plaintiff cannot sue for breach of contract if the plaintiff is not a party to the contract or a third-party beneficiary of the contract. *BIB Constr. Co. v. City of Poughkeepsie*, 612 N.Y.S.2d 283, 284–85 (N.Y. App. Div. 1994).

As noted above, the Agent Contract clearly states that it is between and for the benefit of Ignite and ACS, and that Ignite's sponsor bank is the only third party beneficiary of the contract. *See supra* Section I. The specific parties to the Commissions Contract are not identified in the contract nor alleged in the complaint. *See supra* Section I. ACS and Gumino do not plead facts sufficient to allege that Gumino was a party to the Agent Contract or the Commissions Contract. Therefore, the Court grants FDC's and Ignite's motion to dismiss all claims asserted by Gumino. *See BIB Constr. Co.*, 612 N.Y.S.2d at 284–85 (holding that breach of contract cause of action

---

[7] Under New York law, other theories of liability exist for a non-party to a contract. *See TransformaCon, Inc.*, 2015 WL 4461769 at *3. However, because ACS and Gumino do not argue that these theories apply, the Court does not address their applicability to FDC and the facts of this case.

was correctly dismissed where no contractual relationship between plaintiff and defendants existed and plaintiff was not a third-party beneficiary of the defendants' contract with another party).

### III.     Statute of Limitations

FDC and Ignite argue that the Court should dismiss the complaint because an agreed-upon one-year statute of limitations bars each of the claims. The statute of limitations is an affirmative defense that need not be anticipated in the complaint in order to survive a motion to dismiss. *United States v. Lewis*, 411 F.3d 838, 842 (7th Cir. 2005). But that is not the case where "the allegations of the complaint itself set forth everything necessary to satisfy the affirmative defense, such as when a complaint plainly reveals that an action is untimely under the governing statute of limitations." *Id.*; *see also Brooks v. Ross*, 578 F.3d 574, 579 (7th Cir. 2009) (considering statute of limitations defense on motion to dismiss where relevant dates were set forth in the complaint). However, if there is "a conceivable set of facts, consistent with the complaint, that would defeat a statute-of-limitations defense, questions of timeliness are left for summary judgment (or ultimately trial), at which point the district court may determine compliance with the statute of limitations based on a more complete factual record." *Sidney Hillman Health Ctr. of Rochester v. Abbott Labs., Inc.*, 782 F.3d 922, 928 (7th Cir. 2015).

Here, the Agent Contract contains a statute of limitations clause, which states:

> the parties agree that any action, legal or equitable, based on, related to or arising out of the subject matter of this Agreement, and whether based on contract, tort, strict liability or some other legal or equitable theory of recovery, must be commenced by a party within one year after the earlier of (i) the date on which such party knew or should have known of the first alleged act, omission or violation, or (ii) with respect to obligations that do not survive termination of this Agreement, the date of termination of this Agreement.

9

Doc. 1-1 at 25. The parties do not dispute that the one-year statute of limitations applies to the claims. However, the parties disagree as to when the limitations period began to run. FDC and Ignite assert that the statute of limitations began to run when ACS first knew that they were not receiving the residuals and upfront payments to which they claim to be owed, which was as early as July and September 2014. However, ACS argues that the limitations period began to run in February 2016, which was the first time that FDC and Ignite "manifested their intent not to fulfill their obligations under the contract." Doc. 18 at 4. ACS further argues that Ignite and FDC are barred from asserting the statute of limitations under the doctrine of equitable estoppel.

To determine when ACS's breach of contract claims accrue, the Court looks to Illinois law.[8] Under Illinois law, the cause of action for breach of contract accrues "at the time of the breach of contract, not when a party sustains damages." *Hermitage Corp. v. Contractors Adjustment Co.*, 651 N.E.2d 1132, 1135, 166 Ill.2d 72, 209 Ill. Dec. 684 (Ill. 1995) (citing *W. Am. Ins. Co. v. Sal E. Lobianco & Son Co.*, 307 N.E.2d 804, 807, 69 Ill.2d 126, 12 Ill. Dec. 893 (Ill. 1977)).

A.  **Count I**

Count I of the complaint relates to an alleged failure to pay residuals. The Agent Contract states that "[o]n or about the 20th day of each calendar month Ignite Payments shall pay to [ACS] a Residual for Merchant Accounts boarded by [ACS] on or after the Effective Date that are Open Accounts in accordance with the terms set forth in Exhibit C." Doc. 1-1 at 22. Based

---

[8] The Agent Contract contains a provision that states that the contract is governed by New York law. However, "[a] federal court exercising diversity jurisdiction must apply the choice-of-law rules of the state in which it sits." *ABF Capital Corp. v. McLauchlan*, 167 F. Supp. 2d 1011, 1014 (N.D. Ill. 2001). Under Illinois choice-of-law rules, Illinois law controls procedural issues, such as statutes of limitations and related rules regarding commencement of actions, even when the contracting parties have included a choice-of-law provision in the contract. *Colonial Penn Life Ins. Co. v. Assured Enters., Ltd.*, 151 F.R.D. 91, 95 (N.D. Ill. 1993); *Cessna Fin. Corp. v. Brown*, No. 88 C 3369, 1995 WL 307026 at *1 (N.D. Ill. May 17, 1995).

10

on this provision of the contract, residual payments were due to ACS on a monthly basis. Therefore, a breach of contract claim for failure to pay residuals would accrue on the day in which residuals for a given month were due. Because ACS filed its complaint on August 31, 2016, a breach of contract claim for any unpaid residual that was due to be paid to ACS prior to August 31, 2015, is barred under the one-year statute of limitations.

ACS argues that equitable estoppel bars Ignite and FDC from asserting a statute of limitations defense because their conduct caused the delay in bringing the action. Under New York law, the doctrine of equitable estoppel applies when a plaintiff "was induced by fraud, misrepresentations or deception to refrain from filing a timely action" and when a plaintiff reasonably relied on the misrepresentations. *Zumpano v. Quinn*, 849 N.E.2d 926, 929 (N.Y. 2006). Whether a defendant should be equitably estopped from asserting the statute of limitations as a defense is generally a question of fact. *Local No. 4, Int'l Ass'n of Heat & Frost & Asbestos Workers v. Buffalo Wholesale Supply Co., Inc.*, 854 N.Y.S.2d 610, 612 (N.Y. App. Div. 2007) (quoting *Putter v. North Shore Univ. Hosp.*, 858 N.E.2d 1140, 1143 (N.Y. 2006)); *see also Bild v. Konig*, No. 09-CV-5576, 2011 WL 666259, at *6 (E.D.N.Y. Feb. 14, 2011) (holding that elements of equitable estoppel are typically questions of fact dependent on all the relevant circumstances) (citing *Lazzarino v. Warner Bros. Entm't, Inc.*, 831 N.Y.S.2d 354 (N.Y. Sup. Ct. 2006)).

Here, ACS argues in its response to the motion to dismiss that Ignite and FDC "consistently represented to [ACS and Gumino] that payments due under the contract were forthcoming" and that they reasonably relied upon these representations that Ignite and FDC "fully intended to pay the entire amount owed." Doc. 18 at 5–6. In support of its argument, ACS points to its complaint allegations regarding communications from FDC employees about

the payment of residuals. Whether these communications and ACS's reliance on them establish equitable estoppel to bar FDC's and Ignite's statute of limitations defense is a question of fact that cannot be determined at this stage of the proceedings. *See Local No. 4*, 854 N.Y.S.2d at 612 (holding that motion to dismiss based on statute of limitations was properly denied where "plaintiffs raised an issue with respect to the applicability of the doctrine of equitable estoppel"); *Bild*, 2011 WL 666259 at *6 (E.D.N.Y. Feb. 14, 2011) (denying motions to dismiss based on statute of limitations because plaintiff's allegations raised questions of fact regarding equitable estoppel). Therefore, the Court denies the motion to dismiss Count I based on the statute of limitations.

### B. Count II

Count II of the complaint relates to a failure to pay upfront payments. However, the Commissions Contract does not provide a date by which upfront payments are due to be paid to agents such as ACS. Therefore, it is unclear when a breach of contract for failure to pay the upfront payments would occur. Because the complaint does not "plainly reveal[] that [the] action is untimely under the governing statute of limitations," the Court denies the motion to dismiss Count II based on the statute of limitations. *See Lewis*, 411 F.3d at 842.

### C. Count III

Count III of the complaint relates to a failure to purchase ACS's future residuals under the Agent Contract's "offer to purchase upon retirement" provision. Doc. 1-1 at 23. The Agent Contract provides that "Ignite Payments hereby offers to purchase [ACS'] unencumbered rights to receive future Residuals if [ACS] ceases to conduct the business of soliciting merchants for the purchase of Services from Ignite Payments and any and all competitors of Ignite Payments," subject to additional terms and conditions not stated in the contract. *Id.* ACS alleges that on

December 15, 2015, Gumino requested a retirement buyout and Ignite denied his request. Based on these allegations, the breach of the Agent Contract's retirement provision would have occurred, at the earliest, on December 15, 2015. Because ACS filed its complaint on August 31, 2016, Count III falls within the applicable statute of limitations. The Court denies the motion to dismiss Count III based on the statute of limitations.

### D. Count IV

Count IV of the complaint relates to Ignite's termination of ACS. The Agent Contract provides that Ignite may terminate the contract upon five days prior written notice if any reasonable evidence is discovered indicating that ACS or its personnel "committed any act of misrepresentation, fraud, forgery, dishonesty or other willful or malicious act." Doc. 1-1 at 21. ACS alleges that "on or about January 2016," Ignite terminated ACS for alleged and unsubstantiated fraud. Doc. 1-1 ¶¶ 89–91. Based on this allegation, the breach of contract for wrongful termination would have occurred on or about January 2016. Because ACS filed its complaint on August 31, 2016, Count IV likewise was timely filed. The Court denies the motion to dismiss Count IV based on the statute of limitations.

## IV. Termination of Contract for Cause

FDC and Ignite argue that the Court should dismiss the entire complaint because Ignite terminated the Agent Contract for cause, which allowed Ignite to discontinue payment of any amounts due to ACS. Section 7.1(b) of the Agent Contract permits Ignite to stop payment of any amounts due to ACS after termination of the contract if Ignite terminates the contract for cause based on reasonable evidence that ACS or ACS's personnel committed "any act of misrepresentation, fraud, forgery, dishonesty or other willful or malicious act." Doc. 1-1 at 21. Because Ignite terminated ACS's contract for cause based on fraud, forgery, dishonesty, or other

willful or malicious acts, FDC and Ignite assert that they do not owe ACS anything. In response, ACS argues that, because its complaint challenges the legal justification for its termination for cause, the Court cannot dismiss its claims on that basis.

Count IV of the complaint alleges that "[a]t no point did Gumino partake in any fraudulent, dishonest, willful or malicious acts" and that Ignite breached the Agent Contract by terminating the contract for "alleged and unsubstantiated fraud." Doc. 1-1 ¶ 90. ACS further alleges that Ignite terminated the Agent Contract "to relieve Ignite of paying additional funds to Gumino and [ACS]." *Id.* ¶ 93. Whether Section 7.1(b) allows Ignite to discontinue payment of amounts due to ACS depends upon the resolution of Count IV, which is a question of fact that the Court cannot decide at this early stage of the proceedings. The Court therefore denies the motion to dismiss the complaint based on ACS's termination for cause.

## V.     Upfront Payments (Count I)

FDC and Ignite assert that the Court should dismiss Count I of the complaint, which seeks relief based on the failure to make "upfront payments," because ACS was not entitled to "upfront payments" under the Commissions Contract. FDC and Ignite base their argument on a provision of the Commissions Contract that states: "[t]he up-front commission offers apply only to new Tier 1 businesses with a multi year contract. Internet businesses and mail-order/telephone-order merchants who use an Internet gateway to process payments are *not* eligible." Doc. 1-1 at 41. FDC and Ignite assert that, according to Beauty Counter's Merchant Processing Agreement, Beauty Counter used "Mobile pay," which "by its very title requires telephone (mobile) ordering and requires an Internet gateway to process payments." Doc. 9 at 8.

In response, ACS argues that FDC's and Ignite's interpretation of the Commission Contract alters the previous interpretation of the contract. ACS contends that, during the course

14

of its relationship with FDC and Ignite, accounts using "Mobile pay" qualified for and received upfront payments. Further, ACS argues that even if FDC's and Ignite's interpretation is correct, their course of performance and affirmative actions demonstrate that the parties modified the contact and intended to be bound by $150 upfront payments for Beauty Counter accounts.

Under New York law, a contract can be modified "by another agreement, by course of performance, or by conduct amounting to a waiver or estoppel." *Belsito Commc'ns, Inc. v. Dell Inc.*, No. 12-CV-6255, 2013 WL 4860585, at *4 (S.D.N.Y. Sept. 12, 2013) (quoting *Dallas Aerospace, Inc. v. CIS Air Corp.*, 352 F. 3d 775, 783 (2d Cir. 2003)); *see also Gaia House Mezz LLC v. State Street Bank & Tr. Co.*, 720 F.3d 84, 90–91 (2d Cir. 2013) ("[A]ny written agreement, even one which provides that it cannot be modified except by a writing signed by the parties, can be effectively modified by a course of actual performance." (quoting *Harold J. Rosen Tr. v. Rosen*, 386 N.Y.S.2d 491, 499 (1976), *aff'd*, 371 N.E.2d 828 (1977))); *Janover v. Bernan Foods, Inc.*, 901 F. Supp. 695, 701 (S.D.N.Y 1995) (modification can be shown "if the evidence, taken as a whole, shows that the modification was authentic, or if the agreement was otherwise ratified by the parties' conduct"). Modification of a contract requires "some sort of mutual assent to its terms." *Belsito Commc'ns, Inc.*, 2013 WL 4860585 at *4. Where a plaintiff pleads sufficient factual content regarding an alleged modification to a contract and a subsequent breach of that modification, the claim can survive a Rule 12(b)(6) motion. *Id.*

Here, ACS has pleaded sufficient facts to allege a modification of the contract. The complaint alleges that Ignite and FDC employees represented to Gumino that he would receive upfront payments for the Beauty Counter accounts. Doc. 1-1 ¶¶ 23, 25, 26, 27. The complaint also alleges that Ignite offered to enter into an addendum agreement with ACS explicitly

providing for upfront payments for Beauty Counter "Mobile Pay" accounts. Doc. 1-1 at 68. Based on these facts, ACS has sufficiently alleged a modification to the Commissions Contract.

In the alternative, ACS argues that the Court should not dismiss Count I because the Commissions Contract is ambiguous. A court should not dismiss a breach of contract claim under Rule 12(b)(6) if the language of the contract is ambiguous. *Int'l Bus. Mach. Corp. v. Smadi*, No. 14 CV 4694, 2015 WL 862212, at *4 (S.D.N.Y. Mar. 2, 2015) (holding that when contract language is ambiguous, motion to dismiss should be denied); *LaSalle Commercial Mortg. Sec., Inc. v. Bank of Am., N.A.*, No. 13 C 5605, 2014 WL 4124249, at *4 (N.D. Ill. Aug. 21, 2014) (applying New York law and denying motion to dismiss breach of contract claim because contract language was reasonably susceptible to two different meanings and was ambiguous). Under New York law, a contract's language is ambiguous "if it is reasonably susceptible to more than one meaning." *Desner v. Educators Mut. Life Ins. Co.*, No. CV 13-6154, 2014 WL 4907603 (E.D.N.Y. Sept. 29, 2014) (citing *Maniolos v. United States*, 741 F. Supp. 2d 555, 567 (S.D.N.Y. 2010)). Contract language is not ambiguous if it has a "definite and precise meaning" for which there is "no reasonable basis for a difference of opinion." *Maniolos*, 741 F. Supp. 2d at 567 (quoting *Hunt Ltd. v. Lifschultz Fast Freight, Inc.*, 889 F.2d 1274, 1277 (2d Cir. 1989)).

Here, the term "internet business" is susceptible to more than one meaning. Doc. 1-1 at 41. The term could refer to a business that uses the internet generally or a business that uses the internet in only a specific way, such as accepting orders and receiving payments via a website. Neither the Commission Contract nor the Agent Contract defines this term. Because the term lacks a definite and precise meaning, it is ambiguous.

Because ACS has pleaded facts sufficient to allege a modification of the Commissions Contract's provision on upfront payments, and because the language of the provision is ambiguous, the Court denies the motion to dismiss Count I based on the upfront payments provision.

## VI. Damages Limited by Contract

FDC and Ignite argue that the Court should dismiss ACS's claims to the extent they seek damages in excess of $500,000 because the Agent Contract contains a limitation of liability provision. The provision states:

> Notwithstanding anything contained in this Agreement or otherwise, Ignite Payments' cumulative liability to [ACS] and anyone claiming by through or under [ACS], for all Damages arising out of or related to this Agreement, and regardless of the form of action or legal theory shall not exceed, in the aggregate, the lesser of aggregate Residuals paid to [ACS] in the twelve months preceding the act giving rise to the claim or $500,000.00. Agent understands the limitation on damages to be a reasonable allocation of risk and expressly consents to such risk allocation.

Doc. 1-1 at 25.

Under New York law, a contract clause that exonerates a party from liability or limits a party's damages is generally enforceable unless the party has engaged in willful or grossly negligent conduct. *Baidu, Inc. v. Register.com, Inc.*, 760 F. Supp. 2d 312, 318 (S.D.N.Y. 2010); *Sommer v. Fed. Signal Corp.*, 593 N.E.2d 1365, 1370–71 (N.Y. 1992). Gross negligence is "conduct that evinces a reckless disregard for the rights of others or 'smacks' of intentional wrongdoing." *Colnaghi, U.S.A., Ltd. v. Jewelers Prot. Servs., Ltd.*, 611 N.E.2d 282, 284 (N.Y. 1993) (citing *Sommer*, 593 N.E.2d at 1365).

FDC and Ignite assert that the complaint against them does not allege grossly negligent conduct and that the limitation of liability provision should therefore apply to this case. In response, ACS argues that the complaint alleges conduct amounting to "gross negligence at best,

and willful, fraudulent conduct at worst." Doc. 18 at 13. ACS argues that the facts alleged in its complaint show that FDC and Ignite "intentionally breached the contract at issue," "intentionally misled" ACS, and "wrongfully terminated" ACS. *Id.* at 14. Although the Complaint does not specifically state that FDC and Ignite were "grossly negligent" or "intentionally" breached the contracts, the Court will consider this argument raised in opposition to the motion to dismiss because it is consistent with the factual allegations in the complaint and does not raise a new claim. *See supra* n.4.

In its complaint, ACS alleges that Gumino communicated repeatedly with FDC and Ignite employees to request unpaid residual and upfront payments that were contained within the Agent Contract and the Commissions Contract. Doc. 1-1 at ¶¶ 23, 25, 26, 28, 29, 32, 34, 36, 37, 38, 40, 49, 50, 51, 53. Gumino also contacted FDC to request his buy-out. *Id.* ¶ 48. These complaint allegations and the exhibits attached to the complaint show that FDC and Ignite knew of and considered Gumino's various requests to receive payments to which he believed he was entitled under his contracts. These facts are sufficient to allege that FDC and Ignite breached the Agent Contract and Commissions Contract with intent or gross negligence. The Court therefore denies FDC's and Ignite's motion to dismiss claims seeking damages in excess of $500,000.

## CONCLUSION

For the foregoing reasons, the Court grants in part and denies in part FDC's and Ignite's motion to dismiss [8] and grants FDC's motion to dismiss [11]. The Court dismisses Gumino as a plaintiff in this action and dismisses FDC as a defendant in this action.

Dated: April 25, 2017

_____
SARA L. ELLIS
United States District Judge